## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LYDIA E. VEGA,

        Plaintiff,

        v.

CHICAGO PARK DISTRICT,

        Defendant.

No. 13-CV-451

Judge James B. Zagel

### MEMORANDUM OPINION AND ORDER

Plaintiff, Lydia E. Vega ("Vega"), brings seven counts against the defendant, Chicago Park District ("Park"), alleging unlawful employment discrimination. Count I claims discrimination on the basis of national origin in violation of 42 U.S.C. § 1981 ("§ 1981"). Counts II and V claim retaliatory action in violation of § 1981 and Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e *et seq*., as amended by the Civil Rights Act of 1991 ("Title VII"). Count III alleges discrimination based on national origin and gender in violation of Title VII. Count IV alleges a violation of Title VII based on gender discrimination for sex stereotyping. Lastly, Vega seeks redress based on state law claims for intrusion upon seclusion in Count VI and violation of the Illinois Eavesdropping Act, 720 ILCS 5-14/1 *et seq.*, in Count VII. I granted summary judgment for defendants on Count VII, so only Counts I through VI remain. For the following reasons, Park's motion to dismiss is denied in part and granted in part.

### I.    Background

Vega is an openly gay Hispanic female who worked for Park for twenty-two years before her termination on September 10, 2012, for allegedly falsifying work hours on her timesheet. Park divides its facilities into areas and further divides the areas into regions. Each park within an area

that contains a Class A or Class B facility has a supervisor, and all supervisors report to the same manager. Bessemer Park ("Bessemer") is located in the South Region of Area 6. In 2003, Park appointed Vega as a Class A park supervisor at Bessemer and she held that position until her employment ended. Throughout her career with Park, Vega received satisfactory or better performance reviews and, prior to the acts complained of herein, was never disciplined.

A central component to this case is the alleged Park timesheet practice. Vega describes the practice as a "one sheet only" paper system that requires employees to manually fill out their timesheets. The system uses one timesheet per employee, and the timesheet is permanently located at the employee's assigned park for each pay period. This practice, Vega claims, sometimes requires employees to fill out their timesheets prior to the end of the pay period, thus anticipating their work hours for the remainder of the pay period. Vega alleges that all of the Class A and B park supervisors in her region followed this timesheet practice.

At some point during Vega's employment, Shereece Childs ("Childs"), an African American Park employee, called Park's hotline and complained that Vega was often absent from work. Childs was allegedly performing poorly at the time of the complaint and a subordinate of Vega. Kenneth Teal, a friend of Childs, made another complaint when he expressed concern about African American children's access to park facilities used by a Hispanic organization. Later, in July of 2012, another subordinate African American employee reported a "false" complaint, stating Vega's park was unorganized and a child had been lost at the park's day camp. A fourth complaint was made in early September 2012 to report Vega's park was not open an hour after scheduled. Vega alleges she was at the park entrance when the call was made. According to Vega, all the complaints made against her came from racially-motivated African Americans.

In or around September 2011, Park assigned Michael Hester ("Hester") and Leroi Catlin ("Catlin"), both African American, to investigate Vega for her alleged failure to be present during claimed work hours at Bessemer. As part of the investigation, Hester and Catlin conducted surveillance on Vega, which involved following her vehicle (or vehicles thought to be owned by her) and using audio and video recording devices. At some point in the investigation, the device recorded an investigator saying Vega "looks like a guy."

Vega accuses the investigators of intrusive behavior, including "peering through the windows" of her home, asking invasive questions regarding family and friends, pulling her out of a scheduled training session, and telling other Park employees that Vega was not working all the hours she claimed. Vega states the manner in which she was investigated caused her to experience severe health problems. On one particular occasion, Vega claims she met with her manager and Hester at Bessemer and Hester said, "Well, I got you, I got you. So do you want to say something before I leave, because after I leave, I am closing the case and that's it."

Shortly after that encounter, Hester and Catlin interviewed Vega at Park headquarters, where she states she provided documentation of her whereabouts for most dates in question. Vega alleges the investigation was done in bad faith and caused her to experience severe health repercussions.

Following the investigation, Corrective Action Meetings were held on July 26, 2012, and August 23, 2012, to address Vega's purported failure to be at her assigned park during work hours on fifteen dates from October 11, 2011, to January 31, 2012. Vega claims she provided written documentation verifying her work hours, including names of witnesses. She believes her verification documents were discounted and dismissed by Park. On September 10, 2012, Park issued a Corrective Action Meeting Disposition letter that terminated Vega's employment. Vega

alleges the reasons given for her termination were pretextual, discriminatory, and not supported by the investigation results.[1] She further claims that, at a post-termination appeal hearing, Park attorneys asked questions about the length and style of her hair and style of her dress.

