**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LYDIA E. VEGA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13 cv 00451 |
| | ) | |
| v. | ) | Judge James B. Zagel |
| | ) | |
| CHICAGO PARK DISTRICT, | ) | Magistrate Judge Daniel G. Martin |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO CHICAGO**
**PARK DISTRICT'S COMBINED MOTION AND MEMORANDUM**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff, LYDIA VEGA, ("Plaintiff" or "Vega"), by and through her attorneys, Offices of Catherine Simmons-Gill, LLC, and for her Memorandum of Law in Response to Defendant CHICAGO PARK DISTRICT's ("Defendant" or "CPD") Combined Motion and Memorandum In Support of its Motion for Summary Judgment ("MSJ" or "Defendant's motion") states as follows:

**TABLE OF CONTENTS**

**INTRODUCTION**…………………………………………………………….............................1

**STATEMENT OF FACTS**………………………………………………………………………...1

**LEGAL STANDARD**…………………………………………………………………………5

**ARGUMENT**……………………………………………………………………………….6

**I.     SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE A**
**RATIONAL JURY COULD CONCLUDE THAT THE CHICAGO**
**PARK DISTRICT DISCRIMINATED AGAINST VEGA ON**
**THE BASIS OF NATIONAL ORIGIN AND/OR GENDER**
**UNDER TITLE VII**…………….............................................................................7

**A.     Although the Longstanding Direct-Indirect Methods of
Proving Discrimination Remain Intact, the Overriding Consideration
At the Summary Judgment Stage Is Whether a Reasonable Fact-Finder
Could Infer Discrimination**…………………………………………………………………...9

**B.     Plaintiff Can Establish a "Convincing Mosaic" of "Bits and Pieces"
of Circumstantial Evidence Under the Direct Method That
Discriminatory Intent Motivated Plaintiff's Termination**…………………………………...10

1.   Defendant Employs a Disproportionately Small Number of
Hispanics Relative To the City of Chicago's Racial and
Ethnic Makeup…………………………………………………………………………..12

2.   The Investigation of Plaintiff That Led To Her Termination
Was Initiated By An African-American Subordinate With Discriminatory
Animus Against Hispanics and Two African-American Investigators
Who Supported, and Facilitated, That Animus………………………………………………14

3.   The Quality of the Vega Investigation Was Poor, and the
"Evidence" Obtained Therein Failed To Establish That Plaintiff
Was Not Working On Park District Business…………………………………………………...19

4.   CPD Decision-Makers Refused To Consider Plaintiff's
Evidence Refuting the Investigator's "Findings" and Did Not
Independently Review Any of the "Evidence" In Support of the
Investigative Report…………………………………………………………………………22

5.   Defendant Offered "Shifting Reasons" for
Plaintiff's Termination…………………………………………………………………………..23

6.   Plaintiff Was the First CPD Employee To Be Fired
Solely for Technical "Timesheet Falsification," Even Though
CPD Has a Time-Honored Tradition of Casual, Imprecise
Timekeeping Among Salaried Employees…………………………………………………………24

7.   CPD Chose To Disregard Its Union mandated Policy of
"Progressive Discipline" and Fire Plaintiff for Her First
Ever Disciplinary Incident In Twenty-TwoYears of Service………………………………………..26

8.   Conclusion…………………………………………………………………………………27

**C.     Plaintiff Can Show Under the Indirect Method That
Similarly Situated Non-Hispanic Employees Were Treated
More Favorably for Conduct of Comparable Seriousness, and
That Defendant's Reliance on "Timesheet Falsification" To
Justify Her Termination Was Mere Pretext**…………………………………………………28

1. Plaintiff Was an Exemplary Employee and Exceeded
CPD's Legitimate Expectations At the Time of Her Termination…………………………..29

2. Similarly Situated Non-Hispanic Employees Were Treated
Far More Favorably Than Plaintiff, and Were Afforded More
Leniency for Comparable Rule Violations…………………………………………………..31

    i.     *Only other CPD Park Supervisors, not Playground Supervisors,*
        *are similarly situated under* McDonnell Douglas *since the two*
        *positions are not comparable in all material respects*…………………………………..31

    ii.    *Other non-Hispanic female CPD Park Supervisors*
        *were not terminated for conduct of comparable seriousness,*
        *and in many cases, offenses that were more severe*…………………………………..34

3. "Timesheet Falsification" Was a Pretext for Defendant's
Discriminatory Employment Action………………………………………………………...38

**II.     SUMMARY JUDGMENT IS UNWARRANTED BECAUSE**
**AMPLE EVIDENCE EXISTS THAT PLAINTIFF WAS**
**THE VICTIM OF ACTIONABLE GENDER STEREOTYPING**
**WITHIN THE MEANING OF TITLE VII**………………………………………………..40

**III.    A REASONABLE JURY COULD FIND THAT DEFENDANT**
**FIRED PLAINTIFF FOR COMPLAINING ABOUT**
**DISCRIMINATION, AMOUNTING TO IMPERMISSIBLE**
**RETALIATION UNDER TITLE VII**………………………………………………...43

**IV.    SUMMARY JUDGMENT IS INAPPROPRIATE ON**
**PLAINTIFF'S SECTION 1981 CLAIMS BECAUSE THEY**
**ARE SUBJECT TO THE SAME ANALYSIS AS HER**
**TITLE VII CLAIMS**………………………………………………………………...46

**CONCLUSION**…………………………………………………………………48

## TABLE OF AUTHORITIES

*Atanus v. Perry*, 520 F.3d 662 (7th Cir. 2008) ................................................................. …….23

*Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835 (7th Cir. 2014) ................................ ……...9
*Bellaver v. Quanex Corp.*, 200 F.3d 485 (7th Cir. 2000) ................................................ ……5,6
*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007)…………………...40,43,44
*Burks v. Wisconsin Dep't of Transportation*, 464 F.3d 744 (7th Cir. 2006) .................... …….28

*Carney v. City & Cnty. of Denver*, 534 F.3d 1269 (10th Cir. 2008) ................................ …….47
*Castro v. DeVry Univ., Inc.*, 786 F.3d 559 (7th Cir. 2015) .............................................. ……...9
*Chadwick v. WellPoint, Inc.*, 561 F.3d 38 (1st Cir. 2009) ............................................... ……...9
*Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908 (7th Cir. 2010) .............................. …….31
*Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559 (7th Cir. 2009) ................................ …….7,8
*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) .......................................................... *passim*
*Complainant v. Dep't. of Transportation*, EEOC DOC 0120133080,
2015 WL 4397641 (July 16, 2015)…………………………………………………………......40
*Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005)…………………………......45
*Curry v. Menard, Inc*., 270 F.3d 473, 477 (7th Cir. 2001)…………………………………...29

*Dandy v. UPS, Inc.*, 388 F.3d 263 (7th Cir. 2004) ......................................................... …….41
*Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060 (7th Cir. 2012)......................................... …….10
*Davis v. Wisconsin Dep't of Corr.*, 445 F.3d 971 (7th Cir. 2006) ................................... …….38
*Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860 (7th Cir. 1996) ............................. …….39
*Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582 (7th Cir. 2011) ...................................... …….11

*E.E.O.C. v. Chicago Miniature Lamp Works*, 947 F.2d 292 (7th Cir. 1991) .................. …….12
*E.E.O.C. v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872 (7th Cir. 1994) .. …12-13

*Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397 (7th Cir. 1996) ......................... …..6,48

*Geier v. Medtronic, Inc.*, 99 F.3d 238 (7th Cir. 1996) ..................................................... …..…6
*Gordon v. United Airlines, Inc.*, 246 F.3d 878 (7th Cir. 2001) ........................................ *passim*

*Hamm v. Weyauwega Milk Products, Inc.,* 332 F.3d 1058 (7th Cir. 2003) ..................... …….40
*Hanners v. Trent*, 674 F.3d 683 (7th Cir. 2012)............................................................... …….26
*Hasan v. Foley & Lardner LLP*, 552 F.3d 520 (7th Cir. 2008)…………………….....10-11,11
*Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733 (7th Cir. 2013)....................................... ….23,28
*Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635 (7th Cir. 2013)...................................... …….11
*Howell v. N. Cent. Coll.*, 320 F. Supp. 2d 717 (N.D. Ill. 2004) ...................................... …….40
*Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348 (7th Cir. 1987) .............................. …….46

*Ianetta v. Putnam Investments, Inc.*, 142 F. Supp. 2d 131 (D. Mass. 2001) .................. …….40

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (U.S. 1977).... ........12

*Johnson v. Koppers, Inc.*, 726 F.3d 910 (7th Cir. 2013) .................................. …14,15

*Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467 (7th Cir. 2002) .................................... ……...5
*Lust v. Sealy, Inc.*, 383 F.3d 580, 585 (7th Cir. 2004)…………………………………..33,34

*Matthews v. Waukesha County*, 759 F.3d 821 (7th Cir. 2014)........................................ ……13
*McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368 (7th Cir. 1992)................................…….6,7
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (U.S. 1973).....................................*passim*
*Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir. 2002)....................................... ……..28

*Oest v. Illinois Dep't of Corr.*, 240 F.3d 605 (7th Cir. 2001)…………………………….....29

*Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681
(7th Cir. 2007)…………………………………………………………………………….....34
*Perdomo v. Browner*, 67 F.3d 140 (7th Cir. 1995) .......................................................……...6
*Perez v. Thorntons, Inc.*, 731 F.3d 699 (7th Cir. 2013) .................................................*passim*
*Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751 (7th Cir. 2006) .........................................46
*Price Waterhouse v. Hopkins*, 490 U.S. 228 (U.S. 1989) ............................................40,41

*Quintana v. Byrd*, 669 F. Supp. 849 (N.D. Ill. 1987)......................................................…46,47
*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000) ....................................... …….11
*Raymond v. Ameritech Corp.*, 442 F.3d 600 (7th Cir. 2006) ........................................... …….31
*Rudin v. Land of Lincoln Cmty. College*, 420 F.3d 712 (7th Cir. 2005) ........................... …….23

*Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604 (U.S. 1987)........................................ …….46
*Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035 (7th Cir. 1993)........................................ ……...6
*Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372 (7th Cir. 2011) ................ …..3,22
*Shager v. Upjohn Company,* 913 F.2d 398 (7th Cir. 1990) ............................................. …….41
*Sitar v. Ind. Dep't of Transp.,* 344 F.3d 720 (7th Cir.2003) ............................................ …….43
*Smith v. Bray*, 681 F.3d 888 (7th Cir. 2012) .................................................................. …….14

*Theno v. Tonganoxie Unified Sch. Dist No. 464*, 377 F. Supp. 2d 952 (D. Kan. 2005) . …….40
*Timothy v. Our Lady of Mercy Med. Ctr.*, 233 F. App'x 17 (2d Cir. 2007)................... ……...9
*Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994)........................................6,11,43

*United States v. North Carolina*, 914 F. Supp. 1257 (E.D.N.C. 1996)…………….................12

*Wimmer v. Indiana Masonic Home, Inc.*, No. 1:11-CV-1432-WTL-TAB,
2013 WL 2467994 (S.D. Ind. June 7, 2013) ................................................................. ……...8

## INTRODUCTION

Defendant's motion for summary judgment should be denied. It presents an incomplete version of the facts, and ignores the multitude of probative evidence of racial and gender animus toward Plaintiff by three African-American CPD employees, which is bolstered by Defendant's institutional discrimination against Hispanic employees generally. Defendant's motion is the culmination of a dynamic that has persisted throughout the entirety of the instant action: Defendant boldly refuses to acknowledge the facts as they are, and, head in sand, continues simply to present them as it wishes they were. In doing so, it relies on the repetitive, self-serving, and unpersuasive legal conclusions of individual CPD witnesses that Park District management never treated anyone differently based on gender or ethnic origin.[1] This Court should not be persuaded by Defendant's willful ignorance the reality of the facts presented below.

