# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

LYDIA E. VEGA,

    Plaintiff,

        v.

CHICAGO PARK DISTRICT,

    Defendant.

No. 13 C 451
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

In this action, Plaintiff Lydia E. Vega ("Plaintiff") alleges that her former employer, Defendant Chicago Park District ("Defendant" or the "Park"), unlawfully discriminated against her in violation of both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Plaintiff also brings two privacy-based pendant state claims against Defendant. This case is presently before me on Defendant's motion for summary judgment on all counts. For the following reasons, Defendant's motion is granted in part and denied in part.

## FACTS AS ALLEGED

Plaintiff began working for Defendant as a seasonal employee in 1990 and was promoted to Park Supervisor in 2004. As a Park Supervisor, Plaintiff's duties included overseeing park operations and programs, supervising employees and volunteers, training employees, conducting community outreach, and attending meetings and conferences. Plaintiff was assigned to Bessemer Park in Chicago, Illinois, which is located at 8930 South Muskegon Avenue. She was a member of Local 73 of the Service Employees International Union.

Defendant is a local government entity that provides cultural opportunities for the people of Chicago. It operates over 400 parks and other recreational facilities in Chicago, and in

1

2012, employed approximately 1,440 full-time employees, 1,277 part-time employees, and an additional 3,685 seasonal summer employees. The Park's employment policy is established by the Personnel Board, which produced a Code of Conduct for employees and accompanying disciplinary procedures and penalties. Defendant divides its employees into three geographical Regions; Bessemer Park is located in the South Region.

Mary Saieva is the Human Resources Manager for the South Region. Saieva reports to the Director of Human Resources, Michael Simpkins, who is responsible for overseeing and applying employment-related policies. In the South Region, Park Supervisors and Playground Supervisors are responsible for overseeing parks. Park Supervisors and Playground Supervisors perform essentially the same duties, activities, and functions, except that Park Supervisors oversee larger parks while Playground Supervisors oversee smaller parks.

Plaintiff is a Hispanic female who openly identifies as a Lesbian. Prior to the events that led to her termination on September 10, 2012, Plaintiff generally received satisfactory feedback when reviews were conducted. Plaintiff had never been disciplined for any reason, and her immediate supervisor, Park Area Manager Anita Gilkey, described Plaintiff as "a good leader, dependable and competent."

*The Park Receives a Complaint and Starts an Investigation*

The Park operates a telephone hotline where citizens and employees are given the ability to make anonymous calls about suspected wrongdoing by Park employees. If a complaint is received through the hotline, the Park's General Counsel assesses the complaint and decides whether to assign an investigator to follow up. On September 23, 2011, a Park employee placed a call through the hotline and accused Plaintiff of "theft of time" by alleging that Plaintiff on "several occasions [had] not put in a full eight hour day."

Upon receiving this complaint, the Park began an investigation on September 27, 2012, enlisting Chicago Police Department Officers Leroi Catlin and Michael Hester to investigate Plaintiff's alleged wrongdoing. Edward Skerrett, a Caucasian male Park employee, also participated in the investigation. In a typical timesheet falsification investigation, the investigators gather background information on the employee and commence surveillance of the employee's home by videotaping the time that the employee leaves her house in her vehicle and the time that the employee arrives at their job site and parks her vehicle. These videotapes are then compared with the employee's timesheet. According to the Park, investigators have discretion to conduct as much surveillance as needed.

According to Plaintiff, at least one of the investigators identified and spoke to the Park employee who called the hotline to complain about Plaintiff. After searching Illinois Department of Motor Vehicle records and learning that Plaintiff was the owner of a burgundy Chevy Trail Blazer, Catlin and Hester began intermittently monitoring Plaintiff's Trail Blazer by recording the SUV's activity on videotape. Over the next five-and-a-half months, Catlin and Hester, along with other investigators, conducted 48 video surveillances. They videotaped the Trail Blazer when it left the Plaintiff's residence and also when it arrived and parked at Bessemer Park. Each video recording was date and time stamped.

Because they were videotaping from the inside of their car, these videotapes also recorded conversations between the investigators. In one recording, Hester remarked on Plaintiff's short hairstyle, while in other recordings, Catlin referred to the Plaintiff using the gender-based derogatory term "bitch" and remarked the Plaintiff "looks like a dude" because of "that short hair shit."

Unaware that she was being investigated and monitored, Plaintiff continued to

3

manually enter her timesheets in the Park's timesheet system and keep a logbook containing her hours.