During the investigation, Vega's attorney contacted Park's legal counsel to "inquire about what appeared to be unprofessional and prejudicial behavior of [Hester and Catlin] and to state that [Vega] felt she was experiencing discriminatory treatment." After the second Corrective Action Meeting, and six days before her termination notice, Vega sent a letter to Park's Director of Human Resources explaining she felt discriminated against based on her national origin and because African Americans investigated her after other African Americans made complaints. She claims the basis for the investigative findings that she was not at Bessemer during work hours was that Hester and Catlin could not locate her car at the park. Vega contends her responsibilities had actually taken her elsewhere. She states that no Caucasian or African American Class A or B park supervisor has been "investigated or terminated for failure to be as [sic] their assigned park while performing Park responsibilities at other locations or because their vehicles were not in the parking lot of the park at which they worked."

Vega provides the following statistics and examples to support her claims: From January 2008 to the present, Park has employed approximately seventy-six Class A park supervisors and twenty-eight Class B park supervisors.[2] In 2008, Hispanic female supervisor Maria Ortiz ("Ortiz") was investigated and terminated by Park and is currently contesting that termination. During 2010, Park employed seven Class A and B park supervisors who were Hispanic females.

---

[1] The reasons given for Vega's termination were: "failure to be present for duty at assigned times and places, failure to be truthful in all statements signed by her in connection with Park employment, and failure to be truthful in any testimony or other statements made during a disciplinary hearing, pre-suspension meetings, or any other proceeding at any point in the disciplinary process."

[2] Park argues Vega's statistics "drastically understate[]" the actual number (206) of park and playground supervisors.

From 2010 to September 2012, Park investigated and terminated Nereida Avile ("Avile"), a Hispanic female supervisor. Martha Ramirez ("Ramirez"), a Hispanic female supervisor, retired in 2011 while under investigation. Ramirez experienced "severe health issues" resulting from her investigation that forced her into retirement, Vega alleges. Of the preceding supervisors, none were replaced by a Hispanic female and, since 2008, Park has not appointed a Hispanic female to a Class A or B park supervisor position.

During the time of the acts of which Vega complains, Park employed four Class A and six Class B park supervisors in South Region, Area 6. Of the ten supervisors, two were Hispanic females (Vega and Ramirez). Vega argues that other Class A and B park supervisors in her region worked away from their assigned parks and followed the timesheet practice, but the only supervisors investigated by Park for inaccurate timesheets were Vega and Ramirez. She claims that, although Park could have terminated all Class A and B park supervisors in her region for her alleged infractions, no such supervisor has even been investigated in the past five years.

Vega filed charges against Park with the Equal Employment Opportunity Commission ("EEOC") on or around October 12, 2012, alleging acts of discrimination based on gender, age, and national origin. The EEOC issued Vega a Right to Sue letter, which she received on October 24, 2012. Vega filed a second charge against Park with the EEOC on or around November 21, 2012, alleging Park engaged in retaliatory action. Vega received a Right to Sue letter on her retaliation charge dated December 21, 2012. Vega filed this complaint on January 18, 2013.

## II. Standard of Review

A party may motion the court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a complaint for dismissal, the allegations are viewed "in the light most favorable to the plaintiff" with "all possible inferences"

drawn in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This requirement seeks to provide the defendant with "fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Additionally, factual allegations must only "state a claim to relief that is plausible on its face" and "above the speculative level." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Seventh Circuit has interpreted the "fair notice" and plausibility requirements as "two easy-to-clear hurdles" in the pleadings stage. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007); *Tamayo*, 526 F.3d at 1084 (discussing the "minimal pleading standard for simple claims of race or sex discrimination"). Pleading "a short and plain statement of the claim" requires only "very minimal" factual detail. *Concentra*, 496 F.3d at 779.

### III.  Discussion

#### A.  Counts I and III Alleging Discrimination Satisfy Federal Pleading Standards

The first issue to address is whether Vega has pled plausible discrimination claims under § 1981 and Title VII.

In Count I, Vega alleges that Park discriminated against her based on her national origin (Hispanic) in violation of § 1981. To state a claim under § 1981, Vega must plead (1) she is a "member[] of a racial minority;" (2) Park intended to discriminate against her based on race; and (3) the discrimination concerned activities listed in the statute, including "the making,

performance, modification, and termination of contracts, and the enjoyment of all benefits … of the contractual relationship." *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996); 42 U.S.C. § 1981.