For the reasons set forth below, genuine issues of material fact remain, and a rational fact-finder could find that Defendant unlawfully terminated Plaintiff because of her protected status, and retaliated against her complaining of discrimination. As such, Defendant's motion should be denied, and this case should proceed to jury trial.

## STATEMENT OF FACTS

Lydia Vega was Park Supervisor of Bessemer Park at the time of her termination, and was employed by CPD for twenty-two years. She had an excellent, if not stellar, performance record, and, as CPD admits, no prior discipline of any kind. *Plaintiff Lydia Vega's Statement of Additional Material Facts Under Rule 56.1 ("PL FACTS"), ¶¶ 2-30; Local Rule 56.1 (a)(3)*

---

[1] Defendant's 30(b)(6) witness on CPD investigations of discrimination admits that CPD has never heard an employee admit to discrimination, and that s/he would be highly unlikely to admit to it even if they did.

1

*Statement of Material Facts Submitted in Support of Defendant Chicago Park District's Motion for Summary Judgment ("S.F.") ¶ 49.* CPD terminated Vega because a poorly performing African-American subordinate, Shreece Childs ("Childs"), with racial animus toward Hispanics—and in particular towards her Latina supervisor Vega—called a CPD "whistleblower" Hotline to accuse Vega of "theft of time," and managed to get the attention of two African-American CPD investigators, Michael Hester ("Hester") and Leroi Catlin ("Catlin"), who took up Childs' cause against Plaintiff. *PL FACTS ¶¶ 61-95, 95-109.* During the same period, Childs provoked an African-American parent of a Bessemer patron, Kenneth Teal ("Teal"), to call the same Hotline to accuse Vega of "blatant racial bias" against African-Americans. *PL FACTS ¶¶ 86-88, 172.*

It should be clarified from the outset that CPD did not terminate Vega for "theft of time," nor for failing to work an eight-hour day even once, nor for issues with her performance. Instead, CPD terminated her for technical "timesheet falsification," although Vega's practice of manually recording an imprecise 8-hour period on her timesheets was the same as that of many, if not most, salaried CPD employees. *PL FACTS ¶¶ 40, 48, 49.* Further, CPD's sole basis for Vega's termination was the unexamined Investigative Report generated by Hester and Catlin after a five and-a-half month surveillance investigation. *PL FACTS ¶¶ 139, 146-150.* In addition, despite Vega's complaints to CPD about the discriminatory aspects of that investigation, which she asserted verbally in February of 2012 and again in writing immediately before her termination in September of 2012, CPD management refused to investigate her complaints and never questioned or scrutinized the Investigative Report or its underpinnings because, among other reasons, "the investigation was over." *PL FACTS ¶¶ 206-208.*

Moreover, CPD decision-makers refused to administer the "progressive discipline"

mandated by the Union Agreement.[2] They also refused to meaningfully investigate or consider—indeed, they simply chose not believe—Plaintiff's 56 pages of documentation refuting the "findings" of the investigators, detailing her whereabouts and offering confirming witnesses for each day the investigators claimed that she was not "working on CPD business" during the precise times recorded on her manual timesheets. *Plaintiff's Response to Local Rule 56.1 (a)(3) Statement of Material Facts Submitted in Support of Defendant Chicago Park District's Motion for Summary Judgment ("Response to S.F.") ¶¶ 84, 85; PL FACTS ¶¶ 186-188*. CPD merrely contacted a single witness, Elizabeth Millan, CPD South Region Manager who supervised Vega for 8 years (though she was retired at the time of the call), who corroborated the information in Vega's documentation CPD asked her about. *PL FACTS ¶ 190*.

To add insult to injury, during the course of their investigation, Catlin and Hester began gender stereotyping Vega, commenting that "she look[ed] like a dude," referencing her "short hair shit," and referring to her as "bitch." *PL FACTS ¶¶ 213-226*. That dynamic continued through Plaintiff's Administrative Hearing when a CPD lawyer attempted to measure Vega's hair in the middle of the hearing, as well as through discovery in this case, most notably when another CPD attorney unbuttoned his shirt in a deposition in an attempt to prove that due to the buttons on Plaintiff's shirt, she "dressed like a guy." *Id.*

Unsurprisingly, a union representative who handles disciplinary cases for many CPD employees, testified that CPD's disciplinary system is "fundamentally flawed" and susceptible to misuse by those with discriminatory animus[3]. Essentially, CPD manages to accuse and fire

---

[2] Agreement between the Chicago Park District and Service Employees International Union Local 73 January 1, 2009 to December 31, 2012. ("Union Agreement) sponsored by Michael Simpkins *Simpkins 30(B)(6) 6/25, P. 79:10-80:23 and 30(B)(6) Ex. 147 [PX GG]*

[3] *See e.g. Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 383-84 (7th Cir. 2011), discussed below, as another example of CPD's flawed disciplinary system. There, in an analogous factual situation,

employees with long tenure and positive performance records based on a one-time allegation, simply by labeling the "violation" a Class A offense, as outlined in CPD's Code of Conduct, no matter what the allegation. *PL FACTS ¶¶ 181-182*. Plaintiff's termination is a prime example of this arbitrary application.

Crucially, Plaintiff's termination and the dubious investigation on which it was based occurred in the context of an institution that grossly under-employs Hispanics, even in the City of Chicago, which is composed of roughly equal proportions of Caucasians, African-Americans, and Hispanics. Indeed, all CPD employees must be residents of the City of Chicago, and yet CPD employs far more Caucasians and African-Americans than it does Hispanics. *PL FACTS ¶¶ 192-193*.

For instance, in its top five tiers of management, CPD currently has a single Hispanic trustee at the top level, and a single Hispanic program director at the bottom, an appointment which occurred only in the past year. *PL FACTS ¶¶ 194-195*. None of CPD's Human Resources Managers, nor the HR Director—who issue discipline, including terminations—are Hispanic. None of Defendant's investigators, who perform all internal investigations of employees, are Hispanic. *PL FACTS ¶¶ 213-226, 239; Local Rule 56.1(a)(3) Statement of Material Facts Submitted in Support of Defendant Chicago Park District's Motion for Summary Judgment ("S.F."), S.F. 1*. Further, by admission, Defendant currently employs approximately 67 Caucasian Park Supervisors, approximately 41 African-American Park Supervisors, and exactly nine (9) Hispanic Park Supervisors, and of those nine (9) only two (2) are female and both are assigned to "Class B" Parks that do not pay a bonus or premium. *S.F. ¶¶ 116, 118, 121;*

---

decision-makers failed to independently investigate information obtained from a racially biased source that led to the plaintiff's termination. The Seventh Circuit upheld the district court's finding of CPD's liability. *Id.*

*Response to S.F. ¶¶ 116, 118, 121; PL FACTS ¶ 201*. This racial/ethnic imbalance among Park Supervisors is also reflected in CPD's cumulative 2005-2014 statistics. *PL FACTS ¶ 198-201*.

Further evidence of animus toward Hispanics is apparent from other CPD terminations. Between 2005 and Vega's termination on September 10, 2012, CPD fired or forced to retire: (1) four of its 16 cumulative Hispanic Park Supervisors (25%); (2) four of its seven cumulative Hispanic female Park Supervisors (57%); (3) three of its cumulative 42 African-American non-probationary Park Supervisors (7%); and (4) *none* of its Caucasian Park Supervisors. *PL FACTS ¶ 240, 243, 244; see also PL FACTS Ex. HH*. Moreover, one of the three African-American Park Supervisors referenced above was terminated for a documented theft of funds in 2007, another for a residency violation in 2009, and the third, who had an extensive disciplinary history, for breaking the windows of a car on park property with a baseball bat. *PL FACTS ¶ 244*. Moreover, before Plaintiff's termination, no CPD employee at any level had ever been terminated for technical "timesheet" falsification without proof of theft of time. *PL FACTS ¶ 245*.

## LEGAL STANDARD

Summary judgment is only appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining the existence of a genuine issue of material fact, a district court "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000); *see also Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). Moreover, if the non-moving party "succeed[s] in presenting evidence from which an inference of discrimination could be drawn, summary judgment [is] improper and a trial is

required." *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1402 (7th Cir. 1996). Indeed, "[s]ummary judgment is only appropriate when the record reveals that no reasonable jury could find for the nonmoving party." *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 370 (7th Cir. 1992).

In the specific context of employment discrimination cases, courts apply summary judgment standards "with special scrutiny" since they "often turn on the issues of intent and credibility." *Bellaver*, 200 F.3d at 491; *see also Geier v. Medtronic, Inc.*, 99 F.3d 238, 240 (7th Cir. 1996); *Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir. 1995) (noting that the summary judgment "standard is applied with added rigor in employment discrimination cases where intent and credibility are crucial issues"); *McCoy*, 957 F.2d at 370-71. Accordingly, summary judgment in favor of an employment discrimination defendant is warranted only where it would have been entitled to a directed verdict. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

As set forth below, Defendant has not come close to meeting this standard and Defendant's motion for summary judgment should be denied

## ARGUMENT

To defeat Defendant's motion, Plaintiff need only point to evidence from which a rational jury "could reasonably infer" that Defendant fired her for a discriminatory reason. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Here, through oral and written discovery, Plaintiff has uncovered compelling circumstantial evidence from which a rational fact-finder could conclude not only that Defendant illegally terminated Vega herself, but also that it engages in institutional discrimination against Hispanics generally, employing them

in precious few decision-making positions and in a disproportionately small number of Park Supervisors positions.

Defendant's motion seeks summary judgment on all seven[4] counts of Plaintiff's operative Amended Complaint, namely: (1) national-origin discrimination under 42 U.S.C. § 1981 (Count I); (2) retaliation under section 1981 (Count II); (3) national-origin and gender discrimination under Title VII (Count III); (4) sex stereotyping under Title VII (Count IV); (5) retaliation under Title VII (Count V); and (6) privacy-based pendant state claims (Counts VI and VII). Plaintiff concedes that it does not have sufficient evidence to support Counts VI and VII, but opposes the Motion with respect to Counts I-V.

For the reasons explained below, this Court should deny the motion with respect to Counts I, II, III, IV, and V, and permit this matter to go to trial.

## I. SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE A RATIONAL JURY COULD CONCLUDE THAT THE CHICAGO PARK DISTRICT DISCRIMINATED AGAINST VEGA ON THE BASIS OF NATIONAL ORIGIN AND/OR GENDER UNDER TITLE VII.

As an initial matter, Plaintiff asserts in Count III of her Amended Complaint that Defendant terminated her on the basis of her national origin, *i.e.* Hispanic, and *also* due to her status as a Hispanic female, both in violation of Title VII. The two claims are separate and independently viable, the latter more accurately described as a "sex-plus" theory of discrimination "which hinges on disparate treatment based on sex in conjunction with another characteristic." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). Plaintiff submits she should prevail on both her straight-national-origin and sex-plus claims, and that dwelling on fine distinctions between the two is unnecessary at the summary judgment stage.

---

[4] Defendant inexplicably refers to eight (8) counts in the opening paragraph its motion, and then recites six (6) counts in paragraph 1. The Amended Complaint contains seven (7) counts.