On February 15, 2012, Catlin and Hester went to Bessemer Park and retrieved Plaintiff's logbook. Around this time, both investigators spoke to Plaintiff and told her that she needed to set up a meeting with them. On February 28, 2012, Plaintiff called Brian Flores, an attorney at Park's Law Department, to complain about what she believed was prejudicial behavior by the investigators and stated that she felt she was experiencing discriminatory treatment.

Plaintiff and her union representative met with Catlin and Hester on March 12, 2012. Plaintiff alleges that Catlin and Hester were hostile and accusatory during the meeting and were not interested in Plaintiff's explanations of her whereabouts on the dates in question.

*The Park Terminates Plaintiff*

Catlin and Hester filed a final investigative report on March 20, 2012. The report contained Plaintiff's timesheets, logbook pages for some dates, and a chart listing the result of each day's surveillance. Specifically, the report alleged that Plaintiff arrived at Bessemer Park at a later time than she entered on her timesheets and that Plaintiff failed to properly log all of her absences from Bessemer Park. The report concluded that Plaintiff had falsified timesheets for 13 days. This report was submitted to the Park's General Counsel, who passed it to Saieva.

The Park sent notice to Plaintiff on July 13, 2012 to set up a Corrective Action Meeting ("CAM") with the Park's Human Resources Department and Saieva regarding the allegations that she had falsified her timesheet. The CAM occurred on July 26, 2012. Plaintiff attended the meeting along with her union representative. During the meeting, Plaintiff produced 56 pages of documentation to explain her timesheet discrepancies and refute the report's findings that she

4

was not working on Park business. At that time, Plaintiff claimed that every employee is forced to falsify his or her timesheet, as timesheets are due before the timesheet period is over. Furthermore, Plaintiff stated that most salaried employees use an imprecise eight-hour period, such as 9:00 a.m. to 5:00 p.m. or 10:00 a.m. to 6:00 p.m., and that she almost always worked eight-hour days and sometimes worked more than eight hours.

On September 10, 2012, the Park sent Plaintiff a CAM disposition notice terminating her employment at the Park for timesheet falsification. The Park justified Plaintiff's termination as misconduct falling within the category of "Class A" misconduct (the most serious type of misconduct under the Park's Disciplinary Procedures), specifically "making a false statement or statements in any document required to be made or signed by the employee in connection with Park District employment, including daily attendance records and payroll records." The Park now claims, however, that Plaintiff's misconduct should fall into the "Class B" category of misconduct where the recommended penalty is suspension, but termination is allowed in the most serious cases.

Plaintiff appealed the termination to the Personnel Board, and after an administrative hearing where both the Park and Plaintiff presented evidence and witnesses, the hearing officer affirmed her termination. The Personnel Board adopted the hearing officer's recommendation and affirmed the termination. Plaintiff has not appealed this decision to the Circuit Court of Cook County.

This is not the first time the Park investigated a Park Supervisor for falsifying timesheets. For example, in an unrelated investigation targeting Park Supervisor Denise Raymond, a Caucasian woman who was accused of leaving the job early to pick up her children without signing out of her logbook, Skerrett told Raymond that she was under investigation and

should sign her timesheets after only three days of surveillance. The Park did not discipline Raymond and justified its decision by referring to its policy of giving all Park employees one 15-minute break and a 30-minute lunch each day. Additionally, in four other unrelated investigations of African-American male and female Park Supervisors and Playground Supervisors for timesheet falsification, the number of surveillances conducted ranged from 20 to 42 days. All four Park Supervisors and Playground Supervisors were terminated following a CAM or resigned during the disciplinary process.

In 2014, the Park had approximately 67 Caucasian Park Supervisors, 41 African-American Park Supervisors, and nine Hispanic Park Supervisors. Of the nine Hispanic Park Supervisors, two are female. Between 2005 and November of 2014, the Park terminated fourteen Park Supervisors. Three of the Park Supervisors who were terminated identify as female and Hispanic. The three female Hispanics were terminated for reasons other than timesheet falsification. Between June 2008 and September 2012, four of the Park's eight cumulative Hispanic female Park Supervisors resigned or were terminated, while three additional Hispanic Park Supervisors retired, resigned, or were demoted. In this case, Plaintiff was replaced by an African-American female.