Because Park is a public employer, Vega must also allege that her injury resulted from a municipal custom or policy. *Simmons v. Chi. Pub. Library*, 860 F. Supp. 490, 492 (N.D. Ill. 1994). Alleging an express city policy is not necessary; rather, "a pattern of conduct by non-policy-making municipal employees may rise to the level of a city policy, custom or usage which is sufficient to give rise to municipal policy." *Id.* (quoting *McLin v. City of Chi.*, 742 F. Supp. 994, 997-98 (N.D. Ill. 1990)). Pleading "a series or pattern of misconduct" allows an inference "that the municipality was aware of a problem but acted with deliberate indifference by ignoring it." *Jones v. Vill. of Villa Park*, 784 F. Supp. 533, 535 (N.D. Ill. 1992). Similarly, alleging that the municipality has tacitly authorized the pattern or custom shown as its policy may create an inference of a custom or policy. *Id.*

Here, Vega has satisfied the first and third elements of the test by pleading she is a member of a protected class (Hispanic) and that her employment termination constitutes the "termination … of the contractual relationship." *See Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 372-73 (2004). Vega sufficiently pleading a plausible claim establishing a municipal policy, practice, or custom of discrimination against Hispanics would, on its face, satisfy the second element.

Vega's allegations list numerous instances of discrimination and create a possible inference that Park "was aware of the misconduct and tacitly authorized and/or condoned it." *Cf. Simmons*, 860 F. Supp. at 493 ("Because Count IV describes a number of allegedly discriminatory incidents, rather than a single such event, it is possible to infer that the City was aware of the misconduct and tacitly authorized and/or condoned it."). In *Simmons*, the plaintiff's allegations

that the city's failure to investigate her complaint and other unequal treatment constituted discrimination was sufficient to survive a motion to dismiss. Here, in addition to claiming Park's failure to investigate her complaints was discriminatory, Vega also alleges the decisions to investigate and terminate her were discriminatory. She argues that the complaints prompting the investigation were unfounded and that she was terminated for engaging in a timecard practice that all other supervisors, including Caucasians and African Americans, took part in. Although Park was aware all supervisors engaged in this practice, it chose only to investigate Vega and Ramirez (another Hispanic supervisor) for the infraction, and no other supervisors in the region have been investigated in the past five years. Accepting Vega's allegations as true, the decision to investigate only Hispanics for the timecard practice creates a possible inference that Park was aware of discriminatory behavior and acted with "deliberate indifference" or "tacitly authorized" the practice. *Cf. Moore v. City of Chi.*, No. 97-C-2170, 1998 WL 160891, *6 (N.D. Ill. Mar. 31, 1998) (allegations that plaintiff and other African Americans were subjected to random drug tests and unequal treatment compared to Caucasian officers created an inference of city awareness and authorization).

Park puts forward two main arguments as to why Vega has not pled a plausible discrimination claim under § 1981. First, gender is not a protected class under § 1981, and Vega's claims and statistics rely on her status as a "Hispanic female." *See Friedel v. Madison*, 832 F.2d 965, 966 n. 1 (7th Cir. 1987) (noting that "claims of sex discrimination are not cognizable under section 1981"). Park cites to *Vasquez v. City of Reno*, 461 F. Supp. 1098 (D. Nev. 1978) to argue that Vega's discrimination claim under § 1981 must be based solely on national origin rather than a hybrid form of discrimination. In *Vasquez*, the court dismissed the plaintiff's claim because it "inextricably intertwine[d]" a scheme of race, age, and sex

discrimination. *Id.* at 1100.

While *Vasquez* calls into questions Vega's use of statistics to prove her claim, her allegations of discriminatory investigations remains plausible. Contrary to *Vasquez*, Vega only alleges discrimination based on national origin under her § 1981 claim. In *Moore*, allegations that other African Americans were subjected to unequal treatment compared to Caucasian officers was sufficient to survive a motion to dismiss. 1998 WL 160891, *6. Similarly, Vega alleges that only Hispanics, albeit Hispanic females, were investigated for infractions that other non-Hispanics practiced. Thus, those employees outside her protected class were treated more favorably. At this stage of the pleadings, where all possible inferences are drawn in Vega's favor, she has pled a plausible claim of discrimination against Hispanics.[3]

Second, Park argues that Vega's claim of a pattern or practice of discrimination rests on her investigation alone, and only one instance of discrimination is not enough to establish a pattern or practice. In support, Park cites *Davis v. Metro. Pier & Exposition Auth.*, No. 11 C 9018, 2012 U.S. Dist. LEXIS 91710 (N.D. Ill. July 3, 2012) and *Johnson v. Hart*, No. 10 C 240, 2011 U.S. Dist. LEXIS 48397 (N.D. Ill. May 5, 2011). In *Davis*, the court dismissed the plaintiff's discrimination claim because there were no allegations "that the Defendants acted on a discriminatory basis towards any other employees." 2012 U.S. Dist. LEXIS 91710, *36. In *Johnson*, the court held that more than a single incident is needed to establish a policy or practice claim. 2011 U.S. Dist. LEXIS 48397, *16 (claim dismissed where inmate alleged a policy or practice of discrimination based solely on his dissatisfaction with the medical care he received).