Moreover, although Defendant is correct that the Seventh Circuit has not expressly recognized a sex-plus theory of recovery (*see Def. MSJ ¶ 12*), it has permitted claims based on both gender and national origin to proceed to jury trial. For instance, in the recent case *Perez v. Thorntons, Inc.*, a Hispanic female plaintiff alleged that the defendant employer "fired her because she [was] Hispanic and a woman." 731 F.3d 699, 703 (7th Cir. 2013). In an analysis similar to that here, the *Perez* court cited evidence in the record that the defendant harbored discriminatory animus against both Hispanics and women. *Id.* at 701. Further, the court highlighted that "a non-Hispanic male" had not been terminated for an infraction similar to that for which the plaintiff was terminated. *Id.* at 708. Notably, the *Perez* court refrained from dwelling on where to draw the line between discrimination based on national origin and discrimination based on gender—indeed, it did not even refer to a sex-plus theory of recovery— even though it plainly considered both aspects in its analysis. *Perez* ultimately concluded that summary judgment for the defendant was not warranted, holding that "[w]hether [the plaintiff] will be able to convince a jury that she was fired because of her gender or national origin remains to be seen, but she is entitled to have a jury answer those questions." *Id.* at 711.

This Court should follow a similar tack. Even in *Coffman*, the case cited by Defendant to challenge the viability of a sex-plus theory, the Seventh Circuit engaged in a sex-plus analysis. *See* 578 F.3d at 564 ("[w]hether or not we explicitly recognize 'sex plus height' as a vehicle for a Title VII discrimination suit, Coffman must demonstrate that [the alleged adverse employment actions] occurred at least in part because she is female"); *see also Wimmer v. Indiana Masonic Home, Inc.*, No. 1:11-CV-1432-WTL-TAB, 2013 WL 2467994, at 11-12 (S.D. Ind. June 7, 2013), *appeal dismissed* (Aug. 26, 2014) (denying the plaintiff's sex-plus claim on the merits, though noting the absence of express ratification of the theory in the Seventh Circuit). Further,

8

other circuits have explicitly recognized the theory. *See e.g. Chadwick v. WellPoint, Inc.*, 561 F.3d 38 (1st Cir. 2009); *Timothy v. Our Lady of Mercy Med. Ctr.*, 233 F. App'x 17 (2d Cir. 2007).

Accordingly, whether or not the Seventh Circuit has formally recognized "sex-plus" actions should not affect Plaintiff's claim at the summary judgment stage. As the *Perez* court recognized, the crucial question is whether a jury could decide that Defendant terminated Plaintiff for a discriminatory reason. *See Perez*, 731 F.3d at 711.

**A.** ***Although the Longstanding Direct-Indirect Methods of Proving Discrimination Remain Intact, the Overriding Consideration At the Summary Judgment Stage Is Whether a Reasonable Fact-Finder Could Infer Discrimination.***

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits covered employers[5] from terminating an employee "because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). Employment discrimination plaintiffs may prove Title VII discrimination under either or both of the "direct" or "indirect" methods of proof, the latter also known as the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (U.S. 1973); *see also Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) ("[i]n a disparate treatment case such as this one, a plaintiff may prove discrimination either directly or indirectly").

Recently, though, the Seventh Circuit began to challenge "the utility of the distinctions between [the direct and indirect methods], recognizing that both methods of proof converge on the same fundamental question: could a reasonable trier of fact infer retaliation or discrimination, as the case may be?" *Castro v. DeVry Univ., Inc.,* 786 F.3d 559, 564 (7th Cir. 2015); *see also Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014); *Perez*,

---

[5] CPD does not dispute that it is a covered employer within the meaning of Title VII.

731 F.3d at 703 ("we recognize and join the majority of active judges in this circuit who have opined that the time has come to jettison the 'ossified direct/indirect paradigm' in favor of a simple analysis of whether a reasonable jury could infer prohibited discrimination").

But despite apparent judicial frustration with the "snarls and knots" of the long-standing direct-indirect rubric, *see Coleman*, 667 F.3d at 862 (Wood, J., concurring), the Court has stopped short of expressly dismantling it in favor of a simpler test. Indeed, the direct and indirect frameworks are still good law, so Plaintiff applies the two tests here. *See Bass*, 746 F.3d at 840 (7th Cir. 2014)("[u]nder *current law* [the plaintiff] may prove her claim through either the 'direct' or 'indirect' method of proof") (emphasis added). However, Plaintiff submits that despite the intricacies in the analysis that follows, "when all is said and done, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Id.*

As explained below, Plaintiff prevails under both the direct method and the indirect *McDonnell Douglas* burden-shifting framework.

**B.**     ***Plaintiff Can Establish a "Convincing Mosaic" of "Bits and Pieces" of Circumstantial Evidence Under the Direct Method That Discriminatory Intent Motivated Plaintiff's Termination.***

Under the direct method, a discrimination plaintiff may produce "either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action." *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012). Direct-method evidence generally falls into one of two categories: (1) admissions that an adverse employment action was motivated by an employee's protected class; and/or (2) a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action." *Id.*; *see also Hasan v. Foley & Lardner LLP*, 552 F.3d 520,

527 (7th Cir. 2008), as corrected (Jan. 21, 2009) (noting that evidence under the direct method is not limited to an employer's "near-admissions" of discriminatory intent, but can also include "circumstantial evidence 'which suggests discrimination albeit through a longer chain of inferences'").

This kind of circumstantial evidence generally takes the form of: (1) suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other "bits and pieces" from which an inference of discriminatory intent might be drawn; and (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the plaintiff's protected class received systematically better treatment. *Troupe*, 20 F.3d at 736. "The key to the direct method of proof is that the evidence, whether direct or circumstantial, points directly to a discriminatory reason for the employer's action." *Hasan*, 552 F.3d at 527 (internal quotations omitted). Importantly, evidence that might be insufficient standing alone can "together with other facts" be sufficient to defeat summary judgment. *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013).

As an initial matter, Defendant's harping on the lack of "smoking gun" evidence in the form of direct admissions of discrimination is inaccurate and unpersuasive. *See e.g. Def. MSJ ¶ 39*. Courts recognize that such evidence is rare. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) ("[i]n pleading discrimination cases, litigants, usually as an alternative argument, will often contend that they have unearthed direct evidence of discriminatory intent, but such direct evidence—'eyewitness testimony as to the employer's mental processes'—is rarely found"); *see also Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011).

Moreover, while CPD investigators made gender-related epithets, discussed below in section II, Plaintiff need not point to racial or gender epithets to defeat summary judgment.

11

Rather, she can establish a convincing mosaic of discrimination with statistical evidence of racial imbalance and the other bits and pieces of circumstantial evidence discussed below. Indeed, this case involves a significant mosaic of circumstantial evidence.

    1. <u>Defendant Employs a Disproportionately Small Number of Hispanics Relative To the City of Chicago's Racial and Ethnic Makeup.</u>

Racial and ethnic statistics can be probative evidence of discriminatory intent, and their utility in discrimination analysis has a long historical basis in both this circuit and the United States Supreme Court. For instance, in *International Brotherhood of Teamsters v. United States*, the Supreme Court remarked on their importance, noting that since Title VII's enactment, "courts have frequently relied upon statistical evidence to prove a violation" and that "in many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer." 431 U.S. 324, 339–40 n. 20, (U.S. 1977)[6]; *see also E.E.O.C. v. Chicago Miniature Lamp Works*, 947 F.2d 292, 299 (7th Cir. 1991) ("[s]tatistical evidence of disparities between minority representation in an employer's work force and minority representation in the community from which employees are hired can prove disparate treatment in a pattern and practice case").

Indeed, "in some cases, statistical disparities *alone* may prove [discriminatory] intent," although reliance on statistical evidence does not diminish a plaintiff's obligation to prove that intent. *E.E.O.C. v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994) (emphasis added). Further, statistics suggesting a racial and/or ethnic imbalance "are probative . . . because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily expected that nondiscriminatory hiring practices will in time result in a work force

---

[6] *But cf. United States v. North Carolina*, 914 F. Supp. 1257, 1264 (E.D.N.C. 1996) (noting that *Teamsters* has "been overruled with regard to disparate impact theory—if indeed, they were ever applicable to disparate impact theory . . ."). Plaintiff has found no authority to suggest that *Teamsters*'s logic is inapplicable to a disparate treatment case like the instant matter.

more or less representative of the racial and ethnic composition of the population in the community from which employees are hired." *Id.* (citing *Teamsters,* 431 U.S. at 339–40 n. 20). Obviously, then, "[d]etermining the relevant labor market is an essential step in determining whether there are any statistically significant deviations between the market and the employer's hiring patterns." *O & G Spring*, 38 F.3d at 876-77.

In the instant case, as discussed above, Hispanics are grossly underrepresented in the Park District. The City of Chicago is roughly one-third Hispanic, and yet there are virtually no Hispanics in senior executive or HR positions, and far fewer Hispanic Park Supervisors than there are Caucasians and African-Americans. *PL FACTS ¶¶ 194-196*. Indeed, between 2005 and December 2014, CPD employed 73 cumulative African-American Park Supervisors, 67 cumulative Caucasian Park Supervisors, and only 21 cumulative Hispanic Park Supervisors[7]. *PL FACTS ¶ 200*. The disparity is clear on its face. Moreover, between June 2008 and September 2012, Defendant fired or forced into retirement four of its eight cumulative Hispanic female Park Supervisors, and three additional Hispanic Park Supervisors have retired, resigned, or been demoted. *PL. FACTS Ex. FF; Response to S.F. 123-128*. Plaintiff was replaced by an African-American male, and Park Supervisor Martha Ramirez ("Ramirez") was replaced by a Caucasian female. *PL FACTS ¶ 242*; *see also generally PL FACTS ¶¶ 192-201*.

Interestingly, Defendant claims that this troublesome statistical evidence is an "irrelevant red-herring," citing *Matthews v. Waukesha County*, 759 F.3d 821 (7th Cir. 2014) for the proposition that "evidence of a pattern or practice [of discrimination] can only be collateral to evidence of specific discrimination against the plaintiff herself." *Id.* at 829. Notwithstanding any discrepancy between *Matthew*'s dicta and the authority cited above, Defendant's misguided

---

[7] This same imbalance is apparent to the number of cumulative Park and Playground Supervisors combined: 139 Caucasians, 133 African-Americans, and 37 Hispanics.

attempt to rely on *Matthews* to discount statistical evidence as an "irrelevant red-herring" plainly misstates the gravamen of that case. "Collateral" is not the same as "irrelevant." The *Matthews* plaintiff lacked specific evidence of discrimination against her personally to "bolster [the] statistical evidence," *see id.* at 830, whereas Vega asserts a wealth of evidence that Defendant and its employees harbored discriminatory animus against her specifically. Collateral or standing on its own, the instant statistical evidence is highly probative, and Defendant's attempt to rewrite the holding in *Matthews* for its own benefit should be disregarded.

Accordingly, and particularly in light of the case law recited above, a distinct question of fact surrounds the plain statistical disparities as they exist according to Defendant's own data.

> 2. <u>The Investigation of Plaintiff That Led To Her Termination Was Initiated By An African-American Subordinate With Discriminatory Animus Against Hispanics and Two African-American Investigators Who Supported, and Facilitated, That Animus.</u>

Because Plaintiff asserts that the subordinate employee responsible for triggering the investigation that led to her termination harbored discriminatory animus, as well as the investigators themselves, a jury could find Defendant liable under a "cat's paw" theory. "Cat's paw theory applies in the employment discrimination context when a biased subordinate who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013) (internal quotations omitted). "[W]here the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action," an employer may be liable under a cat's paw analysis. *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012). Accordingly, cat's paw "requires both evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause

14

of the adverse employment action." *Koppers*, 726 F.3d at 914.