## LEGAL STANDARD

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

I consider the record in the light most favorable to the non-moving party, and I draw all reasonable inferences in the non-movant's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002). I will accept the non-moving party's version of any disputed fact, however, only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## DISCUSSION

Defendant's motion seeks summary judgment on all counts of Plaintiff's operative Amended Complaint, namely: (1) discrimination on the basis of Hispanic national origin under 42 U.S.C. § 1981 (Count I); (2) retaliation under section 42 U.S.C. § 1981 (Count II); (3) national-origin and gender discrimination under Title VII (Count III); (4) sex stereotyping under Title VII (Count IV); (5) retaliation under Title VII (Count V); and (6) privacy-based pendant state claims (Counts VI and VII). Plaintiff concedes that Counts VI and VII should be dismissed, but opposes Defendant's motion with respect to Counts I-V.

7

I.       Plaintiff's National-Origin Discrimination Claim under Section 1981 (Count I)

Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." *Jordan v. Whelan Sec. of Illinois, Inc.*, 30 F. Supp. 3d 746, 752 (N.D. Ill. 2014) (quoting 42 U.S.C. § 1981(a)). In Count I of the complaint, Plaintiff alleges that the Park violated Section 1981 by discriminating against her on the basis of her Hispanic national origin.

An employee alleging discrimination under § 1981 may defeat a motion for summary judgment under either the direct method or indirect method of proof. "Under either approach, a plaintiff must demonstrate that she was the victim of adverse employment action and that the adverse action was the result of discrimination." *Brand v. Comcast Corp., Inc.*, No. 11 C 8471, 2015 WL 7077243, at *3 (N.D. Ill. Nov. 13, 2015).

To prevail under the direct method, a "plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action." *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014); *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *Overly v. Keybank Nat'l Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011). Direct evidence is akin to an explicit admission that an employment decision was motivated by discrimination, and is therefore rare. *See Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Direct evidence, if believed, proves "the particular fact in question without reliance upon inference or presumption." *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998) (internal quotation omitted). Direct evidence "can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).

In addition to the direct method of proof, a plaintiff may also attempt to defeat summary judgment by establishing a prima facie case of discrimination using the indirect, burden-shifting method of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014).

Under the indirect method, a plaintiff must first establish four requisite elements: (1) she belongs to a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 591–92 (7th Cir. 2008); *Brewer v. Board of Trustees of the University of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). If a plaintiff establishes all four elements, the presumption of discrimination shifts to the employer, who must provide a legitimate non-discriminatory reason for its action. *Johnson v. Gen. Bd. of Pension & Health Benefits of the United Methodist Church*, 733 F.3d 722, 727-28 (7th Cir. 2013). If the employer articulates a legitimate non-discriminatory reason, the burden then shifts back to the plaintiff to show that the proffered reason is pretextual, which would then permit an inference that the employer's real reason was unlawful. *Id.*; *Nichols v. Southern Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007). Here, there is nothing in the record that qualifies as direct evidence.

To survive summary judgment without direct evidence, a plaintiff must present a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action." *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1070 (7th Cir. 2012) (quoting *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004)).

Circumstantial evidence generally takes the form of: (1) suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the

9

protected group, and other "bits and pieces" from which an inference of discriminatory intent might be drawn; and (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the plaintiff's protected class received systematically better treatment. *Troupe*, 20 F.3d at 736. "The key to the direct method of proof is that the evidence, whether direct or circumstantial, points directly to a discriminatory reason for the employer's action." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008), *as corrected* (Jan. 21, 2009) (internal quotations and citations omitted). Importantly, evidence that might be insufficient standing alone can "together with other facts" be sufficient to defeat summary judgment. *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013).

Here, Plaintiff successfully presents a convincing mosaic of circumstantial evidence. Although Hispanics make up roughly one-third of the Park's population, they are grossly underrepresented in the Park's senior executive positions and HR positions.

Plaintiff's statistical data is coupled with persuasive evidence of suspicious—if not alarming—timing. Plaintiff's surveillance investigation was remarkably long. In fact, it was one of the longest investigations ever conducted of a CPD employee, and the only one in which all five investigators participated. Furthermore, when asked about his investigation of CPD Park Supervisor Denise Raymond, a Caucasian who was accused of leaving her park every day to pick up her children without signing out in her park's logbook, Senior Investigator Skerrett testified that he would have never prolonged that investigation for five-and-a-half months.

On top of this, Plaintiff was the first Park employee to be fired solely for "Timesheet Falsification" without corresponding allegations of actual theft of time, or other Code of Conduct violations. The fact that the Park first classified Plaintiff's violation as Class A and then switched it to Class B is also questionable. "Significant, unexplained or systematic deviations from

10

established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012); *see also Davis v. Wisconsin Dep't of Corr.*, 445 F.3d 971, 977 (7th Cir. 2006) (upholding jury finding of pretext where a corrections officer was disciplined more harshly than the Department of Corrections' progressive discipline policy prescribed).