Contrary to *Davis*, Vega pleads that three other Hispanics (Ortiz, Avile, and Ramirez) were

---

[3] It should be noted that, moving forward, if Vega wants to *prove* her claim through the use of statistics, she must use the relevant proportion of supervisors, which would include Hispanic males. *Cf. E.E.O.C. v. Chi. Miniature Lamp Works*, 947 F.2d 292, 305-06 (7th Cir. 1991) (reversing district court judgment for relying on skewed statistics).

subjected to investigations. Of these three employees, Ortiz is currently contesting her termination and the manner in which Ramirez was investigated drove her into retirement. Vega specifically claims that Park investigated Ramirez for alleged time sheet infractions. Unlike the plaintiff in *Johnson*, Vega is not attempting to prove a policy or practice of discrimination based solely on the decision to investigate her. In addition to providing various statistics and naming other Hispanics who possibly experienced discriminatory treatment, she also alleges that the decisions to terminate her and not respond to her complaints constituted discriminatory behavior.

Vega has pled sufficient facts for a plausible discrimination claim under § 1981 and provided fair notice to Park of her claim and the grounds upon which it rests. Accordingly, Park's motion to dismiss Count I is denied.

Next, Vega alleges in Count III that Park discriminated against her based on national origin and gender in violation of Title VII. Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Unlike a § 1981 claim, a plaintiff does not need to plead the existence of a pattern or practice of discrimination under Title VII. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (explaining how an employer is subjected to vicarious liability).

The Seventh Circuit has repeatedly held "that a plaintiff alleging employment discrimination under Title VII may allege these claims quite generally." *Tamayo*, 526 F.3d at 1081. While "a complaint must contain something more than a general recitation of the elements of the claim," there is a "minimal pleading standard for simple claims of race and sex discrimination." *Id.* (citing *Concentra*, 496 F.3d at 781-82); *see Davis*, 2012 U.S. Dist. LEXIS 91710, *19-20 (discussing minimal pleading standards in race and sex discrimination cases).

Here, Vega alleges that Park has discriminated against employees based on national origin (Hispanic) and gender (female). Park has spent a better part of its Motion to Dismiss and Reply on this count arguing that Vega has failed to make a "similarly situated" argument (*i.e.*, that similarly situated employees were treated more favorably than Vega). However, the "similarly situated" argument is an evidentiary standard applicable at the summary judgment stage; it is not a requirement in reviewing the sufficiency of a complaint. *See Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) ("[c]omplaints need not plead law or match facts to every element of a legal theory").

More specifically, courts in the Seventh Circuit have interpreted the "similarly situated" argument as a method to prove discrimination through indirect evidence and the burden-shifting method laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005); *Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir. 2005); *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1034 (7th Cir. 2004). The plaintiff's requirement to establish a prima facie case under *McDonnell Douglas* is an evidentiary standard, not a pleading standard. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). The Supreme Court has "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that the plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511.

In *Swierkiewicz*, the plaintiff's allegations "easily satisfie[d]" pleading requirements. The plaintiff alleged he was terminated based on his national origin, included relevant events and dates leading up to his termination, and listed the nationalities of some of the people involved in his termination. *Id.* at 514. Similarly, Vega claims her investigation and termination resulted from her national origin and gender. She lays out specific instances, dates included, of alleged

discriminatory behavior, ranging from the complaints that prompted the investigation, to Park's failure to investigate her complaints, and ultimately her termination. She pleads the names and nationalities of those who made complaints against her and investigated her. Similar to the plaintiff in *Swierkiewicz*, Vega has given Park notice of her claims and the grounds upon which they rest, perhaps in more detail than needed.

Although, as noted above, Vega is not yet required to establish a prima facie case of discrimination under the *McDonnell Douglas* framework, my analysis of the sufficiency of her pleadings may still be informed by the requirements of the test. The *McDonnell Douglas* framework requires a plaintiff to prove (1) she is in a protected class; (2) she was meeting employer expectations; (3) she was the recipient of an adverse employment action; and (4) similarly situated employees outside her protected class were treated more favorably. *Ballance*, 424 F.3d at 617.

Here, Vega pleads she is a member of a protected class (both Hispanic and female). Prior to the events complained of, she received satisfactory or better performance reviews and was never subjected to discipline. Thus, she was meeting Park's expectations. As a result of her termination, Vega suffered an adverse employment action. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006) ("[f]iring Tomanovich … clearly constituted a materially adverse action"). She alleges that all supervisors in her region reported to the same manager and all supervisors followed the same timesheet practice, which involved filling our hours other than those actually worked. Even though Park was aware that all supervisors engaged in this practice, it chose only to investigate Hispanics and females. In support, Vega provides the name of another Hispanic female (Ramirez) who was investigated for the timesheet practice. Vega further alleges that Park has not terminated Caucasian or African American

supervisors for the reasons given for her termination, even though these supervisors engage in the same behavior. These allegations create at least a plausible claim that similarly situated supervisors were not disciplined similarly.