Here, strong evidence exists that Shreece Childs ("Childs"), Plaintiff's subordinate who called the CPD Whistleblower Hotline ('Hotline") maintained by Defendant to accuse Plaintiff of stealing time, and who ultimately got Plaintiff fired, harbored animus toward Hispanics and Plaintiff specifically. First, Childs, a physical instructor ats Bessemer Park, never had a Hispanic child in one of her classes, although she admitted that Bessemer patrons were 30-40% Hispanic, and that the surrounding neighborhood was roughly half African-American and half Hispanic. *PL FACTS ¶¶ 66, 69*. Further, Childs "had an attitude" toward Hispanic teachers and children in the La Causa Community Committed after school program ("La Causa program"), and she refused Vega's request to recruit from the more than 100 Hispanic children in the La Causa program. Further, Childs actually admitted to Vega that "I don't want to teach Hispanic kids." *PL FACTS ¶ 72*.

As well as her own racially motivated calls to the CPD Whistleblower Hotline ("Hotline") on September 23, 2011, October 2, 2011 and December 1, 2011, Childs incited Kenneth Teal ("Teal"), an African-American parent of the only child in Childs' basketball class in February of 2012, to storm into Vega's office to accuse her of discrimination, and to also call the Hotline to accuse Vega of "blatant racial discrimination." *PL FACTS ¶¶ 76, 77, 79, 81, 82, 86-88*. Additionally, each of Childs' own documented Hotline calls (September 23, 2011, October 2, 2011 and December 1, 2011) and the February Teal call were precipitated by interactions between Childs and Plaintiff pertaining to Childs' poor performance. *PL FACTS ¶¶ 73-78, 80-82, 85-89; S.F. 92-93*. As such, the timing of Childs' calls and her behavior toward Hispanics generally strongly suggest the animus necessary to prevail under a cat's paw theory. And notably, all of Childs' performance issues disappeared after she was transferred to Fosco

Park to work under an African-American Park Supervisor with almost exclusively African-American patrons. *PL FACTS ¶ 91*.

Further, a jury could just as easily infer that Hester and Catlin had their own animus. First, Hester and Catlin, the two primary investigators, began surveilling Plaintiff without official authorization. When Childs called the Hotline, she spoke to someone at least once, and, moreover, Catlin believes that Hester called Childs per the investigation unit's customary practice with "anonymous" Hotline calls where the caller's number is captured. *PL FACTS ¶¶ 76, 101, 102*. Based on these calls, Hester and Catlin, both African-American, initially ignorant of the other's activities, began conducting surveillance of Vega without management approval for at least two months. *PL FACTS ¶¶ 95-100, 103-108*. Typically, senior CPD investigator Edward Skerrett ("Skerrett") performed surveillance investigations himself, and assigned them out only when he did not have time to perform them. *PL FACTS ¶¶ 110-112*. Catlin and Hester had only performed two surveillance investigations previously, and Hester had not even been trained in the area of surveillance investigations. *Id.* Nonetheless, they initially began surveilling Plaintiff without direction from Skerrett.

Second, the surveillance investigation was remarkably long, which suggests that Hester and Catlin were essentially "out to get" Vega. It was one of the longest investigations ever conducted of a CPD employee, and the only one in which all five (5) investigators participated. *PL FACTS ¶¶ 114, 245*. In fact, when asked about his investigation of (white) CPD Park Supervisor Denise Raymond ("Raymond"), who was accused of leaving her park everyday to pick up her children without signing out in her park's logbook, senior investigator Skerrett testified that he would have never prolonged that investigation for five-and-a-half months. *PL FACTS ¶ 246-248*. Specifically, Skerrett testified:

20  But you only surveilled [Raymond] for --
21  surveilled her or observed her for three days,
22  correct?
23  A. Correct.
24  Q. And you have no idea what the results would
Page 204
1  have been if you surveilled her for five and half
2  months, correct?
3  A. No. I'll tell you right now I wouldn't do
4  that that long. We wouldn't let it go for that long.
5  Q. So you wouldn't let it go for five and a
6  half months?
7  A. *No. It wouldn't be worth 15 minutes a day*
8  *to spend all that time to tell somebody that she*
9  *shouldn't do this*.
10  Q. Okay. So it was appropriate to tell her
11  after three days that she should fill out her
12  timesheets --
13  A. Well, we saw that what she was doing, so I
14  assume that's what she did most of the time.
15  Q. And you assumed that she should -- you
16  believe that she should be told about this and fill
17  out her timesheets properly?
18  A. Correct.

*Deposition of Edward Skerrett 30(b)(6) on 6/11 p. 203:24-204:18* (emphasis added). Rather than

spend months "building a case" against her, Skerrett told Raymond *after three days of*

*surveillance* that he had been surveilling her, and that she should change the way she kept her

timesheets. *Id.* CPD issued *no discipline whatever* Raymond. *Id.* The stark contrast with which it

treated Raymond compared to Plaintiff is remarkable evidence of discrimination. *Id.*

The Raymond investigation highlights another important point. Both Elizabeth Millan

("Millan") and Anita Gilkey ("Gilkey"), Plaintiff's supervisors, neither of whom knew about the

Vega investigation until it was over, believe that had CPD instructed Vega to be more precise in

keeping her timesheets and to more diligently record her whereabouts in Bessemer's logbook,

she would have immediately complied. *PL FACTS ¶¶ 36-37.* Raymond was afforded such an

opportunity by Skerrett. Hester and Catlin, on the other hand, opted to keep up their

17

investigation of Plaintiff for months before confronting her with the "evidence" gathered therein.

Finally, Hester and Catlin made biased remarks about Plaintiff's appearance and were hostile to her in person. Catlin referred to Plaintiff as a "dude," and Hester commented on "short hair shit" and used the word "bitch." *PL FACTS ¶¶ 217, 219; see Section II on gender stereotyping below*. The fact that neither Catlin nor Hester made specific racially discriminatory remarks on the tapes or at the Investigative meetings does not disprove their animus, particularly when they treated African-Americans at similar meetings differently, and were generally accusatory toward Plaintiff and dismissive of her explanations of her whereabouts. *PL FACTS ¶¶ 168-180*. Moreover, as union representative Charles Harper noted, the CPD investigators are at least sophisticated enough not to display discriminatory animus "in the light of day." *PL FACTS ¶ 184*.

Given the evidence discussed above, a jury could conclude that Childs, Hester, and Catlin were all motivated by discriminatory animus against Plaintiff. Accordingly, since CPD decision-makers responsible for Plaintiff's termination relied only on the unquestioned, unexamined Vega Investigative Report, whether or not the decision-makers had discriminatory intent, Defendant may be found liable under a cat's paw theory since the "factual information" provided to those decision-makers was provided by Childs and the two investigators. That Plaintiff's termination was based entirely on the Investigative Report is undisputed. *S.F. 59; Response to S.F. 52 and 58; PL FACTS ¶¶ 139, 146-150*.

However, Plaintiff does not concede that the decision-makers were not also racially biased, particularly HR Manager Saieva ("Saieva"), who recommended that Vega be terminated. Saieva picked and chose the victims of her blatantly accusatory style, refused to believe Vega or to investigate the extensive documentation and witness information she provided refuting the

Report's allegations, and, on at least one occasion prior to Vega, recused herself from the discipline of a Hispanic employee. *PL FACTS ¶¶ 187, 191; Response to S.F. 100, 102*. By contrast, during the same period of time, Saieva treated Childs at her Corrective Action Meetings ("CAMs") with a much softer touch, even though Childs had a history of child endangerment issues and was investigated for being inexplicably absent from work for over a week while working under Vega. In that instance, Saieva chose to believe Childs' excuses and documentation in the face of allegations by Vega, Vega's supervisor Gilkey, and Regional Manager Millan. Saieva ultimately elected not to discipline Childs after any of the Corrective Action Meetings ("CAMs") held while Childs worked under Vega. *PL FACTS ¶¶ 62, 64, 73-75, 78, 80, 83 – 85, 90*. Interestingly, despite her disciplinary history, CPD promoted Childs to Playground Supervisor shortly after her deposition was noticed in the instant matter, although she had applied for and been refused such a promotion 15-20 times previously. *PL FACTS ¶¶ 92-94*.

As such, Plaintiff submits that a rational jury could conclude that discriminatory animus motivated Plaintiff's investigation and subsequent termination.

> 3. <u>The Quality of the Vega Investigation Was Poor, and the "Evidence" Obtained Therein Failed To Establish That Plaintiff Was Not Working On Park District Business.</u>

The Vega investigation did not prove that Plaintiff was not engaged in Park District business for at least eight hours[8] on the days that she was surveilled. At most, the Vega Investigative Report, authored by Hester, established "evidence" that Vega was 10-20 minutes later on three to four work days, and that she was approximate in her timekeeping, much like many other salaried CPD employees. *PL FACTS ¶¶ 48-49*.

---

[8] *See PX F1* for countless examples of days on which Plaintiff worked more than eight hours.

Moreover, the Vega investigation was rife with irregularities and assumptions. For instance, the investigators assumed that: (1) Vega drove the same car every day; (2) she had a habitual pattern of home and park arrivals and departures; (3) if they saw her maroon Chevy Trail Blazer, she was driving it; (4) she would park in the same spot at Bessemer every day, although the park covers five city blocks and there are numerous, including shielded, places to park; (5) if her car was not in the spot, Vega was not at Bessemer and not working on park business, although they never called or went into Bessemer to determine where she was or what she was doing (unlike the Investigation of Hattie Lewis, in which Hester called the subject's park himself to determine her location, *see PX JJ1, JJ12*, and knew very well that she did not have to be at Bessemer to be working on park business. Further, they have no idea when Vega left work or how many hours she worked on *a single day* on which they surveilled her, a particularly troubling feature of an investigation that began under the pretense of "theft of time." *PL FACTS ¶¶ 117-131*.

The investigation was replete with other errors as well. *See PL FACTS ¶¶ 117-165*. For instance, investigators surveilled Vega on eight days that were not included at all in the Report, failed to include over 200 individually date- and time-stamped pieces of video footage in the Report even though the dates themselves and other footage is referenced the Report, and included footage for two days that have nothing to do with the Vega surveillance. *PL FACTS ¶¶ 141-143*. Moreover, Hester, who wrote the Report, had no idea which investigator took what footage, nor did he know at the time he authored the report if any other investigator involved had properly calibrated the date- and time-stamp on the camera. *PL FACTS ¶ 145*. Catlin did not even know what Vega looked like until January 30 2012—two days before the end of the surveillance—and Hester did not know what she looked liked until two weeks after the end of

surveillance. *PL FACTS ¶¶ 130-131*. Nor were the investigators familiar with Vega's job duties, nor did they know her regular start times until after the surveillance was over. *PL FACTS ¶¶ 116, 128*.

The quality of the Vega investigation is in contrast to better, more efficient investigatory and "evidence worthy" techniques used in other investigations. *See e.g.* Investigation of Robin Locke (African-American male Park Supervisor) by Skerrett (the "subject" and not simply his car was observed each day departing his residence and arriving at work) *S.F. 153-159, specifically S.F. 154, Bates Nos. 05401 CPD-05497 CPD*; Investigation of Wendy Ellis (African-American female Park Supervisor) by Skerrett (the "subject" and not just her car was surveilled daily and residency violation was thoroughly documented) *S.F. 152, Bates Nos. 05762 CPD-05763 CPD*; Investigation of Lester Rivers (African-American male Playground Supervisor) by Catlin (the "subject" and not just his vehicle was surveilled and presumably videotaped most days) *S.F. 138-144 and specifically S.F. 142, Bates Nos. 06268 CPD-06271 CPD*.