Because Plaintiff has successfully constructed a convincing mosaic of discriminatory intent, analysis under the indirect method of proof is not required. Because a rational jury could find that the Park discriminated against Plaintiff on the basis of her Hispanic national origin, summary judgment is not appropriate on her Section 1981 discrimination claim.

## II. Plaintiff's Retaliation Claim under Section 1981 (Count II)

"The Supreme Court has held that § 1981 authorizes claims for retaliation, if one person takes action against another for asserting the right to substantive contractual equality provided by § 1981." *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008)). "In the context of laws governing employment rights, 'unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination.'" *Id.* (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)).

Retaliation claims under § 1981 can also be established under either the direct or indirect method of proof. *Coleman*, 667 F.3d at 859. Under the direct method of proof, a plaintiff must show that: (1) she engaged in a protected activity; (2) Defendant took an adverse employment action against her; and (3) there was a causal connection between the two. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 14-3201, 2016 WL 304043, at *13 (7th Cir. Jan. 26, 2016) (citing *Tank v. T-Mobile*, 758 F.3d at 807 (7th Cir. 2014)).

11

Under the indirect method of proof, the plaintiff must show (1) she engaged in statutorily protected activity; (2) she met Defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d, 657-58 (7th Cir. 2012).

Here, Plaintiff has provided enough evidence to defeat a motion for summary judgment under the direct method. Plaintiff argues that she made two complaints about discrimination to the Park after she learned about the investigations and that this is protected activity. The first complaint was a phone call made on February 26, 2012, to a Park attorney, nine days after she learned about the investigation. The second was a letter sent to Simpkins—the Director of Human Resources and Saieva's boss—and Inspector General Alison Persona on September 4, 2012, about a week-and-a-half after her second August, 23, 2012, CAM meeting and six days before her termination.

Plaintiff bases her argument for a causal link on the suspiciously short period of time between her complaint and her termination. Where such action "follows closely on the heels" of a complaint, a jury may conclude that a plaintiff's complaint triggered the subsequent action. *See Boumehdi v. Plastag Holdings*, LLC, 489 F.3d 781489 F.3d at 793. The jury will need to hear the testimony presented by Plaintiff and the people who decided to terminate her, and assess their credibility during trial. Accordingly, I am denying Defendant's motion for summary judgment with respect to Plaintiff's retaliation claim under § 1981.

### III.    Plaintiff's Discrimination Claims under Title VII (Count III)

Title VII prohibits discrimination in employment: "It shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *Howard v. Inland SBA Mgmt. Corp.*, 32 F. Supp. 3d 941, 955 (N.D. Ill. 2014). Although Plaintiff pleads several Title VII discrimination claims in one count of the Complaint (Count III), each unique claim should be addressed separately.

A.     **National-Origin Discrimination**

Title VII and Section 1981 claims are analyzed in the same manner. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). Because Plaintiff has successfully defeated Defendant's motion for summary judgment with respect to her discrimination claim under Section 1981 on the basis of her Hispanic national origin, Plaintiff may also proceed with her identical claim under Title VII.

B.     **Gender Discrimination**

Plaintiff also argues gender discrimination under Title VII. This analysis proceeds along the same direct and indirect method framework as discussed in SECTION I of this opinion. *See Rhodes v. Illinois Dep't Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

Plaintiff has failed to present any direct evidence of discrimination on the basis of her gender. Plaintiff's arguments track closely with her national-origin claims, namely that there was suspicious timing in her firing, but unlike her national-origin claim, she has failed to present convincing statistical evidence and, more importantly, she cannot invoke the Raymond report because Denise Raymond is, like Plaintiff, a female.

Plaintiff alleges that Hester, Catlin, and the Park management acted with discriminatory intent, but this is only speculation. Although the investigators made several remarks that were recorded during their surveillance—such as "she looks like a dude" and "that

13

short hair shit" and "bitch"—these comments fall in the category of "stray remarks" that are disconnected from the employment decision at issue, and fail to defeat summary judgment. *See Overly*, 662 F.3d 856, 865. The investigators' comments are the type of remarks in the workplace that do not "inevitably prove that gender played a part in a particular employment decision." *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). Hester and Catlin's comments showed a poor choice of words, but they do not rise to the level where intentional gender discrimination can be inferred. Without additional evidence, Plaintiff cannot defeat summary judgment under the direct method of proof.