Park puts forward numerous arguments questioning the sufficiency of Vega's pleadings. First, Park argues that Vega has not provided any specific individual comparisons in proving a "similarly situated" argument. Second, Park again argues that any "similarly situated" argument fails because Vega does not allege other supervisors who received complaints against them were not investigated. Third, Vega has not provided statistics showing that all or most women, not just Hispanic women (or all or most Hispanics, not just Hispanic women), are more harshly treated for timecard infractions.

As addressed above, there is no requirement at this stage in the pleadings to prove that "similarly situated" employees were treated more favorably than Vega. Regardless, a plaintiff attempting to prove this element "need not demonstrate complete identity" of similarly situated individuals. *Luster v. Ill. Dept. of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011). Additionally, Vega has pled that the complaints made against her were unfounded and racially-driven, which discounts the argument that she was not similarly situated to supervisors receiving no complaints. Likewise, Vega is not required to plead that all women, or all Hispanics, experienced similar discrimination. *See Diaz v. Kraft Foods*, 653 F.3d 582, 587 (7th Cir. 2011) ("the principal focus of [Title VII] is the protection of the individual employee, rather than the protection of the minority group as a whole") (quoting *Connecticut v. Teal*, 457 U.S. 440, 453-54 (1982)). "Discrimination against one Hispanic [or female] employee violates the statute . . . ." *Diaz*, 653 F.3d at 588.

At this stage, Vega is allowed to plead her claims "quite generally," which she has done by

arguing that non-Hispanics and males followed the exact practices she did, with Park's knowledge, but were not investigated or terminated. She need not plead all facts that are entailed in her claim and she has met the minimal pleading requirements for a race and sex discrimination case.[4]

Accordingly, Park's motion to dismiss Count III is denied.

### B. *Counts II and V Alleging Retaliation Satisfy Federal Pleading Standards*

The next issue to address is whether Vega has pled plausible retaliation claims under § 1981 and Title VII.

A plaintiff is entitled to bring a retaliation claim under § 1981 against a municipality. *Smith v. Bray,* 681 F.3d 888, 896 (7th Cir. 2012). A retaliation claim "occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Id.* Similarly, it is unlawful "for an employer to discriminate against any of his employees or applicants for employment … because he has opposed any practice made an unlawful employment practice by [Title VII]. 42 U.S.C. § 2000e-3(a). Methods of proof and substantive standards applying to Title VII retaliation claims also apply to § 1981. *Smith*, 681 F.3d at 896; *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).

Under both statutes, a plaintiff may plead a retaliation claim through either the direct or indirect methods of proof. *Smith*, 681 F.3d at 896. Vega's complaint does not specify whether she is proceeding under the direct or indirect method, but her allegations appear to follow the direct method. Under the direct method, Vega must plead (1) that she "engaged in a statutorily protected activity; (2) "suffered a materially adverse action" by Park; (3) and a causal connection between the two. *Stephens*, 569 F.3d at 786. Vega can plead causation through circumstantial

---

[4] If Vega wishes to prove her claims after pleadings by the use of statistics, she may have difficulty doing so without a complete breakdown of the genders and national origins of all the supervisors.

evidence that would permit an inference of retaliation absent an employer's admission. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). Types of circumstantial evidence include "suspicious timing" and "pretextual reason[s] for an adverse employment action." *Id.* Vega is not required to prove a prima facie retaliation claim; she must only plead facts to create an inference of a plausible claim. *See Compton v. Lowe's Cos.*, No. 08-cv-809-JPG, 2010 U.S. Dist. LEXIS 71182, *9-10 (S.D. Ill. July 15, 2010) (explaining how a plaintiff may plead less for a retaliation claim at the pleadings stage compared to the summary judgment stage).

First, Vega claims she engaged in statutorily protected activity when her counsel, on her behalf, called Park's counsel to advise of the discriminatory treatment Vega felt she was experiencing. Later, Vega sent a detailed letter directly to the Deputy Director of Human Resources and the Inspector General that specifically stated she felt she was experiencing harassment and discrimination based on her national origin (Hispanic) and requested an investigation.

The first complaint to Park's counsel, standing alone, would likely be insufficient to satisfy the first element because it was never specified that Vega felt the discriminatory treatment was due to the fact she is Hispanic. *See Tomanovich*, 457 F.3d at 663 ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."). However, in Vega's second complaint via letter, she specifically states that she believed "the harassment [was] due to the fact that [she is] a Hispanic …." Because Vega pleads the harassment resulted from her Hispanic origin, the allegation is sufficient to satisfy the first element. *See id.* at 664 (holding certain internal reports did not satisfy the first element because they did not specify that the plaintiff felt his discrimination resulted from his national origin).