Indeed, the Vega Investigative Report's near-total lack of reference to Vega's person, rather than to her vehicle, in itself is problematic for Defendant. As CPD Inspector General Alison Perona noted,

> if you have the subject and vehicle together, that is the strongest evidence . . . if you see the vehicle depart and arrive at the work location . . . it is not as strong as the other . . . this has happened, where we have had surveillances where we see the car depart and we're never able to put the subject in the car. *You don't turn it in as a sustained finding because you don't have a face to put on it*.

*Response to S.F. 64* (emphasis added). But here, Hester and Catlin hardly ever recorded Plaintiff's person, and assumed that the absence of her car in a single parking lot at Bessemer Park meant that she was not working. *PL FACTS ¶ 178*.

21

Again, at most, the Report provides credible evidence that Vega may have been late for work between 10 and 20 minutes (when compared to the start time on her manual timesheets) on only three to four days in five-and-a-half months. *PL FACTS ¶¶ 151-165*. Hester admitted in deposition testimony that evidence is lacking to support the "findings" for certain days listed in his Report. *PL FACTS ¶¶ 151, 153, 155-156*.

The Vega Investigative Report simply did not present credible evidence that Plaintiff was not working on Park business for at least eight hours on the days in question.

4. CPD Decision-Makers Refused To Consider Plaintiff's Evidence Refuting the Investigator's "Findings" and Did Not Independently Review Any of the "Evidence" In Support of the Investigative Report.

As set forth above, neither HR Manager Mary Saieva nor HR Director Michael Simpkins—the CPD decision-makers who ultimately terminated Vega—performed a meaningful investigation of the wealth of information Plaintiff produced disputing Hester and Catlin's "findings." "Under any formulation of the cat's paw standard, the chain of causation can be broken if the unbiased decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 383-84 (7th Cir. 2011) (finding cat's paw liability for employer where decision-makers failed to independently investigate information obtained from a racially biased source that led to the plaintiff's termination). Additionally, "when an employee provides '[a] detailed refutation of events which underlie the employer's negative performance assessment,' the employee demonstrates 'that the employer may not have honestly relied on the identified deficiencies in making its decision.'" *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001)

22

Here, CPD decision-makers performed virtually no investigation into the 56 pages of information provided by Plaintiff explaining her whereabouts on days CPD accused her of falsifying her timesheets. Despite the "extraordinary" detail of Plaintiff's evidence, Saieva was not interested in reviewing it; her investigation consisted of a single phone call. *PL FACTS ¶¶ 186-187, 190*. Likewise, Simpkins testified that he has no idea what the investigators actually proved in the course of the Vega investigation, and neither Simpkins nor Saieva scrutinized Hester's report or reviewed any of the videotaped surveillance before deciding to terminate Vega, even though that decision was based *entirely* on the Report. *PL FACTS ¶¶ 148-150*. As in *Schandelmeier*, another discrimination case involving the Park District, CPD's utter failure to independently investigate the materials tendered by Vega, or even to review the surveillance footage and other "evidence" proffered by Hester's report, did not disrupt the chain of causation necessary under a cat's paw theory.

Indeed, Defendant's unjustifiable failure to investigate Plaintiff's explanation amounts to yet another indicator of discrimination in the mosaic of evidence presented here.

5.   Defendant Offered "Shifting Reasons" for Plaintiff's Termination.

"One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (citing *Rudin v. Land of Lincoln Cmty. College*, 420 F.3d 712, 726 (7th Cir. 2005)). In addition to its relevance in the *McDonnell Douglas* analysis in section I.C below, a plaintiff's assertion that an employer's purported reason for an adverse employment action was a "pretext for discrimination" can be relevant to a direct method analysis as well. *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008).

Here, the Childs' Hotline calls accused Vega "theft of time" or "not working a full 8-

hour day," and that was the conduct she was purportedly investigated for. *PL FACTS ¶¶ 76-81*. However, at some indeterminate time, the allegation changed, and Vega was terminated because she was "not at [her] assigned location at [her] assigned time and falsified [her] timesheets" on a total of eleven days. *PL FACTS ¶ 146*. This language did not appear until CPD issued its first "CAM Notice" to Vega on July 13, 2012, after months of investigation and at least four "investigative" meetings, at which time CPD apparently elected to abandon the "theft of time" allegation, perhaps recognizing that it did not know what time Vega left work or how many hours she worked total on a *single* day during the span of the investigation. *PL FACTS ¶ 129; S.F. 81*. Moreover, Plaintiff's Regional Manager Millan and two of Plaintiff's Bessemer Park subordinates, asserted that Plaintiff regularly worked more than 40 hours a week. *PL FACTS ¶ 35*.

Ultimately, Defendant's shifting basis for Plaintiff's termination is further evidence of discrimination.

6. Plaintiff Was the First CPD Employee To Be Fired Solely for Technical "Timesheet Falsification," Even Though CPD Has a Time-Honored Tradition of Casual, Imprecise Timekeeping Among Salaried Employees.

Until July 2012, CPD had no written policy on time sheets. *PL FACTS ¶ 41*. To this day, CPD has no written policy or consistent agency-wide practices of logbook use to record time spent on park business outside of an employee's assigned park.[9] *PL FACTS ¶¶ 43, 44*. Other than employees in his department, HR Director Simpkins is unaware whether employees are instructed in filling out timesheets at all, and Gilkey, Vega's Area Manager and direct supervisor, does not believe that she was ever trained on how to fill out a timesheet. *PL FACTS ¶¶ 46-47*. However, the common practice among CPD salaried employees is to fill in an

---

[9] The failure to be absolutely precise to the minute in filling out these two types of paperwork formed the basis of Vega's termination.

imprecise 8-hour period on a timesheet that may not necessarily reflect the actual hours worked. *PL FACTS ¶¶ 48, 49, 54*. In fact, union representative Harper testified that after reviewing thousands of CPD timesheets, he found that employees' customary practice is to record their hours worked as 9:00 to 5:00 or 10:00 to 6:00, even if they worked nine or ten hours in a given day and received no overtime pay. *PL FACTS ¶ 54*. Further, all CPD employees are forced to "falsify" their timesheets each time they are turned in because employees always submit them before the end of the pay period that they cover, sometimes by two or three days. *PL FACTS ¶¶ 45, 50*. Correcting a timesheet once it has been submitted is extraordinarily rare. *PL ¶¶ FACTS 54-55*.

Moreover, CPD does not provide a formal definition of "timesheet falsification" anywhere in CPD policy. *Response to S.F. 20, 23, 24, 25*; *see Gordon*, 246 F.3d at 890 ("[t]he record makes starkly clear that, at the time of the incident, United did not have a clear definition of what constitutes an 'unauthorized deviation' [,which was the basis of the plaintiff's termination.] Apparently, the term is not defined in any United manual. Furthermore, the individuals involved in [the plaintiff]'s discharge employed different definitions of the term").

In an ironic twist, Hester and Catlin themselves actually falsified their own time sheets during the Vega investigation in precisely the same way that CPD accused Vega of falsifying her timesheets. *PL FACTS ¶¶ 132-138*. Both Hester and Catlin were required to fill out timesheets accurately, and to make subsequent changes if the actual hours worked are not reflected on their timesheets. *PL FACTS ¶¶ 132-134*. However, on at least five days, when Hester and Catlin both signed in for 8:00 a.m., or Hester signed in for 8:00 a.m. and Catlin was off for shoulder surgery, there is videotape surveillance footage that was time-stamped 35-25 minutes before 8:00 a.m.[10]

---

[10] CPD admits that all footage taken at or near Vega's house or Xsport Fitness was taken by Hester or

*PL FACTS ¶ 138.*

Finally, Plaintiff was the first CPD employee ever to be terminated for technical "timesheet falsification" alone without corresponding allegations of actual theft of time, or other Code of Conduct violations like residency issues, theft, or breaking out car windows with a baseball bat. *PL FACTS ¶¶ 114, 245.*

### 7. CPD Chose To Disregard Its Union mandated Policy of "Progressive Discipline" and Fire Plaintiff for Her First Ever Disciplinary Incident In Twenty-Two Years of Service.

"Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012); *see also Davis v. Wisconsin Dep't of Corr.*, 445 F.3d 971, 977 (7th Cir. 2006) (upholding jury finding of pretext where a corrections officer was disciplined more harshly than the Department of Corrections' progressive discipline policy prescribed).

Here, CPD has an agreement with SEIU Local 73 under which it agrees to engage in "progressive discipline" of Union members that, with an exception for severe actions, follows a general pattern of oral reprimand, written reprimand, suspension, termination. *PL FACTS ¶ 237; S.F. 27.* Further, CPD categorizes employee infractions by severity, labeling them as either Group A, B, or C misconduct, with A being the most serious. In accordance with union representative Harper's testimony regarding CPD's capricious application of its Code of Conduct, CPD originally labeled Vega's "timesheet falsification" a Group A infraction, *see PL FACTS ¶ 181*, but it has since abandoned that position, now claiming that it was a Group B violation for which the recommended discipline is suspension, not termination except in the

---

Catlin. *PL FACTS ¶ 115.*

most serious cases. *S.F. 26*. As in *Davis*, Plaintiff was disciplined more severely than suggested by the agreed-upon policy of progressive discipline, and a jury could infer discrimination from CPD's deviation from this well-established policy. *See Davis*, 445 F.3d at 977.

### 8. Conclusion.

Under the direct method, a "convincing mosaic" of circumstantial evidence from which a rational jury could infer discrimination is present here. First, a significant racial imbalance exists in CPD's workforce, and it indicates institutional discrimination against Hispanics, a feature of this case which should in itself be sufficient to defeat summary judgment. Second, the Vega investigation was initiated by a racially motivated African-American subordinate, and carried on by two investigators who broke protocol by beginning surveillance without ratification from their lead investigator or General Counsel, and continuing the investigation for an unusually protracted period of time. Third, the investigation did not produce any credible evidence that Vega intentionally "falsified" her timesheets, stole time by working less than eight hours a day, or did anything other than follow the customary approach of approximate timekeeping among salaried employees. Fourth, despite the detailed refutations she provided, CPD decision-makers refused to consider Plaintiff's evidence, and they not conduct any independent review of the "evidence" generated by the investigation. Fifth, the basis for Plaintiff's investigation and termination changed over time, a hallmark of discriminatory intent. Sixth, no CPD employee before Plaintiff had ever been terminated for "timesheet falsification" alone. Finally, CPD ignored its well-established policy of progressive discipline when it terminated Plaintiff, despite a complete absence of any disciplinary history.

For these reasons, a rational jury could find that CPD discriminated against Plaintiff. As such, summary judgment is inappropriate, and Defendant's motion should be denied.

**C.** ***Plaintiff Can Show Under the Indirect Method That Similarly Situated Non-Hispanic Employees Were Treated More Favorably for Conduct of Comparable Seriousness, and That Defendant's Reliance on "Timesheet Falsification" To Justify Her Termination Was Mere Pretext.***

Plaintiff can also defeat summary judgment under the indirect method, or the so-called *McDonnell Douglas* burden-shifting scheme. Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination, which requires evidence that: (1) she is a member of a protected class; (2) her job performance met the defendant employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside the protected class were treated more favorably than the plaintiff. *Coleman*, 667 F.3d at 845 (citing *Burks v. Wisconsin Dep't of Transportation*, 464 F.3d 744, 750-51 (7th Cir. 2006)); *McDonnell Douglas,* 411 U.S. at 802. Importantly, "[t]o offer a prima facie case of discrimination under the indirect method, the plaintiff's burden is not onerous." *Coleman*, 667 F.3d at 846 (internal quotations omitted).