If a plaintiff cannot prevail under the direct method of proof, she must proceed under the indirect method (the *McDonnell Douglas* framework) and establish a prima facie case by proving that: (1) she was a member of a protected class; (2) she was performing her job satisfactorily; (3) she experienced an adverse employment action; and (4) similarly situated individuals were treated more favorably. *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002). If the Plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment action. *Id.*

There is no dispute that, as a woman, Plaintiff is a member of a protected class and, as a terminated employee, experienced adverse employment action. Even if Plaintiff can show that she was performing her job functions satisfactorily by filling out her timesheets utilizing certain idiosyncratic customs and practices of Park employees, she still needs to meet the fourth prong by comparing her situation with similarly situated employees. This is fatal to Plaintiff's case.

Similarly situated employees "must be 'directly comparable' to the plaintiff 'in all material respects,'" but they need not be identical in every way. *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009) (quoting *Raymond v. Ameritech Corp.*,

442 F.3d 600, 610-11 (7th Cir. 2006). At a minimum, a plaintiff must show that the comparators (1) were managed by the same supervisor, (2) were held to the same standards, (3) were engaging in similar conduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (quoting *Snipes v. Ill. Dep't of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002)).

Plaintiff cannot fulfill this requirement because she has not introduced any evidence that a male employee was investigated for "Timesheet Falsification" and treated any differently by the Park. Between January 2005 and November 2014, the Park terminated one female and three male Park Supervisors and Playground Supervisors for timesheet falsification.

Plaintiff, therefore, has failed to defeat Defendant's motion for summary judgment on her gender discrimination claim.

**C.     Plaintiff's Sex-Plus Discrimination Claim**

A sex-plus, or gender-plus, theory of discrimination hinges on disparate treatment based on sex in conjunction with another characteristic. *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). Plaintiff argues that while the Seventh Circuit has not expressly recognized a sex-plus theory, it has allowed claims based on gender and national origin to proceed to trial. Plaintiff argues that the court refrained from dwelling on where to draw the line between discrimination based on national origin and discrimination based on gender in *Perez v. Thorntons, Inc.*, where a Hispanic female plaintiff alleged that the defendant employer "fired her because she [was] Hispanic and a woman." *See* 731 F.3d 699, 703, 711 (7th Cir. 2013).

Putting aside the viability of Plaintiff's sex-plus claim by her classification as a

15

Hispanic female, Plaintiff must still produce evidence that the Park took an adverse employment action at least in part on account of sex. *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 563-65 (7th Cir. 2009). As discussed in the previous section, Plaintiff is lacking in such evidence and therefore cannot defeat summary judgment on this claim.

**IV.  Plaintiff's Sex Stereotyping Claim Under Title VII (Count IV)**

Although discrimination claims based on sexual orientation are not covered by Title VII in the Seventh Circuit, discrimination based on failure to conform to gender norms violates Title VII and is actionable. *See Hamm v. Weyauwega Milk Products, Inc.*, 332 F.3d 1058, 1064-65 (7th Cir. 2003). Specifically, Title VII prohibits an employer from discriminating against a female employee because her dress, appearance, and conduct do not conform to stereotypical notions of femininity. *See Price Waterhouse*, 490 U.S. 228, 250-51 (1989).

To support her claim, Plaintiff argues that Park investigators made several remarks on Plaintiff's hair and dress that reveal their discriminatory animus. The problem with this argument, however, is that these remarks are not sufficiently related to Plaintiff's termination. Although Catlin commented that Plaintiff "looked like a guy, like a dude," and referred to her as "that short hair shit," these statements fall in the category of "stray remarks" that are disconnected from the employment decision at issue. *See Overly*, 662 F.3d 856, 865.

Plaintiff's sex-stereotyping claim is dismissed because, under either method of proof, there is not enough evidence that would allow a rational juror to conclude that the Park terminated Plaintiff due to sex stereotyping.

**V.  Plaintiff's Retaliation Claim under Title VII (Count V)**

The legal analysis for Plaintiff's Title VII retaliation claim and Section 1981 retaliation claim is identical. *See Smith v. Chicago Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015);

*Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009)*; Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). For the reasons discussed in SECTION II, Plaintiff may therefore proceed with her retaliation claim under Title VII.

## CONCLUSION

Plaintiff may proceed with her race discrimination claims and retaliation claims under Section 1981 and Title VII. All of Plaintiff's other claims—which include her gender discrimination claim under Title VII, sex-plus claim under Title VII, sex-stereotyping claim under Title VII, and her privacy-based pendant state claims—are dismissed with prejudice.

ENTER:

*[signature: James B. Zagel]*

James B. Zagel
United States District Judge

DATE: March 2, 2016