Park argues that, in order for Vega to allege she engaged in a statutorily protected activity she believed violated Title VII, the belief must be reasonable. *Compton*, 2010 U.S. Dist. LEXIS 71182, *10. In order for the belief to be reasonable, the opposed and reported behavior "must actually be prohibited by Title VII." *Id.* In *Compton*, an African American alleged she was wrongfully written-up by her Caucasian, male supervisor after complaining that the supervisor was a racist and chauvinist. *Id.* The court held that it was reasonable to infer that her complaints were based on her belief that violations of Title VII had occurred, specifically race and gender discrimination. *Id.* at *10-11.

In the instant case, Vega alleges the decision to investigate her was discriminatory because she had performed satisfactory or better until the events in question but was investigated based on unfounded, racially-motivated complaints. Her allegation she was discriminatorily targeted is further supported by her assertion that all supervisors, including Caucasians and African Americans, were following the timecard practice, but only Hispanics were investigated for the actions. These allegations are sufficient to support a reasonable belief of unlawful behavior.

Next, Vega's termination is sufficient to constitute a "materially adverse employment action" taken by Park. *See Tomanovich*, 457 F.3d at 664 ("[f]iring Tomanovich … clearly constituted a materially adverse action"). The question is whether Vega has pled sufficient facts to create an inference of causation under the third prong.

Generally, "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). However, "[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link." *Scaife v. Cook*

*Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006) (quoting *Lang v. Ill. Dept. of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004).

Most cases in the Seventh Circuit holding that suspicious timing was not enough to establish a causal connection of retaliation involved timeframes lasting longer than a month. *See, e.g., O'Leary*, 657 F.3d at 635 (two-month timeframe failed to establish a causal connection); *Longstreet v. Ill. Dept. of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002) (four-month timeframe failed to establish a causal connection); *Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913, 919 (7th Cir. 2000) (three-month timeframe failed to establish a causal connection). Vega alleges she was terminated within one week of her written complaint to Park. In any event, *Scaife* dealt with evidence allowing a plaintiff to survive summary judgment; as noted several times above, Vega is only trying to survive a motion to dismiss, where considerably less is required.

In addition, Vega claims the reasons given for her termination were pretextual and "admittedly not supported by the report of the Defendant's Investigators." As evidence of pretext, Vega claims she provided Park with documentation and names of witnesses confirming she was working on the dates in question. Vega further claims she performed satisfactorily or better and was never disciplined before the events in question. She also pleads that the only complaints made against her were unfounded and racially-driven. Lastly, Vega specifically requested an investigation in her written complaint and, rather than investigating, Park terminated Vega's employment. These allegations, taken together, create a reasonable inference of causation and satisfy minimal pleading standards.

Park cites to *Tomanovich* to argue that Vega failed to claim that supervisors outside her protected class were treated more favorably when opposing discriminatory behavior. As discussed, proving a "similarly situated" argument is an evidentiary standard and used under the

indirect method; Vega's retaliation claim is facing a motion to dismiss and proceeding under the direct method. Park then cites to *Green v. Scurto Cement Constr., Ltd.*, 820 F. Supp. 2d 854, 857 (N.D. Ill. 2011) to argue that Vega must allege Park "systematically retaliated against employees of any national origin or gender or race who opposed discriminatory practices involving race or national origin." Park's argument is not clearly supported by *Green*, a case in which the court discussed minimum pleading requirements for a retaliation claim and found the defendants "ask[ed] too much at the pleading stage." *Green*, 820 F. Supp. 2d at 858.

Accordingly, Park's motion to dismiss Counts II and V is denied.

### C. Count IV Alleging Sex Stereotyping Satisfies Federal Pleading Standards

The next issue to address is whether Vega has sufficiently pled a sex stereotyping claim under Title VII.

In addition to sexual discrimination or harassment, a plaintiff may also allege a sex stereotyping claim under Title VII. *See generally Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989) (discussing sex stereotyping claims). Remarks in the workplace based on sex stereotypes do not "inevitably prove that gender played a part in a particular employment decision." *Id.* at 251. A "plaintiff must show that the employer actually relied on … gender in making its decision." *Id.* However, "stereotyped remarks can certainly be *evidence* that gender played a part." *Id.* (emphasis in original).

In sex stereotyping cases, Justice O'Connor's concurring opinion in *Price Waterhouse* is often cited to help explain the law:

> Thus, stray remarks in the workplace … while perhaps probative of sexual harassment, cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard.

*Id.* at 277 (O'Connor, J., concurring).

Vega claims Park discriminated against her because her physical appearance does not conform to the female stereotype. She further claims her unconventional appearance factored into Park's decision to investigate and terminate her employment. Vega puts forward two occasions as evidence. First, the investigator's comment that Vega "looks like a guy." Second, the questions Park's attorney asked Vega about the length and style of her hair and the style of her dress.