Once a plaintiff establishes a *prima facie* case, "a presumption of discrimination is triggered." *Id.* at 845. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Id.*; *Burks*, 464 F.3d at 751. If the employer is able to articulate such a reason, the burden shifts back to the plaintiff to prove that the employer's articulated basis for its action was pretextual, "which in turn permits an inference of unlawful discrimination." *Id.* "Pretext means a lie, specifically a phony reason for some action." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737-38 (7th Cir. 2013) (citing *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002)). Finally, "[i]f the plaintiff meets his respective burdens under *McDonnell Douglas,* summary judgment is inappropriate; a plaintiff need not come forward with direct evidence of discrimination in order to survive summary judgment." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001)

Defendant concedes that Plaintiff is a member of a protected class (first prong), and that she suffered an adverse employment action (third prong). *See Def. MSJ ¶ 26*. It disputes, however, that Plaintiff was meeting CPD's legitimate expectations at the time of her termination (second prong), and that similarly situated Non-Hispanic employees were treated more favorably (fourth prong). Plaintiff discusses the second and fourth prongs below.

1. Plaintiff Was an Exemplary Employee and Exceeded CPD's Legitimate Expectations[11] At the Time of Her Termination.

Defendant has not given annual or other periodic performance reviews since 2000, and it admits that the best way to determine the performance of an employee is to consult his or her supervisors and subordinates. *PL FACTS ¶¶ 15-16*. To that end, Vega has submitted the Declarations of her long-time Regional Manager and two subordinates who are still CPD employees.[12] In addition, in testimony, her immediate supervisor, Area Manager Gilkey, also still employed by Defendant, praised Vega's performance. *PL FACTS ¶¶ 30-37*. Through these four individuals, and union representative Harper, Vega presents the following view of her performance.

Vega was an outstanding employee for the twenty-plus years she was in Defendant's employ. *PL FACTS ¶¶ 2-39*. CPD acknowledges that Vega was never disciplined. *Def. MSJ ¶ 3*. Vega was promoted several times and took Bessemer Park from a gang-infested, graffiti-ridden

---

[11] Plaintiff notes that the Seventh Circuit has at times foregone discussion of whether a discrimination plaintiff was meeting her employer's legitimate business expectations under *McDonnell Douglas*. *See Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 617 n. 3 (7th Cir. 2001) (noting that a legitimate-expectations analysis was unnecessary since "the people judging [the plaintiff's] performance were the same she accused of discriminating against her"); *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001) ("where the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it 'makes little sense . . . to discuss whether she was meeting her employer's reasonable expectations'"). However, this element is easily established in Plaintiff's case.

[12] With the exception of Elizabeth Millan, former Regional Manager, these individuals are African-American.

location with three full-time police officers to a model park in the South Region with Caucasian, Hispanic, and African-American patrons. *PL FACTS ¶¶ 2, 18-20*. In addition to her regular duties, Vega developed or introduced at Bessemer several special programs, including significant and fully subscribed programs for individuals with special needs, and a boxing program that produced Golden Glove winners. *PL FACTS ¶¶ 21, 23, 24, 25, 26*. Under Vega, Bessemer held numerous regular special annual events. *PL FACTS ¶¶ 22, 25*. She was appointed to and served on many community groups, was selected as an agency-wide ActiveNet trainer, prepared and gave presentations for her Regional Manager, and was selected to assume the responsibilities of Area Manager Gilkey when Gilkey was out on medical leave. *PL FACTS ¶¶ 23, 24, 27, 28 29, 30*. Gilkey describes Vega as "a good leader, dependable and competent," "hardworking and dedicated," as someone Gilkey never had a problem with "doing what she should be doing," and who turned in reports on time. *PL FACTS ¶¶ 31-34*. Supervisors and subordinates found that Vega responded promptly to calls and requests even when she was off duty. *PL FACTS ¶ 32*. She regularly worked more than 40 hours a week. *PL FACTS ¶ 35*. In summary, Millan, who worked for Defendant in a series of positions of increasing responsibility over 30 years, found Vega to be one of the most dedicated Park Supervisors she had ever supervised. *PL FACTS ¶ 17*.

Defendant's claim that she was not meeting expectations is limited to alleged technical timesheet falsification. *Def. MSJ ¶ 26*. CPD totally disregarded her overall performance, her documentation, and her witnesses. *PL FACTS ¶¶ 187-188, 191*. The alleged violation depends for its substance on the unexamined and unquestioned Vega Investigative Report, and the import of that Report is that Vega was late according to the time she entered on her manual timesheets on three or four days over a period of five-and-a-half months by 10-20 minutes, and that she (or

her subordinates) neglected to enter into the logbook all of her absences from Bessemer on legitimate CPD business.

Given her positive employment history as related by both superiors and subordinates, CPD cannot claim in good faith that Plaintiff was not meeting its legitimate business expectations.

> 2. <u>Similarly Situated Non-Hispanic Employees Were Treated Far More Favorably Than Plaintiff, and Were Afforded More Leniency for Comparable Rule Violations.</u>

> i. *Only other CPD Park Supervisors, not Playground Supervisors, are similarly situated under* McDonnell Douglas *since the two positions are not comparable in all material respects.*

As the *Coleman* court noted, "[a]ll things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." 667 F.3d at 846. The initial step in the analysis is to determine exactly how alike comparators must be to the plaintiff to be considered similarly situated, which calls for a "flexible, common-sense examination of all relevant factors." *Id.* at 841, 846. Although similarly situated employees "need not be identical in every conceivable way," they "must be directly comparable to the plaintiff in all material respects." *Id.* (internal quotations omitted); *see also Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010) ("the similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone"). Further, "[t]he inquiry is fact intensive, requiring consideration of the circumstances as a whole." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).

Here, according to HR Director Michael Simpkins, although both positions report to the Area Manager, Park Supervisors and Playground Supervisors are not the same position. *PL*

31

*FACTS ¶ 227*. They have different job descriptions; Park Supervisor is a "professional" position, while Playground is a "para-professional." Moreover, there are significant differences in their respective training and expertise requirements, as well as the pay for the two positions. *PL FACTS ¶¶ 228-230, 233*. Notably, a CPD employee cannot become a Park Supervisor unless he or she has first been a Playground Supervisor, and a change in position from a Playground Supervisor to a Park Supervisor is "definitely a promotion," requiring interview and selection. Further, there is no transfer "by request" between Playground Supervisor and Park Supervisor, although employees may request lateral transfers (park to park or playground to playground) without the need for an interview and selection. *PL FACTS ¶¶ 231-232*. As such, Playground Supervisors are not "directly comparable in all material respects" to Park Supervisors and, thus, are not appropriate comparators.

Nonetheless, in its motion, Defendant compares Plaintiff—a Class A Park Supervisor— to at least two Playground Supervisors under the similarly situated prong. *See Def. MSJ ¶¶ 28, 34-35*. Moreover, Defendant provides four non-Hispanic comparators, three of whom are male, to argue against the racial and gender bias in Vega's investigation and subsequent termination: (1) Lester Rivers ("Rivers") (African-American male); (2) Herman Sims ("Sims") (African-American male); (3) Dina Rutledge ("Rutledge") (African-American female); and (4) Robin Locke ("Locke") (African-American male). *Def. MSJ ¶¶ 28, 34-35*. In presenting these "comparators," Defendant yet again attempts to present a version of "facts" that suits it.

First, both Sims and Rivers are Playground Supervisors according to documents produced and testimony provided by Defendant itself. *See Response to S.F. 145, 123; see also PX JJ1 (Chart of non-Park Supervisor Employees of Defendant who were investigated or disciplined for time or timesheet related allegations)*. CPD further admits that Sims did not

dispute the results of his investigation and was permitted to resign. *Def. MSJ ¶ 34*. Accordingly, Sims is not comparable to Plaintiff, who refuted CPD's allegations in their entirety and was terminated involuntarily. With regard to Rivers, not only was he also a Playground Supervisor, he was only surveilled over 14 days for 20 total surveillances, during which his person, rather than only his vehicle, was observed, and during which period he "stole" and was paid for 23 hours of time that he did not actually work. *See Response to S.F. 145; see also PX JJ1 and documentary support for S.F. 138-144*. Rivers, then, is also not an appropriate comparator.

Locke was a Park Supervisor, but Skerrett surveilled and recorded his vehicle *and* person leaving his home each day of surveillance, and who was terminated for residency violations in addition to timesheet issues. *See Response to S.F. 145; see also PX JJ1 and documentary support for S.F. 138-144*. Finally, Rutledge was a Park Supervisor whose investigation did not begin until October 15, 2012, over a month *after* Vega complained twice about racial discrimination and was terminated. *S.F. 133*. Rutledge's case should be ignored entirely, since Federal Rule of Evidence 407 "forbids using evidence of subsequent repairs or other remedial measures to prove that the defendant could or should have avoided inflicting the injury of which the plaintiff is complaining." *Lust v. Sealy, Inc.*, 383 F.3d 580, 585 (7th Cir. 2004) (finding that evidence of an employer offering a promotion to a female employee *after* she filed a sex discrimination charge with the EEOC for initially denying her a similar promotion violated Rule 407). Rutledge presents a similar case: Defendant, suspecting an imminent law suit due to Plaintiff's complaints of discrimination, immediately began investigating an African-American employee for conduct similar to that of which Plaintiff was accused, ultimately terminating her for the same technical "timesheet falsification." In addition to Plaintiff, Rutledge was the only other CPD employee ever to be terminated on that basis alone As in *Lust*, this

"remedial" measure "violated the spirit, and probably the letter" of Rule 407. *Id.* As such, Rutledge is not an appropriate comparator.

Accordingly, this Court should disregard each of the four "comparable" employees offered by Defendant. As is its way, Defendant presents an unrepresentative handful of "comparators" to prove its point and ignores the evidence that contradicts it: numerous examples of leniency granted to non-Hispanic employees, which are discussed below.

> ii. *Other non-Hispanic female CPD Park Supervisors were not terminated for conduct of comparable seriousness, and in many cases, offenses that were more severe.*

CPD treated African-American and Caucasian employees systematically better than Hispanics, which is in itself *prima facie* evidence of discrimination. The Seventh Circuit employs a "comparable seriousness" standard with regard to treatment of comparator employees. *Coleman*, 667 F.3d at 850. As the *Coleman* court explained:

> [i]n a disparate discipline case, the similarly-situated inquiry often hinges on whether co-workers 'engaged in comparable rule or policy violations' and received more lenient discipline. The Supreme Court has made clear that 'precise equivalence in culpability between employees is not the ultimate question: as we indicated in *McDonnell Douglas*, an allegation that other employees involved in acts against [the employer] of *comparable seriousness*' received more favorable treatment 'is adequate to plead an inferential case' of discrimination. Following this language, our circuit, like many others, has adopted this 'comparable seriousness' standard.

*Id.* (emphasis in original) (internal citations omitted); *see also Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007) ("[o]f course, employees may be similarly situated to the plaintiff even if they have not engaged in conduct identical to that of the plaintiff").

Indeed, the Seventh Circuit has consistently refused to award summary judgment to

defendant employers where employees outside of a plaintiff's protected class received different treatment for comparable misconduct. For instance, in *Coleman*, an African-American female postal service employee was terminated for violating a policy against workplace violence when her employer discovered that she told a psychiatrist that she had experienced suicidal ideation and thoughts of killing her supervisor. 667 F.3d at 840-44. However, two white male postal service employees had instigated an incident where they "held a knife to the throat of a black male co-worker . . . while holding down his legs" and were merely suspended. *Id.* at 847. The *Coleman* court noted that the white employees "engaged in conduct that appears, at least for purposes of summary judgment, at least as serious as [the plaintiff]'s indirect 'threat' against [her supervisor]—and arguably even more so," and held that summary judgment was inappropriate. *Id.* at 851, 859.