The workplace comments in the instant case do not rise to the level of those in *Price Waterhouse*. *See id.* at 235 (sex stereotyping found where female plaintiff denied partnership and employer relied on gender stereotyped comments as motivating factor in decision, including comments that plaintiff was "macho," "overcompensated for being a woman," and was told to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry"). However, *Price Waterhouse* dealt with requirements for a plaintiff to *prove* a prima facie case, which is not the pleading standard at the motion to dismiss stage. Vega is only required to plead enough facts for a plausible claim, with reasonable inferences drawn in her favor.

Standing alone, the comment by the investigator would not create an inference that Park investigated and terminated Vega because of her noncompliance with the female stereotype. As pointed out by Park, the investigation had already commenced by the time the investigator made the comment. It is the questions by Park's attorney at the post-termination hearing that presents more probative evidence that Vega's unconventional physical characteristics possibly played at least some role in the decision to terminate her. There is, in fact, little explanation as to why else the attorney asked the questions.

19

Park argues that Vega has failed to create an inference of causation between her alleged instances of sex stereotyping and the decision to investigate then terminate her. By providing at least two instances of stereotypical comments and questions, Vega's claim exceeds the speculative level. She has put forward at least some evidence to allow her to explore the claim further.[5] *See Creed v. Family Express Corp.*, No. 3:06-CV-465RM, 2007 U.S. Dist. Lexis 57680, *11 (N.D. Ind. Aug. 3, 2007) ("[W]hether [defendant] acted with a stereotypical motivation needn't be determined at [the motion to dismiss] stage…. [Plaintiff's] factual allegations supporting her claim she was terminated because of her failure to comply with male stereotypes supports a plausible claim she suffered discrimination because of her sex."); *see also Lust v. Sealy, Inc.*, 277 F. Supp. 2d 973, 981 (W.D. Wis. 2003) (whether supervisor's decision to not recommend plaintiff was based on sex stereotypes under Title VII action was a question for the jury).

Accordingly, Park's motion to dismiss Count IV is denied.

### D. Count VI Alleging Intrusion Upon Seclusion Partially Satisfies Federal Pleading Standards

The final issue to address is whether Vega has pled a plausible state law claim for intrusion upon seclusion.

The elements to state a claim for intrusion upon seclusion are: (1) an unauthorized intrusion or prying into a plaintiff's seclusion; (2) the intrusion would be "highly offensive or objectionable to a reasonable person;" (3) the matters upon which the intrusion occurred were private; and (4) the intrusion caused anguish and suffering. *Busse v. Motorola, Inc.*, 813 N.E.2d 1013, 1017 (Ill. App. Ct. 2004). The third element requiring allegations of private facts is a

---

[5] It should be noted that moving forward Vega must produce evidence showing those responsible for terminating her employment considered her nonconformity with the female stereotype in their decision (illegitimate reason), rather than strictly the reasons given in her termination letter (legitimate reasons).

"predicate for the other three." *Id.* ("Without private facts, the other three elements of the tort need not be reached."). Thus, it is not sufficient if the behavior complained of only intrudes into personal, rather than private, matters. *Id.*

While personal information can include names and social security numbers, private facts are "facially embarrassing and highly offensive if disclosed." *Cooney v. Chi. Pub. Sch.*, 943 N.E.2d 23, 32 (Ill. App. Ct. 2010). Examples of private facts include "family problems, romantic interests, sex lives, health problems, future work plans and criticism of [an employer]." *Busse*, 813 N.E.2d at 1018. Other examples of prying into private matters are opening a person's mail, searching a person's safe or wallet, and reviewing a person's banking information. *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 424 (Ill. 2012) (citing Restatement (Second) of Torts § 652B cmt. b (1977)).

In this case, only the second and third elements are contested. Vega alleges that Park investigators intruded into her seclusion through the following activities: using audio and video recording devices to record her and vehicles believed to be owned by her at home, work, and elsewhere; peering into the windows of her home; following Vega and various vehicles believed to be owned by Vega; making untruthful statements to other employees that Vega was not working all the hours she claimed; following Vega and tracking her off-duty affairs; questioning Vega in a hostile manner about family and friends and their vehicles; and threatening Vega in the course of the investigation.

Of all Vega's allegations, the only one that involves "highly offensive" intrusion into private matters is her claim that the investigators peered into the windows of her private residence. *Jorgan v. Simmons*, 704 F. Supp. 2d 814, 822 (N.D. Ill. 2010) ("examples of actionable intrusion upon seclusion would include … peering into the windows of a private home") (quoting *Benitez*

*v. KFC Nat'l Mgmt. Co.*, 714 N.E.2d 1002, 1006 (Ill. App. Ct. 1999)). Indeed, "the core of

[intrusion upon seclusion] is the offensive prying into the private domain of another." *Lovgren v.