Similarly, in *Gordon*, the Seventh Circuit reversed the district court's award of summary judgment, relying in part on the fact that a similarly situated employee had been disciplined less harshly than the plaintiff for a similar infraction. 246 F.3d at 890. There, the plaintiff flight attendant was terminated for an "unauthorized deviation," though the defendant had "not spoken with one voice" in defining exactly what an unauthorized deviation was and had only charged one employee with the conduct previously—a white female who was merely warned. *Id.* at 886, 887-88. Moreover, the *Gordon* court found that "[o]ther employees, who engaged in facially similar conduct, received only interim warnings because their conduct was deemed a 'missed flight.'" *Id.* at 890. *Gordon* concluded that a triable issue of fact remained because a jury could determine that the plaintiff "simply missed a flight but was treated differently from the other flight attendants." *Id.* at 888.

Finally, in *Perez v. Thorntons*, a Hispanic female retail employee was terminated for

discounting a candy bar she purchased from the defendant store. 731 F.3d at 704. The plaintiff's non-Hispanic male supervisor committed a comparable act of misconduct when he "covered up theft from the store and, without the consent of his supervisors, concocted a one-man sting operation that invited additional theft—yet he was merely warned." *Id.* The *Perez* court found that the infractions were similar, since they both "involved inventory control, and yet the employees were treated very differently by [the defendant]'s higher management. We believe it should be left to a jury to decide whether they were similar enough to support an inference of discrimination." *Id.* at 705.

Indeed, disparate treatment among similarly situated employees is a persuasive indicator of discriminatory animus, and this case is replete with examples of black and white employees receiving leniency for conduct that was comparably serious, or "arguably more so," than technical "timesheet falsification" without the allegation of actual theft of time. Moreover, under the Seventh Circuit's "comparable seriousness" standard, Plaintiff need not limit her discussion of other employees' conduct to technical "timesheet falsification" offenses specifically.

In one of the starkest examples of "facially similar" conduct resulting in no discipline (also discussed in section I.B.2 above), Denise Raymond's documented timesheet falsification— specifically leaving her park everyday to pick up her children from school and failing to record it in the logbook—and *actual theft of time* over a period of months, if not years, resulted in *no discipline* after a *three-day investigation. PL FACTS ¶¶ 246-247.* Instead of discipline, Raymond was merely warned, *see Gordon*, 246 F.3d at 886-890; had Plaintiff received the same courtesy, she would have adjusted her timesheet and logbook habits. *PL FACTS ¶ 37.* A jury could infer discrimination from the dissimilar treatment of Raymond alone.

And yet, Defendant conveniently ignores Raymond in its discussion of comparators, as

well as the fact that in the span of 10 years, CPD conducted short investigations of only four (4) Caucasian Park Supervisors, and, even where violations were or could have been sustained (as in Raymond's case), no discipline, let alone termination, was imposed. *PL FACTS ¶¶ 246-248, 250, 251*. For instance, Catlin's investigation of Richard Blake (Caucasian male Park Supervisor), which initially uncovered theft-of-time and timesheet-falsification issues, was suspended for reasons unknown to the investigator. Curiously, Blake was transferred to another park and the investigation was never resumed. *PL FACTS ¶ 250*.

Moreover, also by contrast to Plaintiff, the three non-probationary African-American Park Supervisors terminated between 2005 and September 10, 2012 committed serious, documented offenses like financial fraud with a previous suspension (Marion McDonald), or physical damage to property combined with a long disciplinary history (Corenthia Davis-John).[13] *PL ¶ FACTS 244*. By way of further example, Jeannette Stovall and Roy Ellis (African-American female and male Park Supervisors, respectively) falsified the timesheets of two different subordinates over the course of a summer, so that Stovall's niece could work directly for her, but not appear to be doing so. CPD did not issue any discipline. *PL FACTS ¶ 249*. Likewise, Deborah Groh and Thomas MacManamon (Caucasian female and male Park Supervisors, respectively) were the subjects of a Hotline call complaining that they were spending time in bars during working hours, but were only surveilled before 9:30 a.m. on a handful of days, an investigation that CPD admits was not designed to investigate the allegation. *PL FACTS ¶ 251*.

Apparently, the pattern in CPD disciplinary policy is that African-American employees

---

[13] Of the 12 African-American Park Supervisors Defendant lists as terminated between 2005 and November of 2014, three were probationary and terminable without "just cause" under the Union Agreement, and five were terminated after September 10, 2012, Plaintiff's termination date. *Response to S.F. 123, 128; PL FACTS ¶ 244; PX HH*.

enjoy the benefits of CPD's formal "progressive discipline" policy—rather than being fired for a first offense, which was the treatment Plaintiff received—while Caucasian employees are hardly ever investigated and do not seem to have been disciplined at all between 2005 and September 2012. *See PX II1*. The comments of union representative Harper are revealing: despite having represented all CPD employees belonging to the union over seven years in disciplinary meetings and other events, he has not represented a single Caucasian employee. *PL FACTS ¶ 238*.

Indeed, as *Coleman* held, this kind of "selective enforcement of a rule calls into question the veracity of the employer's explanation." 667 F.3d at 857 (internal quotations omitted). Given the disparate treatment that Plaintiff received when compared to the similarly situated employees discussed above, a rational fact-finder could readily conclude that Plaintiff's termination was motivated by discriminatory animus. Summary judgment on these facts is wholly unwarranted.

### 3. "Timesheet Falsification" Was a Pretext for Defendant's Discriminatory Employment Action.

Discrimination plaintiffs may demonstrate that an employer defendant's basis for an adverse employment action is pretextual, *i.e.* "deceit used to cover one's tracks," by showing that it: (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the adverse employment action. *Davis v. Wisconsin Dep't of Corr.*, 445 F.3d 971, 977 (7th Cir. 2006). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Perez*, 731 F.3d at 708. But, "[i]f the stated reason, even if actually present to the mind of the employer, wasn't what induced him to take the challenged employment action, it was a pretext." *Id.*

The comparator evidence discussed immediately above is also "especially relevant" to establish pretext. *See Coleman*, 667 F.3d at 841 ("[i]n *McDonnell Douglas* itself, the Supreme

Court noted that comparator evidence would be '[e]specially relevant' at the pretext stage"). Indeed, "the prima facie case and pretext analyses often overlap." *Id.* at 858; *Gordon*, 246 F.3d at 892 ("[a] showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination"). So is whether Plaintiff was meeting CPD's legitimate expectations. *Gordon*, 246 F.3d at 886; *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996). Accordingly, Plaintiff incorporates the material discussed under the second and fourth prongs of the *McDonnell Douglas* above into the pretext analysis here.

In addition, the direct-method evidence discussed above suggests that "timesheet falsification" was pretext for a discriminatory termination. To briefly reiterate: (1) a significant racial imbalance exists in CPD's workforce disfavoring Hispanics; (2) the Vega investigation was initiated by a racially motivated African-American subordinate, who accused Plaintiff of "theft of time" and provoked African-American parent Kenneth Teal to accuse Plaintiff of "blatant racial bias," and carried on by two investigators who supported her animus; (3) the investigation did not produce any credible evidence that Vega "falsified" her timesheets in any way contrary to the normal timesheet practices of salaried CPD employees generally; (4) CPD decision-makers ignored Plaintiff's refutations of the "evidence" generated by the investigation; (5) the basis for Plaintiff's investigation and termination changed over time; (6) no CPD employee before Plaintiff had ever been terminated for "timesheet falsification" alone; and (7) CPD ignored its "progressive discipline" policy and terminated Plaintiff for her first offense.

Indeed, this case present numerous "weaknesses, implausibilities, inconsistencies, [and] contradictions in [Defendant]'s proffered reasons," and "a reasonable person could find them

unworthy of credence and hence infer that [Defendant] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). Summary judgment should be denied.

## II. SUMMARY JUDGMENT IS UNWARRANTED BECAUSE AMPLE EVIDENCE EXISTS THAT PLAINTIFF WAS THE VICTIM OF ACTIONABLE GENDER STEREOTYPING WITHIN THE MEANING OF TITLE VII.

Defendant engaged in impermissible gender stereotyping directed at Plaintiff. *Price Waterhouse v. Hopkins*, the seminal gender-stereotyping case, held that Title VII prohibited discrimination against a female employee because her dress, appearance, and conduct did not conform to stereotypical notions of femininity. 490 U.S. 228 (U.S. 1989); *Howell v. N. Cent. Coll.*, 320 F. Supp. 2d 717, 722 (N.D. Ill. 2004). Although discrimination claims based on sexual orientation are not covered by Title VII in the Seventh Circuit[14], *see e.g. Hamm v. Weyauwega Milk Products, Inc.,* 332 F.3d 1058, 1065 (7th Cir. 2003), discrimination based on failure to conform to gender norms violates Title VII and is actionable. *See Id.* at 1064 (acknowledging that sexual stereotyping claims are cognizable under Title VII); *see also Theno v. Tonganoxie Unified Sch. Dist No. 464*, 377 F. Supp. 2d 952, 974 (D. Kan. 2005) (noting that discrimination based on gender norms is actionable); *Ianetta v. Putnam Investments, Inc.*, 142 F. Supp. 2d 131, 134 (D. Mass. 2001) (holding that discrimination against a male for failing to conform to gender stereotypes "states a claim for sex discrimination under Title VII").

In *Price Waterhouse*, the plaintiff alleged that the defendant employer, an accounting firm, denied her a partnership position because she did not measure up to stereotyped images of women. 490 U.S. at 235-36. Through the course of her employment, the plaintiff had been

---

[14] *But cf. Complainant v. Dep't. of Transportation*, EEOC DOC 0120133080, 2015 WL 4397641, at *10 (July 16, 2015) (holding that sexual-orientation discrimination amounts to sex discrimination under Title VII).

referred to by other firm employees as "macho" and "masculine," among other gender-charged remarks. *Id.* at 235. The Court held that although stereotyping remarks at work may not invariably prove that gender motivated an employment decision, "stereotyped remarks can certainly be *evidence* that gender played a part." *Id.* (emphasis in original). The *Price Waterhouse* Court concluded that in that case, the comments directed toward plaintiff were not mere "stray remarks" but amounted to sex discrimination. *Id.*

A so-called "doctrine of stray remarks" followed in the wake of *Price Waterhouse*, and has been a source of confusion among lower courts. However, in *Shager v. Upjohn Company*, an age discrimination case, Judge Posner explained the import of the doctrine, noting that:

> all that [stray-remark] cases really stand for is the common-sense proposition that a slur is not in and of itself proof of actionable discrimination, even if repeated. The remark taken to be a slur *may* have been innocent and misunderstood; or it *may* have had no consequence, either because it did not reflect the thinking of the people with decision-making authority or because it did not motivate even the person uttering it to act on it. It thus *may* fall far short of establishing a prima facie case. Even so, it *may* be relevant evidence, with greater or less probative value depending on the precise character of the remark.