Citizens Nat'l Bank of Princeton*, 534 N.E.2d 987, 989 (Ill. 1989) (citing Restatement (Second)

of Torts § 652B cmt. a, b (1977)).

In its defense, Park argues that the peering was done from a public space and cites two cases

in support. First, Park relies on *Schiller v. Mitchell* to argue that the peering was lawful if it was

done from a public location. 828 N.E.2d 323, 329 (Ill. App. Ct. 2005) (camera "aimed at

plaintiffs' garage, driveway, side-door area, and backyard" from a public space not an actionable

intrusion upon seclusion claim). Second, Park cites *Bahrs v. Blakey* to provide more support for

its argument that peering from a public location is lawful. 2012 IL App. (4th) 110940-U, ¶19 (Ill.

App. Ct. 2012) ("watching from a distance" and looking into publically parked van insufficient

to state an intrusion upon seclusion claim).

The instant case is distinguishable from *Schiller* and *Bahrs* in that Vega does not allege the

investigators viewed her in areas immediately surrounding her home (*i.e.*, a garage, driveway,

etc.) or in other public areas; rather, she claims the investigators actually peered into her private

residence. While Park argues that Vega did not plead that any "facially embarrassing" or

"offensive behavior" was witnessed, peering into windows of a person's residence is precisely

the type of activity that leads to observing this private behavior. *Cf. Benitez*, 714 N.E.2d at 1006

(poking holes in ceiling of women's restroom and viewing plaintiffs is sufficient intrusion upon

seclusion claim); *Acuff v. IBP, Inc.*, 77 F. Supp. 2d 914, 927 (C.D. Ill. 1999) (videotaping of

medical examination found to be "highly offensive" behavior). Similar to a bathroom or

operating room, a person's residence is a location where one expects a certain degree of privacy.

Vega's claim that the investigators peered into her windows is conceivable because part of the

investigation admittedly entailed determining her location at different times.

Park argues that in Vega's Response she added allegations, stating the investigators "walked up to and peered through the windows of [Vega's] home," even though the Amended Complaint only alleged the investigators "peer[ed] through the windows." Any possible defenses to Vega's claim, such as the peering being done lawfully from a public location or the investigation being carried out in good faith, should be raised at the evidentiary stage.

None of the other allegations made by Vega relating to the methods used by Park to carry out the investigation rise to the level of "highly offensive" behavior or intrude into private matters. The simple fact that the investigators followed Vega and tracked her throughout the day does not suggest there was an intrusion into private matters. *See Bahrs*, 2012 IL App. (4th) 110940-U, ¶19 (watching someone from a distance not sufficient to state a cause of action for intrusion upon seclusion). Any videotaping done from a public location is lawful as long as the person being videotaped is not in a private location, such as her personal residence. *See Schiller*, 828 N.E.2d at 328-29. Likewise, general questions about family and friends and their vehicles do not intrude into any "facially embarrassing" or private information.

Vega cites to *Johnson v. K-Mart* to argue that the investigators falsely telling other employees that Vega was not at work when she claimed to be constitutes actionable intrusion upon seclusion behavior. 723 N.E.2d 1192, 1196-97 (Ill. App. Ct. 2000) (finding genuine issues of fact remained as to whether there was an intrusion upon seclusion when detectives disguised as employees gathered "highly personal information" about employees). An investigation commenced for clear business reasons, Vega argues, that also elicits private facts is actionable intrusion upon seclusion. In *Johnson*, the disguised investigators gathered information related to "employees' family problems, health problems, sex lives, future work plans, and attitudes about

defendant and reported this extremely personal information to defendant." *Id.* at 1196. Here, the investigators telling other employees Vega was not at work when she claimed to be falls drastically short of the personal information reported in *Johnson*. Any argument that the investigators' report contained private facts outside of information related to the charges brought against Vega rests on pure speculation and must be dismissed.

Aside from peering into the windows of Vega's private residence, none of the other allegations are sufficient to state a plausible claim for intrusion upon seclusion. Accordingly, Park's motion to dismiss Count VI is granted for all claims except the claim that the investigators peered into Vega's windows. With respect to that allegation, Park's motion to dismiss Count VI is denied.

I note that, in light of the preceding discussion, the issues raised in this case may be more properly addressed at the summary judgment stage.

### IV. Conclusion

For the foregoing reasons, Park's motion to dismiss is denied in part and granted in part. The motion to dismiss Counts I through V is denied. All allegations under Count VI are dismissed except the allegation that the investigators peered through the windows of Vega's private residence. With respect to that allegation, Park's motion to dismiss Count VI is denied.

ENTER:

James B. Zagel
United States District Judge

DATE: July 25, 2013