913 F.2d 398, 402 (7th Cir. 1990) (emphasis is original); *see also Dandy v. UPS, Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (stray remarks can be evidence of discrimination if sufficiently connected to the employment decision). *Shager* also pointed out that "the task of disambiguating ambiguous utterances is for trial, not for summary judgment." *Id.*

In the instant case, Defendant's contention that Plaintiff "has not offered any evidence to sustain her sex-stereotyping claim" is patently false. As an initial observation, Defendant erroneously claims that "Vega offers only one allegation that might remotely suggest sex stereotyping," reciting Catlin's comment that he "thought [Vega] was a dude. Man, she could have—she shaved her hair off," an impression Catlin later confirmed in his deposition ("I tell

you the truth, I thought she looked like a guy, like a dude"). *Def. MSJ ¶ 47; PL FACTS 217-218; PX O30.*

But in fact, audio-recorded comments by *each* investigator, made at separate times, indicate bias against Plaintiff due to her appearance. In a second example utterly ignored by Defendant, Hester, on December 5, 2011 while following Vega's Trail Blazer and apparently frustrated during his attempt to identify the driver, remarked about "that short hair shit."[15] *PL FACTS ¶ 219.* The emphasis on Plaintiff's appearance persisted through the CPD Administrative Hearing on January 31 and February 1, 2013, during which CPD attorney Brian Flores attempted to measure Plaintiff's hair with a ruler during his examination of Plaintiff. *PL FACTS ¶ 220.* Further, counsel in this matter questioned Vega about whether she would be surprised if someone thought she was a man, and whether her style of dress was "female," pressing her on the way her shirt buttoned and unbuttoning his own shirt to attempt to prove the point. When Vega told him she found some of his questions offensive he told her he "didn't care" because she had filed a gender stereotyping claim. *PL FACTS ¶¶ 220-224.* But during her tenure at CPD, Vega wore exactly what 90% of other Park Supervisors wore: a long- or short-sleeve shirt with a CPD logo, jeans or sweatpants, and tennis shoes. *PL FACTS ¶¶ 225.*

Ultimately, each investigator, and two CPD attorneys in two separate forums *independently* made pejorative comments about Plaintiff's non-stereotypical appearance. This is evidence of discrimination from which a rational jury could conclude the CPD is rife with gender stereotyping bias, and that that bias played a role in Vega's investigation and termination.

As such, Defendant's motion as to Count IV should be denied.

---

[15] Vega drove her partner's green Jeep Cherokee and her niece was driving the maroon Trail Blazer that Hester was following. *PL FACTS ¶¶ 119, 157, 220.*

## III.    A REASONABLE JURY COULD FIND THAT DEFENDANT FIRED PLAINTIFF FOR COMPLAINING ABOUT DISCRIMINATION, AMOUNTING TO IMPERMISSIBLE RETALIATION UNDER TITLE VII.

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in [a relevant] investigation, proceeding, or hearing." 42 U.S.C. § 2000e–3(a). Like discrimination claims, a retaliation plaintiff can proceed under either the direct or indirect methods of proof. *Boumehdi*, 489 F.3d at 792. Under the direct method, a plaintiff can prove retaliation by presenting direct evidence of: (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. *Id.*; *Sitar v. Ind. Dep't of Transp.,* 344 F.3d 720, 728 (7th Cir.2003). Further, "a plaintiff may offer [a convincing mosaic of] circumstantial evidence of intentional retaliation, including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Boumehdi*, 489 F.3d at 792; *Troupe*, 20 F.3d at 736.

For example, in *Boumehdi*, the Seventh Circuit reversed the district court's award of summary judgment for the defendant where the plaintiff, who had been denied a raise and was also underpaid for completed work, complained to her employer about gender-based comments made by her supervisor. 489 F.3d at 791, 792-93. In so holding, the *Boumehdi* court noted that "[t]he causal link [under the direct method] of a retaliation claim is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action. *Id.* at 793. There, the plaintiff's paycheck shortages "followed closely on the heels" of her complaint, and the court held that a jury could conclude

that "[the plaintiff]'s complaints triggered the subsequent adverse actions." *Id.*; *see also Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005) (finding a triable inference of retaliation under the direct method where a short period of time elapsed between the plaintiff's complaint of discrimination and her termination, even though she had just received a positive performance review).

Here, Plaintiff complained of discrimination orally on February 26, 2012, and in writing on September 4, 2012—six days before her termination. *PL FACTS ¶ 207.* Plaintiff's complaints were protected by Title VII, and she also suffered an adverse employment action, satisfying the first two prongs of the direct method analysis. *See Boumehdi*, 489 F.3d at 792. With regard to causation, the final prong, Plaintiff submits that the short period of time between her written complaint and the letter terminating her dated September 10, 2012, *see PL FACTS ¶ 146*, along with Defendant's blatant failure to investigate her complaints create an issue of triable fact. *See Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1086-87 (7th Cir. 2000) (failure to investigate can alone be the basis of a Title VII claim).

Curiously, Defendant's excuse for its failure to investigate was that Hester and Catlin's investigation was already over, *PL FACTS ¶ 207*, and to further cover its tracks, CPD testified under Rule 30(b)(6) that nothing in Vega's September 4, 2012 letter amounted to a complaint based on discrimination or gender. *PL FACTS ¶ 208*. This reading is plainly wrong, considering that the letter, after outlining in detail the conduct complained of, provides in part that, "I request that this *discrimination* and harassment cease and further that I not be subjected to retaliation because of this *complaint of discrimination*." *PX AA7* (emphasis added). The letter further requested an investigation into the complaint. *Id.* CPD declined to do so.

However, CPD's refusal to investigate Plaintiff's complaints is unsurprising, as its

history of dealing with internal claims of discrimination based on gender, race/ethnicity, gender stereotyping, or retaliation is remarkably inadequate. Although CPD provided relevant files on 24 employees registering such claims between 2007 and 2015, it has *never* sustained a single internal claim of discrimination. *PL FACTS ¶¶ 204, 205*. CPD produced files on only two employees, Plaintiff and Philip McGrath ("McGrath"), who made internal complaints of discrimination in writing. *PL FACTS ¶¶ 207, 208, 211*.

McGrath's case illustrates the point. He was a Caucasian male CPD employee who complained repeatedly about "gay bashing" from 2009 until he retired, and the conduct he complained of included ballet slippers left on his chair, action figure dolls in homosexual pornographic positions left in front of his locker, his locker turned around to face the wall multiple times, and graffiti on bathroom walls disparaging him. *PL FACTS ¶ 211*. However, like Vega's, CPD refused to investigate McGrath's complaints because—somehow—it did not consider them complaints of or evidence of harassment of McGrath. *Id.* Though its stubborn refusal to investigate is similar between Vega and McGrath, CPD never disciplined McGrath after his complaints. They did, however, fire Vega a week after she submitted her written complaint of discrimination. *S.F. 77, 78*.

As in *Boumehdi* and *Culver*, the suspiciously short time between Plaintiff's complaint and her termination, combined with CPD's manifest hostility toward employee complaints of discrimination and its refusal to investigate, could convince a reasonable jury that Plaintiff's termination amounted to unlawful retaliation under Title VII.

## IV.     SUMMARY JUDGMENT IS INAPPROPRIATE ON PLAINTIFF'S SECTION 1981 CLAIMS BECAUSE THEY ARE SUBJECT TO THE SAME ANALYSIS AS HER TITLE VII CLAIMS.

Plaintiff alleges national-origin discrimination under 42 U.S.C. § 1981 in Count I of her Amended Complaint, and retaliation under the same in Count II. Although section 1981 claims apply only to allegations based on race, *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006), a plaintiff need not expressly allege racial discrimination as long as she alleges "intentional discrimination" based on her "ancestry or ethnic characteristics," since "such discrimination is racial discrimination that Congress intended § 1981 to forbid . . . ." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (U.S. 1987) (permitting a section 1981 claim based on Arabian ancestry); *see also Quintana v. Byrd*, 669 F. Supp. 849, 850 (N.D. Ill. 1987) (sustaining a "white Hispanic" female's section 1981 claim, noting that "[w]hat matters is whether defendants discriminated against plaintiff because of her 'ethnic characteristics,' as opposed to her country of origin"). Importantly, a complaint asserting a section 1981 claim based on national origin can be predicated on race "when it is clear that the plaintiff is alleging that he 'belongs to a group that is distinct from 'white citizens' as a matter of race or color.'" *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 352 (7th Cir. 1987).

Here, although Plaintiff's section 1981 claims refer to "national origin" instead of race, the crux of her claims is that she was discriminated against because she belongs to a group distinct from white citizens, as well as from citizens of other races who received preferential treatment by the Park District. *See* Pl. Amend. Comp, ¶ 47 (in the context of Defendant's poor racial statistics, alleging that another Hispanic Park Supervisor was "replaced by a Caucasian female"). Further, plaintiff's claims are couched entirely in terms of her "ethnic characteristics." *See Quintana*, 669 F. Supp. At 850. At no point in the Amended Complaint, or elsewhere, does

she even cite her country of origin. *See e.g.* Pl. Amend. Comp, ¶ 10 ("Plaintiff is a forty-two year old *Hispanic* female who is openly lesbian") (emphasis added). Therefore, Plaintiff stated a viable section 1981 claim.

Moreover, "[t]he substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981." *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012). As such, Plaintiff repeats and realleges the arguments presented above that Defendant discriminated and retaliated against her under Title VII, and asserts that this Court should permit her section 1981 claims to proceed to jury trial.

With regard to Defendant's claim that Plaintiff must show that discrimination against Hispanics was Park District custom, practice, or policy since CPD is a "municipality," *Def. MSJ, ¶ 51*, it has made no showing that that is the appropriate standard or CPD's proper classification. The authority it cites in support of the policy-or-practice standard is *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008), a Tenth Circuit case where a black female sued the City and County of Denver for discrimination for rejecting her employment application to become a police officer. But Defendant has made no showing that CPD is a "municipality." In fact, in its own Rule 56.1 Statement of Facts, it refers to itself as "a local public entity." *S.F. ¶ 1*. It provides no indication that the two are synonymous.

Moreover, assuming *arguendo* that a policy-or-practice standard applies, Plaintiff has provided ample evidence that CPD has both a pervasive practice and an unwritten policy of bias against Hispanics. Thus, the inquiry is clearly best left for a jury. Plaintiff alleged above a pervasive pattern of institutional discrimination against Hispanics, as demonstrated by CPD's own employment statistics. Accordingly, a rational jury could find that such a pattern or practice exists, and Defendant's cursory dismissal of that possibility should be disregarded at the

summary judgment stage.

As such, Defendant's motion should be denied.

## CONCLUSION

Summary judgment should be denied as to Counts I, II, III, IV, and V of Defendant's motion. As discussed above, this case is overwhelmed with issues of triable fact. CPD's disciplinary system is profoundly flawed, and it permitted a stellar employee to be targeted by a racially biased employee and two African-American investigators who wanted to "get" Plaintiff. Plaintiff was ultimately terminated without regard to her performance or her lack of any prior discipline, all while denying her the benefits of CPD's official policy of "progressive discipline." The leniency that similarly situated African-American and Caucasian employees received by comparison to Plaintiff, and other Hispanics, combined with evidence of institutional discrimination, highlights the Defendant's discriminatory animus.

Plaintiff has demonstrated that a rational fact-finder could find for her on all of her remaining claims. Where a non-moving party "succeed[s] in presenting evidence from which an inference of discrimination could be drawn, summary judgment [is] improper and a trial is required." *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1402 (7th Cir. 1996). Plaintiff has presented such evidence, and this case should proceed to trial.

WHEREFORE, Plaintiff respectfully requests that this Court denies Defendant's Combined Motion and Memorandum in Support of Its Motion for Summary Judgment, and set this matter for jury trial.

Dated: October 30, 2015

Respectfully Submitted,
LYDIA VEGA, Plaintiff


By:  /s/ Catherine Simmons-Gill
Catherine Simmons-Gill
Matthew Douglas
Offices of Catherine Simmons-Gill, LLC
111 West Washington Street
Suite 1051
Chicago, IL 60602
simmonsgill@gmail.com
Tel: 312 609 6611
ARDC Number 2159058