**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LYDIA VEGA, | ) |
| | ) |
| Plaintiff, | ) |
| | )    Case No. 13 C 451 |
| v. | ) |
| | )    Judge Jorge L. Alonso |
| | ) |
| CHICAGO PARK DISTRICT, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lydia Vega brought this lawsuit asserting claims of national-origin discrimination and retaliation against her former employer, the Chicago Park District ("CPD"), arising out of her termination in September 2012. A jury found in her favor on her discrimination claims, and the Court now considers her requests for equitable relief.

## BACKGROUND

Plaintiff, a Hispanic woman, began working for CPD in 1990 and was promoted to park supervisor in 2004. CPD operates a telephone hotline that citizens and employees can call to make anonymous reports of wrongdoing by CPD employees, and in September 2011, a CPD employee called the hotline to accuse plaintiff of time-sheet falsification. CPD commenced an investigation. After the investigators filed their report in March 2012, plaintiff had a Corrective Action Meeting ("CAM") with CPD in July. In September 2012, plaintiff received a disposition notice terminating her employment for time-sheet falsification. Plaintiff appealed her termination to the Personnel Board, and her termination was affirmed. This lawsuit followed.

The case went to trial on four of the seven claims that survived summary judgment, *Vega v. Chi. Park Dist.*, 165 F. Supp. 3d 693, 705 (N.D. Ill. 2016), including national-origin discrimination

and retaliation under 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e. The jury returned a verdict for defendant on the retaliation claims but for plaintiff on the discrimination claims.

## STANDARDS

"Under Title VII, after an employer has been found to have intentionally engaged in an unlawful employment practice, the district court may order back pay, reinstatement, and 'any other equitable relief as the court deems appropriate.'" *Washington v. Office of the State Appellate Defender*, No. 12 C 8533, 2016 WL 3058377, at *4 (N.D. Ill. May 31, 2016) (quoting 42 U.S.C. § 2000e–5(g)(1)). In deciding what forms of equitable relief are appropriate in a particular case, the district court is vested "with broad discretion to fashion a remedy." *EEOC v. Ilona of Hungary*, 108 F.3d 1569, 1580 (7th Cir. 1997).

> The guiding principle in exercising that discretion is that the court "has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (internal quotation marks and citation omitted). "And where a legal injury is of an economic character, [t]he general rule is, that . . . [t]he injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." *Id.* at 418-19 (internal quotation marks and citation omitted); *see also Ford Motor Co. v. EEOC*, 458 U.S. 219, 230 (1982) (the statutory aim is "to make the victims of unlawful discrimination whole by restoring them, so far as possible . . . to a position where they would have been were it not for the unlawful discrimination") (internal quotations and citation omitted).

*Ortega v. Chi. Bd. of Educ.*, 280 F. Supp. 3d 1072, 1078 (N.D. Ill. 2017) (internal citations altered).

## DISCUSSION

### I. REINSTATEMENT

Plaintiff seeks reinstatement to her former position as park supervisor, at a park comparable to the one for which she was previously responsible as it existed at the time of her employment. The Seventh Circuit has explained that, in determining whether to award the equitable remedy of

reinstatement, a district court must "strike a delicate balance" by carefully weighing the key factors, which may include competing interests:

> On the one hand, reinstatement is the preferred remedy for victims of discrimination, and the court should award it when doing so is feasible. On the other hand, a court is not required to reinstate a successful plaintiff where the result would be a working relationship fraught with hostility and friction. Reinstatement in such situations could potentially cause the court to become embroiled in each and every employment dispute that arose between the plaintiff and the employer following the plaintiff's reinstatement. A court must be careful, however, not to allow an employer to use its anger or hostility toward the plaintiff for having filed a lawsuit as an excuse to avoid the plaintiff's reinstatement.
>
> The court's task of identifying the source of the friction between the employer and the plaintiff following the litigation may be straightforward when there is absolutely no evidence that there was friction in the relationship before the plaintiff filed suit. However, reinstatement may become particularly infeasible if the plaintiff would no longer enjoy the confidence and respect of his superiors once reinstated. Reinstatement may also be more problematic when the plaintiff holds a management position, or would be supervised by the same individuals who discriminated against him in the first place.

*Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861-62 (7th Cir. 2001) (internal citations omitted).

Notwithstanding that reinstatement is the "preferred remedy," *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1370 (7th Cir. 1992) ("*McKnight II*"), defendant argues that reinstatement is not appropriate in this case because its employment relationship with plaintiff would be fraught with "undue friction and controversy," *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 117 (7th Cir. 1990) ("*McKnight I*"). Defendant explains that, due to this lawsuit and the underlying investigation, there is such hostility between plaintiff and defendant that defendant "wouldn't be able to trust" plaintiff in a park supervisor position again, and reinstating her to that position would only invite conflict that would likely require "continuous judicial intervention in the employment relation[ship]." *Price v. Marshall Erdman & Assocs., Inc.*, 966 F.2d 320, 325 (7th Cir. 1992). Further, defendant argues that (1) plaintiff's career path has diverged from parks and recreation since her termination (she now works in medical billing for a hospital), (2) she has placed

conditions on her reinstatement, and (3) she has testified that working at the CPD caused her such stress that her mental and physical health suffered—all of which, according to defendant, make it unclear whether plaintiff genuinely wants reinstatement to her old position or could ably fill it. Additionally, according to defendant, there is no available park supervisor position in which to place plaintiff, and defendant argues that it would be unfair to "bump" an incumbent park supervisor to make room for her.

Defendant's arguments do not persuade the Court to withhold the "preferred" remedy of reinstatement in this case. Critically, the fact that defendant and some of its employees resent that plaintiff prevailed in her lawsuit is not an appropriate basis for denying reinstatement, as it would essentially punish plaintiff for succeeding in standing up for her own rights. *See Bruso*, 239 F.3d at at 862; *McKnight I*, 908 F.2d at 116 ("Mere hostility by the employer or its supervisory employees is of course no ground for denying reinstatement."); *EEOC v. Century Broad. Corp.*, 957 F.2d 1446, 1462 (7th Cir. 1992) ("If 'hostility common to litigation' would justify a denial of reinstatement, reinstatement would cease to be a remedy except in cases where the defendant felt like reinstating the plaintiff.") (quoting *Coston v. Plitt Theatres, Inc.,* 831 F.2d 1321, 1331 (7th Cir. 1987), *vacated on other grounds*, 486 U.S. 1020 (1988)). The record does not support defendant's contention that there is such deep-rooted and pervasive hostility to plaintiff throughout CPD that plaintiff could not productively work in a park supervisor position.

Defendant called Michael Simpkins, one of its human resources officers, to testify that he resented plaintiff for the allegations she had brought against the CPD and felt he could not trust her, but this appears to be little more than "hostility common to litigation"; Mr. Simpkins does not identify any preexisting reason for hostility or resentment. Further, it does not appear that plaintiff and Mr. Simpkins would have to interact on a regular basis to perform their job duties, nor does

the record reveal other hostile or resentful employees with whom plaintiff would have to interact regularly. *See Stephenson v. Aluminum Co. of Am.*, 915 F. Supp. 39, 56–57 (S.D. Ind. 1995) (in a large organization, "it is unlikely that friction between the parties will be of serious concern"). In this respect, this case is unlike some defendant has cited. *See Price*, 966 F.2d at 323, 325[1] (reinstatement not appropriate because defendant would be supervised by the very person who had discriminatorily discharged him, so "every time he is denied credit for a sale, or denied a raise or a bonus, or has a squabble with [that supervisor], he will be tempted to run to the district court for further equitable relief"); *McKnight II*, 973 F.2d at 1370 (affirming district court decision not to reinstate plaintiff because of, among other reasons, the parties' "acrimonious" relationship and "the management level position involved," *McKnight v. Gen. Motors Corp.*, 705 F. Supp. 464, 469 (E.D. Wis. 1989)); *Arroyo v. Volvo Grp. N. Am., LLC*, No. 12-CV-6859, 2017 WL 2985649, at *13 (N.D. Ill. July 13, 2017) (reinstatement not appropriate because of "extensive acrimony" between the parties that would require "indefinite mediation of the parties' inevitable employment disputes").

In this case, CPD received a tip concerning improprieties with plaintiff's timesheets, and its human resources department conducted what the jury found to be a discriminatory investigation

---

[1] In its brief, defendant cites the following language in *Price*:
> It is one thing to order the reinstatement of low-level employees performing routine tasks, or higher-level employees after the supervisors involved in the unlawful employment action have left the company or been transferred to another division. But to order reinstatement of a high-level employee performing discretionary functions into the division from which he was fired and which remains under the management of the person who fired him is a formula for continuous judicial intervention in the employment relation.

966 F.2d at 325. It is unclear to what extent defendant means to argue that plaintiff is a "high-level employee," but if that is its intent, the argument is inapposite. Although the word "supervisor" is in plaintiff's job title, she did not hold the sort of supervisory or "higher level managerial" position in which "the employer's . . . hostility could well render useless any efforts made to reinstate the employee." *See Coston*, 831 F.2d at 1331. A park supervisor's focus is on a particular park or parks within a large system of parks, and plaintiff could hold that position without having to cooperate closely with Mr. Simpkins and other higher-level employees who might resent her for filing and prevailing in this lawsuit.

that resulted in a discriminatory discharge. Plaintiff's dispute was not with her fellow employees or any operational supervisors she would need to interact with to perform her job duties; it was with the special investigators and the human resources department. The dispute did not even directly concern plaintiff's performance of her job duties, which she did to CPD's satisfaction, with an unblemished disciplinary record, prior to the timesheet investigation.

As for whether plaintiff genuinely wants reinstatement, the Court fails to see why it should doubt it. Plaintiff had a strong performance record, apart from the timesheet issue that led to her termination, and the jury found her termination to have been the result of discrimination, so the timesheet issue is hardly a reliable indicator of her enthusiasm or aptitude for her job. Unlike in some of the case law defendant has cited, plaintiff apparently has little to gain by asking for reinstatement to a park supervisor position if she does not actually want it; after all, she could request front pay *instead* of reinstatement, rather than as an alternative to it, as she does here. *Cf. McKnight II*, 973 F.2d at 1371-72 (court declined to reinstate plaintiff to former position in part based on suspicion that plaintiff, who had already changed career tracks, was merely hoping for a buyout from the employer). Plaintiff has found substitute employment, but it does not pay as well as plaintiff's park supervisor job did, nor is it as stable. Even if plaintiff, during the course of this lawsuit, stated that she found her job stressful and difficult, so do most people, and the Court places little weight on this fact because plaintiff's record shows that she was generally able to perform satisfactorily. If the relief she seeks in prevailing in this lawsuit is to take on that stress again, the Court is not inclined to stand in her way. *Stephenson*, 915 F. Supp. at 56-57 (reinstatement appropriate in part because "[p]laintiff has never expressed any ambivalence regarding her desire for reinstatement; to her reinstatement is the point of this litigation").

Plaintiff seeks reinstatement under the condition that she be placed in a park that is in approximately the condition that Bessemer Park was in at the time of her termination—not its current, deteriorated condition. Some courts have found asking for reinstatement only on specified conditions to indicate that the plaintiff does not genuinely want reinstatement, and therefore not awarded it. *See, e.g., McKnight II*, 973 F.2d at 1370-71 (reinstatement not appropriate where plaintiff asked to be reinstated in an entirely "different job [in finance rather than manufacturing] and to be relocated to a new city"). The Court does not agree with defendant that plaintiff's request is so unreasonable as to indicate that plaintiff does not genuinely want reinstatement; plaintiff is merely seeking to be placed as nearly as possible in the position she would have been in absent the discriminatory treatment that led to her termination, which is a reasonable basis for the request.

However, in part because the Court agrees with defendant that it must fashion its remedy with due regard for any consequences the remedy might have for innocent third parties, the Court will not require CPD to abide by this condition. That is, defendant will not be required to assign plaintiff to a park in substantially the same condition as Bessemer Park at the time of plaintiff's termination. Imposing this condition not only risks forcing defendant to displace innocent employees but also threatens to require "continuous judicial intervention in the employment relation[ship]," *Price*, 966 F.2d at 325. Determining what condition a park was in several years ago is likely to depend on memories that will differ from person to person; adding this requirement to the remedy would make the remedy too difficult to administer. The Court is mindful that it should seek to place plaintiff in as nearly the same position as she would have been in absent the discrimination, but plaintiff has not demonstrated that the precise condition of plaintiff's park is a matter of essential terms and conditions of employment that this Court should concern itself with in making plaintiff whole under Title VII.

The Court does not agree with defendant that the fact that plaintiff has not shown that there is a vacant park supervisor position for plaintiff to fill at the moment makes reinstatement inappropriate. The evidence shows that defendant employs a large number of park supervisors, perhaps dozens at a given time, and over the last several years vacancies have arisen on a regular basis. The Court can defer entering judgment for a reasonable period to give defendant time to place plaintiff in a park supervisor position, or simply order plaintiff to pay plaintiff back pay or front pay until a position becomes available.[2] Defendant argues that the Court must consider the consequences of its decision for innocent third parties and that it would be unfair to order defendant to reinstate plaintiff if it would mean displacing another employee, but it is not clear that reinstating plaintiff necessarily means displacing an innocent employee.

The Court orders defendant to reinstate plaintiff and place her in the next park supervisor position that becomes available, under the conditions described at the conclusion of this opinion and order. Because the Court orders defendant to reinstate plaintiff, it need not reach the parties' arguments concerning the proper calculation of front pay.

## II.    INJUNCTION

Plaintiff seeks an injunction barring defendant from committing "like discrimination in the future," as well as retaliation. (Pl.'s Br. at 6, ECF No. 269.) In determining whether such an injunction is justified, "[t]he relevant inquiry . . . is whether the employer's discriminatory conduct could possibly persist in the future." *Bruso*, 239 F.3d at 864. The Court's decision to reinstate plaintiff, coupled with Simpkins's testimony describing feelings of resentment against plaintiff for

---

[2] Even if it does take some time for a position at a particular park to become available, the Court fails to see why defendant cannot rehire plaintiff, assign her to administrative work or a floating position on a temporary basis, and then place her at a park on a permanent basis at the next opportunity, which, based on past hiring patterns, appears likely to occur within a reasonably short time period. At least, that seems preferable to the alternative, which would be paying her without receiving any labor in return.

bringing this lawsuit, are sufficient to justify such an injunction.  The Court enjoins defendant from discriminating against plaintiff based on her national origin by disciplining or terminating her in a manner disproportionate to the manner in which employees of other national origins who have engaged in similar conduct are treated, or for conduct tolerated in employees of other national origins, or retaliating against her for bringing this lawsuit.

## III.    EXPUNGEMENT

Plaintiff seeks expungement of the personnel records relating to the discriminatory investigation into her timesheet fraud and resulting termination, in order to "remov[e] the stain" of the discriminatory discipline from her employment record.  *Bruso*, 239 F.3d at 863-64. Defendant does not address this issue in its brief, so the Court deems it to have waived any objection.  Because expungement of disciplinary records tainted by discrimination is a fair and appropriate remedy in this case, the Court orders defendant to expunge all references to the discriminatory investigation into plaintiff's timesheet fraud and resulting discipline, as set forth more fully in plaintiff's brief.  (Pl.'s Br. at 9-10, ECF No. 269.)

## IV.    BACK PAY AND BENEFITS

Once the jury has found that there has been employment discrimination, there is a presumption that the employee is entitled to an award of back pay. *See David* [*v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003)]; *E.E.O.C. v. Gurnee Inn Corp.,* 914 F.2d 815, 817-18 (7th Cir. 1990). The claimant must establish the amount of damages, but he is presumptively entitled to full relief. *Hutchison v. Amateur Elec. Supply, Inc.,* 42 F.3d 1037, 1044 (7th Cir. 1994); *Gurnee Inn,* 914 F.2d at 817-18; *see also Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 847-48 (2001) (holding that back pay includes lost benefits); *EEOC v. O'Grady,* 857 F.2d 383, 391 (7th Cir. 1988) (same). "Once a plaintiff has established the amount of damages [he] claims resulted from [his] employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts." *Hutchison,* 42 F.3d at 1044; *accord Taylor v. Philips Indus., Inc.,* 593 F.2d 783, 787 (7th Cir. 1979) (holding that it is "[n]ot until the plaintiff establishes what she contends are her damages [that] the burden of going forward

to rebut the damage claim or to show plaintiff's failure to mitigate damages, fall on defendant").

*Stragapede v. City of Evanston*, 125 F. Supp. 3d 818, 823-24 (N.D. Ill. 2015) (internal citations altered). "[Back pay is] determined by 'measuring the difference between actual earnings for the period and those which [the plaintiff] would have earned absent the discrimination by defendant.'" *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985) (quoting *Taylor*, 593 F.2d at 786).

Plaintiff seeks back pay and other lost benefits through the date of judgment. She seeks a lost salary award of $154,707.50, calculated as the pay she would have received if she had remained employed by CPD, less the amounts she earned in substitute employment, through 2017. She also seeks compensation for lost benefits including pension contributions, paid time off, bonuses, insurance premiums, and a gross-up for taxes.

Defendant argues that plaintiff is not entitled to back pay and lost benefits for a number of reasons. Defendant's principal contention is that plaintiff failed to mitigate damages because she did not make a reasonable effort to obtain comparable employment in her field. Defendant also argues that plaintiff has either not proven or not properly calculated certain portions of the monetary award she seeks.

### A. Mitigation of Damages

Although the duty to mitigate falls on the plaintiff, *see Ford Motor*[, 458 U.S. at 231], it is the employer's burden to establish that the plaintiff failed to mitigate his damages. *See Hutchison*, 42 F.3d at 1044. "To establish the affirmative defense of a plaintiff's failure to mitigate damages, the defendant[] must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate [his] damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." *Id.*; *see also Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir. 1986).

*Smith v. Rosebud Farmstand*, No. 11-CV-9147, 2016 WL 5912886, at *14 (N.D. Ill. Oct. 11, 2016).

According to plaintiff, following her termination in September 2012, plaintiff applied for numerous jobs, including jobs in her field of recreation as well as jobs in other fields. She kept a list of 134 jobs for which she applied between September 2012 and November 2013. (Def.'s Resp. Br., Ex. C, DX 42, ECF No. 278-1 at 62-72.) At trial, plaintiff testified that she submitted applications for some additional jobs and searched for still others for which she did not apply, whether because they required a bachelor's degree or for some other reason.

After she was initially unsuccessful in obtaining any position, she accepted a grant-funded, one-year position in medical billing under the Affordable Care Act at Norwegian American Hospital in November 2013, earning approximately thirty percent less than she had as a CPD employee. Thanks to renewed funding, plaintiff was able to remain in that position until May 2016. Then, based on connections she made at the hospital, plaintiff obtained a position working for a pair of home health agencies, NE Healthcare and ASI Services. However, this position was dependent on state funding, and in February 2017, with the Illinois General Assembly in the midst of a lengthy budget standoff, the funding ran out, and plaintiff was laid off. She did odd jobs for a time, including painting and moving work, but later in 2017, Norwegian American Hospital found renewed funding for plaintiff's medical billing position and rehired her. She still worked there as of the date of her testimony in the remedies phase of this case, in January 2018. (ECF No. 269-8, Jan. 16, 2018 Tr. at 123-126.)

According to defendant, plaintiff's uncorroborated, purely self-reported account of her job-search activity is insufficient to substantiate her job-search efforts. Further, defendant argues that even if plaintiff has provided sufficient proof of her job-search efforts, she has admitted that she

applied in large part to jobs outside her field, recreation. Defendant also argues that plaintiff's job search ceased altogether in November 2013 when she became employed by Norwegian American Hospital, despite the fact that she was making less than she had in her prior position.

### 1. *Sufficiency of Uncorroborated Self-Reported List of Job Applications*

Neither side disputes that defendant has the burden of proving that plaintiff failed to mitigate her damages. Defendant attempts to carry its burden by pointing to plaintiff's self-created list of job applications and arguing that it is not credible that plaintiff actually sought to obtain these jobs in good faith. But defendant has not explained, and the Court fails to see, any reason to doubt that plaintiff applied for these jobs, as she says she did. This case is unlike the case on which defendant principally relies in this respect, *Smith*, 2016 WL 5912886, at *15-17, in which the Court found that the plaintiff's testimony about his job-search efforts during a thirteen-month period between August 2012 and September 2013 was not credible because the plaintiff testified that he spent "five hours per day reviewing ads in local newspapers and applying for jobs online," but he was "unable to produce any records showing that he applied for even a single job," not even so much as "personal notes tracking applications," *id.* at *15. In this case, plaintiff has produced "personal notes tracking applications"; the list of 134 job applications that she provided to defendant is exactly that.[3] Additionally, defendant ignores the fact that, in *Smith*, the court found the plaintiff's testimony describing dozens of job applications he submitted during an earlier period between 2008 and 2011 to be sufficient to demonstrate reasonable job-search efforts during that time period. Although the court found that the "lack of corroborating evidence [was] troubling,"

---

[3] Defendant also cites *Arroyo*, 2017 WL 2985649, at *7, as a case in which the court "discounted plaintiff's list of places where she sought employment" when the list took the form of a "collection of job-seeking correspondence that Plaintiff sent" (Resp. Br. at 5, ECF No. 278), but that case is more inapposite than *Smith*. The court in *Arroyo* did not "discount[] plaintiff's list" because it was a self-created "collection of job-seeking correspondence" but for a different reason: the list documented job applications outside the relevant time frame. *Arroyo*, 2017 WL 2985649, at *7.

not to mention that plaintiff had "hyperbolized his job-search efforts," the court nevertheless concluded that the defendants had "not met their burden in showing that Plaintiff did not exercise reasonable diligence." *Id.* at *17.[4]

Defendant has not persuaded the Court why it should not believe that plaintiff made the job-search efforts that she described in her testimony and documented by creating the list of 134 job applications that she submitted to defendant in discovery. Defendant fails to meet its burden on this point, and its argument therefore fails.

## 2. *Failure to Seek Comparable Employment in Recreation*

Defendant argues that, even if plaintiff genuinely applied for the 134 positions she has listed, this job-application activity fell short of the standard of reasonableness because these jobs were generally unrelated to her field of work (recreation or physical education), and she was not qualified by experience or training for many of them. According to defendant, the only job plaintiff applied for that was in her field of work was a position as recreation supervisor in the Cook County Forest Preserve, and she did not even submit her application for this job until August 2013, when she had been unemployed almost a year. To the extent plaintiff testified at trial to applying for other positions in her field not shown on the list she provided defendant in discovery, defendant argues that her testimony is not credible.

---

[4] The court in *Smith* also stated that the plaintiff deserved some leniency with respect to his failure to keep records of the applications he submitted during the 2008-2011 time period because (unlike Ms. Vega in 2013 and late 2012) he was not yet represented by counsel at that time. 2016 WL 5912886, at *17. To the extent that this might seem to distinguish *Smith* from this case, it is counter-balanced by another distinguishing factor: in *Smith*, the plaintiff had significant credibility issues based on "discrepancies" and "inconsistencies" in the evidence, leading to "successful impeachment" of much of plaintiff's testimony on his job-search efforts, testimony that was also marred by its "general implausibility." *Id.* at *15-17. In this case, defendant has not specifically undermined plaintiff's evidence, nor does the Court view it as generally implausible.

First, the Court disagrees with defendant that the Cook County Forest Preserve position was the only position plaintiff listed that was in her field. Defendant is only correct in this regard if the Court accepts defendant's narrow definition of plaintiff's field: recreation in municipal parks. But plaintiff applied for numerous other positions that involved working with children or youths or otherwise engaging with the community, including positions at schools and hospitals and other community or civic organizations. It seems likely that there would have been significant overlap between plaintiff's job with CPD and these other positions, and the Court is unwilling to disregard these job applications.

True, plaintiff applied for numerous jobs that were genuinely outside her field. For example, early in her unemployment, she applied to work at auto parts stores such as Auto Zone or Advance Auto Parts (she testified that she had previous part-time experience working in such stores). She also applied for positions at Federal Express, manager positions at McDonalds, and a number of insurance agent positions. Defendant would have the Court discount these job applications as insufficient efforts to mitigate damages, but the Court is unwilling to do so. Viewed in its totality, the record shows that plaintiff searched for jobs in her field and, recognizing that there were few such jobs for which she was qualified, plaintiff also applied for jobs outside her field in an attempt to find any paying job she could get. Generally, a Title VII plaintiff who cannot immediately find comparable work in her field will be unable to "afford to stand aside while the wheels of justice grind slowly toward the ultimate resolution of the lawsuit"; she "needs work that will feed a family and restore self-respect," *i.e.*, a "job is needed—now." *Ortega*, 280 F. Supp. 3d at 1083 (quoting *Ford Motor*, 458 U.S. at 221 (internal quotation marks omitted)). Plaintiff made diligent efforts to find substitute employment quickly, which is what the law requires.

Even putting aside whether plaintiff showed reasonable diligence, defendant must also prove that there was a reasonable likelihood that plaintiff might have found comparable work, and defendant has not shown that she could have found such work, as defendant defines it. Importantly, plaintiff testified that she did not apply to a greater number of positions that were more similar to her CPD park supervisor job because such positions now typically require applicants to hold a bachelor's degree. In fact, at some point after plaintiff was initially hired at CPD but before she was terminated, even CPD began to require applicants to hold a bachelor's degree. Although plaintiff did not hold a bachelor's degree, she was allowed to continue to work at CPD under a grandfather rule. (Pl.'s Post-Trial Br. Ex. B, Jan. 16, 2018 Tr. at 176:17-177:24, ECF No. 269-8 at 177-78.) After her termination, plaintiff recognized that a bachelor's degree would improve her employment prospects, so she returned to school and, at the time of her testimony in January 2018, was on track to graduate with her bachelor's degree the following semester.

Defendant has not established that positions that were comparable to plaintiff's CPD position and did not require applicants to hold a bachelor's degree were available at the time plaintiff was searching for positions. In its brief, defendant cites Mr. Simpkins's testimony that CPD reviews job postings in suburban park districts that compete with CPD for employees, and these suburban park districts often advertise for positions similar to plaintiff's park supervisor position, but this testimony did not go far enough to meet defendant's burden. Mr. Simpkins testified only in vague, broad, and general terms that suburban park districts often advertise for positions that appear to be comparable to plaintiff's park supervisor position. (*Id.* at 78:21-81:17.) It was not clear whether he had any specific positions in mind; certainly he did not offer any examples of particular positions with details such as job responsibilities or requisite qualifications.

*Cf. Smith*, 2016 WL 5912886, at *20. This is nowhere near sufficient to meet defendant's burden to establish that comparable positions were available and plaintiff did not exercise reasonable diligence to obtain them.

Based on all this evidence, the Court concludes that defendant has not met its burden of establishing that plaintiff did not exercise reasonable diligence in searching for a comparable position, or that one was available if she had.

### 3. *Failure to Mitigate After November 2013*

Defendant argues that plaintiff stopped searching for jobs after she began working at Norwegian American Hospital in November 2013. Although she had found work, she was making less than she made at CPD, so back pay was still accruing, but according to defendant, she was making no effort to mitigate her damages. Plaintiff replies that in fact she did continue seeking employment in the field of recreation or physical education even after November 2013, although apparently she did not keep records of those job-search efforts and she does not provide any examples of jobs that she applied for during this time frame.

The Court is not convinced by plaintiff's argument, which is perfunctory at best—but neither is the Court convinced that plaintiff was required to do more than work in substitute employment and work toward her bachelor's degree. Defendant contends that plaintiff's decision to take a lesser-paying job at a hospital and cease making serious efforts to find work in her field was a "choice made by Vega herself, and was not a circumstance imposed on her by the unavailability of comparable jobs in her area" (Def.'s Resp. Br. at 9, ECF No. 278 (citing *Hutton v. Sally Beauty Co.*, No. 4:02-CV-190, 2004 WL 2397606, at *4 (S.D. Ind. Oct. 22, 2004))), but the facts show otherwise. In the thirteen months after her termination, plaintiff applied for over a hundred jobs, some in her field and some outside of it, and she believed she was struggling to find

comparable work because she did not have a bachelor's degree, which employers had begun to require for comparable positions during the twenty-two years since plaintiff had last searched for a job. After more than a year of fruitless job-searching, she took a temporary job that paid a substantial salary, although approximately 30% less than she made at CPD, and returned to school to get a bachelor's degree to improve her employment prospects. Plaintiff worked full-time for most of the following four years, up to the date of her testimony at trial, apart from a period of a few months in 2017 in which her employer lost the funding for her position and she did odd jobs.

Contrary to defendant's position, plaintiff's decision to accept a job making less than she had made in her former position was not "a choice made by Plaintiff herself," freely and based on her own desires; it was, to a large extent, "a circumstance imposed on her by the unavailability of comparable jobs in that market area." *Hutton*, 2004 WL 2397606, at *4. Plaintiff did not make a "willful choice" to be underemployed or a "personal choice" to start an "alternative career"; rather, she took the best job she could get, which paid a substantial salary, while she completed her bachelor's degree so that she could someday resume her former career. *See Ortega*, 280 F. Supp. 3d at 1083. The law did not require plaintiff to continue to apply for jobs in her former field of work at her former rate of pay and refuse to accept anything less; once she realized her efforts were futile as long as she did not have a bachelor's degree, it was reasonable to take work outside her field to support herself while she worked toward a bachelor's degree. *See id.* (employment discrimination plaintiff does not sacrifice back pay by "starting an alternative career . . . if after a diligent search, he could not find comparable work") (internal quotation marks omitted); *Coleman v. Lane*, 949 F. Supp. 604, 610 (N.D. Ill. 1996) (plaintiff who was forced to "lower his sights" and accept an inferior position is still entitled to the difference between what he would have earned if he had not been terminated and what he was able to earn in substitute employment).

Defendant has not met its burden to demonstrate that plaintiff did not exercise reasonable diligence in seeking comparable work, or that there was a reasonable likelihood she might have secured comparable work if she had made additional efforts. Defendant's affirmative defense of failure to mitigate damages fails.

### B. Amount of Back Pay

Plaintiff has calculated the amount of back pay she believes she is due in lost salary through 2017 by (1) adding up the amount she would have earned if she had remained employed at CPD from the date of termination through 2017, $308,795.25, and (2) subtracting the amount she has earned in substitute employment, $154,087.75, which equals $154,707.50. (*See* Pl.'s Br. at 10-15.) Plaintiff also seeks to recover two longevity bonuses of $600. Defendant does not dispute her calculation of these amounts, and the Court adopts plaintiff's calculations as its finding. However, defendant argues that the back pay award should be reduced by the amount of unemployment compensation plaintiff received and business expenses she saved.

Plaintiff seeks to recover additional amounts to compensate her for lost paid time off, lost pension benefits, and substitute health insurance premiums, but according to defendant, plaintiff provided insufficient evidence with which to calculate these amounts. Plaintiff also seeks a tax-component award to offset any increased tax liability, but defendant argues she has not adequately established the amount of any such award.

### 1. *Unemployment Compensation*

Defendant argues that the Court should deduct the amounts plaintiff received in unemployment compensation from her back pay award because, during the periods that she was receiving unemployment compensation, she was not making a reasonably diligent effort to find work. First, the Court has already rejected the premise of this argument; as the Court has explained

above, plaintiff did make a reasonably diligent effort to find comparable work. Additionally, while it is within this Court's discretion to deduct unemployment compensation from plaintiff's back pay award, *see Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1428-29 (7th Cir. 1986), the Court is unwilling to do so in this case because that would confer a "discrimination bonus" on defendant by allowing it to pay plaintiff less than it would have paid her if it had never discriminated against her in the first place. *Stragapede*, 125 F. Supp. 3d at 826-28. True, this means that plaintiff reaps a windfall to the extent her back pay award duplicates the unemployment compensation she has already received—but if the Court makes the deduction, then it is defendant that reaps a windfall, and "as between conferring a windfall on claimants or defendants, claimants are the logical choice." *EEOC v. Grady*, 857 F.2d 383, 391 (7th Cir. 1988) (holding district court did not abuse its discretion by refusing to offset pension payments made to plaintiffs who were forced to retire due to age discrimination against their back pay award). The Court will not deduct plaintiff's unemployment compensation from her back pay award.

### 2. *Business Expenses*

Plaintiff took deductions on her 2012 income tax return for certain business expenses she incurred, including union dues, uniforms and uniform shoes, automobile expenses, and cell phone charges. Defendant argues that any lost pay she recovers should be offset by the amount of business expenses she would have, but did not, incur after she lost her job with defendant.

For the most part, the Court disagrees with defendant because these amounts represent expenditures that plaintiff likely incurred anyway, if not for a business purpose. Even though she was not employed by defendant, she still likely had to pay for such things as shoes, a cell phone, and automobile expenses in the years after her termination, and defendant introduces no evidence to suggest that plaintiff spent less on those things after her termination.

The union dues are an exception. The Court agrees with defendant that if plaintiff were to recover lost pay without an offset for the amount she would have spent on union dues, she would receive a windfall. But defendant does not prove how much plaintiff would have spent on union dues in the years after her termination. Defendant points to amounts plaintiff claimed for union dues on her 2012, 2011, and 2010 tax returns, but these amounts varied significantly, and the Court cannot determine with any confidence how much she would have spent in subsequent years.

By not reducing plaintiff's lost pay award by the amount of her saved union dues, the Court may confer a windfall on plaintiff, but defendant has not proved the amount of the offset it should receive, and as the Court has already explained, "as between conferring a windfall on claimants or defendants, claimants are the logical choice." *Grady*, 857 F.2d at 391. The Court will not deduct any business expenses from plaintiff's back pay award.

### C.  Lost Benefits

#### 1.  *Health Insurance Premiums*

After plaintiff lost her position at Norwegian American Hospital, she paid the full premium to maintain her health insurance under the Consolidated Omnibus Budget Reconciliation Act, ("COBRA"), *see* 29 U.S.C. § 1161. She seeks the difference between what she paid during the eighteen months of extended coverage under COBRA and the portion of the premium she would have paid had she remained employed by defendant during that time. (*See* Pl.'s Br. at 19, ECF No. 269 at 26.)

Defendant argues that plaintiff has not proved the amount of the full premium because she introduced no records such as cancelled checks, invoices, or receipts. But defendant does not explain why plaintiff was required to introduce that sort of evidence. There is evidence of the premium amount—plaintiff clearly testified at trial that the amount of the premium was $607 per

month.  Defendant provides no reason for skepticism of the amount plaintiff recited in open court, and the Court credits that testimony.  Thus, as plaintiff explains, plaintiff's $607 per month for eighteen months, less the $1,670.58 she would have spent on health insurance if she had remained a CPD employee (defendant does not dispute plaintiff's calculation of this amount), comes to $9,255.42.  The Court awards plaintiff this amount.

## 2.  *Paid Time Off*

Plaintiff seeks the value of her lost paid time off ("PTO").  She purports to use "the method for computation set forth in *Gracia v. Sigmatron International, Inc.*, [130 F. Supp. 3d 1249, 1262 (N.D. Ill. 2016)]: number of paid time off days available at defendant employer less the PTO available in substitute employment times the daily rate at the substitute employment."  (Pl.'s Br. at 24.)  *Gracia* did not set forth a "method for computation" of the value of lost PTO, but it suggested that the plaintiff "should have . . . adjusted her earnings . . . from [the substitute employer] to determine a rate taking into account paid leave—a rate that reflects the fact that she must work more and with less leave at the new company."  130 F. Supp. 3d at 1262.  Plaintiff attempted to calculate the value of her lost PTO by calculating how much PTO she would have earned if she worked as a CPD employee for the same number of days she worked in substitute employment, and then calculating the value of that PTO at her substitute-employment pay rate.

Even if this is not a "method for computation set forth in *Gracia*," it complies with the spirit of *Gracia* to the extent that case described the goal of "fashion[ing] an award of back pay incorporating the value of lost leave" as requiring an "apples-to-apples comparison of compensation."  *Id.*  By putting her lost leave in terms of the pay she was earning in substitute employment, plaintiff avoids the sort of apples-to-oranges comparison the Court rejected in

*Gracia*. *Cf. id.* (rejecting argument that plaintiff was entitled to value of lost leave at defendant employer's rate of pay, which was merely "tack[ed] on" to the back pay award).

However, as defendant argues, plaintiff is unable to point to any evidence of the PTO she received in her substitute employment. In her briefs, she refers to a counsel-prepared summary of damages attached to the pretrial order (*see* Pl.'s Br. at 17-18, Pl.'s Reply at 7, ECF No. 279 (citing Am. Schedule F-1, ECF No. 260-2 at 1-7)), but not to any trial testimony or documentary evidence. Plaintiff argues that the Court's role is to "make plaintiff[] whole, not to defeat damage claims on technicalities" (Reply Br. at 8), but plaintiff cites no authority for the point, and the Court cannot accept as proved matters which the defendant disputes and of which there is no evidence other than plaintiff's counsel's say-so. Under such circumstances, plaintiff has not met her burden to prove these damages.

### 3. *Pension Contributions*

> The Seventh Circuit has said that, "[i]n order to make plaintiffs whole, a discharged employee should be compensated for pension benefits lost through the wrongful termination." *Graefenhain* [*v. Pabst Brewing Co.*, 870 F.2d 1198, 1212 (7th Cir. 1989)]; *see also Loeb v. Textron, Inc.,* 600 F.2d 1003, 1021 (1st Cir. 1979) ("Pension benefits are part of an individual's compensation and, like an award of back pay, should be awarded."). "If a prevailing plaintiff is returned to the defendant's employment, this award will consist of payments to the pension fund on plaintiff's behalf, bringing plaintiff's pension interest to the level it would have reached absent discrimination." *Loeb*, 600 F.2d at 1021.

*Ortega*, 280 F. Supp. 3d at 1115-16. Plaintiff seeks an award in the amount of the pension contributions defendant would have made on her behalf if she had remained a CPD employee, to be paid directly in to the Park Employees' Annuity and Benefit Fund ("Pension Fund"). Defendant opposes any such award, arguing that plaintiff has not identified any reliable method of calculating such damages or established that such relief is necessary to make her whole.

In particular, defendant argues that plaintiff has not established any basis for her "assumption that a pro rata amount of the annual tax levy paid to the [CPD pension] fund [by CPD] is allocated to a particular employee." (Def.'s Resp. Br. at 25.) The Illinois Pension Code requires CPD's Board of Park Commissioners to levy an annual tax in order to fund a yearly lump-sum contribution to the pension fund based on the aggregate amount of its employees' pension contributions in that year. *See* 40 ILCS 5/12-149.

The Court agrees with defendant that plaintiff has not established that the award of pension contributions that plaintiff seeks is necessary to make her whole. While the Court is aware of decisions in which prevailing plaintiffs have received the sort of relief plaintiff seeks, *see, e.g., Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, No. 09 C 5251, 2014 WL 1514235, at *12 (E.D.N.Y. Apr. 16, 2014); *EEOC v. Yellow Freight Sys., Inc.*, No. 98 C 2270, 2002 WL 31011859, at *31-32 (S.D.N.Y. Sept. 9, 2002), in this case plaintiff does not identify a provision of the Illinois Pension Code or any other authority or evidence on which the Court might base a conclusion that, if it does not order CPD to make contributions to the pension fund "on [plaintiff's] behalf" (Pl.'s Br. at 16), then plaintiff will not receive a level of pension benefits commensurate with the years of service she would have completed if not for defendant's discriminatory termination. Stated differently, plaintiff does not establish that the pension benefits she will receive when she retires are directly tied to amounts CPD contributed to the pension fund on her behalf. The relationship between (1) the number of years in which defendant made a contribution to the pension fund that was calculated in part based on its employment of plaintiff, as opposed to the years of service with which plaintiff is credited, and (2) benefits that will be subsequently paid from the fund to plaintiff upon retirement, is opaque. Because plaintiff has not made a sufficient showing to justify the

remedy she seeks, the Court will not order defendant to make the pension contributions plaintiff requests.

### D.  Tax Offset

Plaintiff seeks a tax-component award to offset any increased income-tax liability she might incur due to any lump-sum back pay award the Court may make.  *See EEOC v. N. Star. Hosp., Inc.*, 777 F.3d 898, 904 (7th Cir. 2015) ("Put simply, without the tax-component award, [plaintiff] will not be made whole, a result that offends Title VII's remedial scheme.").  Plaintiff asks for $30,531.27 to offset her increased tax obligations.  It is unclear how she calculates that amount.

Plaintiff argues that, to the extent the Court rejects her suggested offset figure, she has "provided the data needed to compute her projected tax burden."  (Reply Br. at 14.)  But in the relevant portion of her brief, she points to nothing other than a federal withholding table.  (Pl.'s Br. at 30.)  Perhaps plaintiff can calculate an appropriate tax-component award based on this document alone, but the Court is at a loss.  Based on this meager showing, the Court declines to award plaintiff a tax offset.  *See Arroyo*, 2017 WL 2985649, at *16; *Smith v. Farmstand*, No. 11-CV-9147, 2016 WL 5912886, at *25 (N.D. Ill. Oct. 11, 2016).

### E.  Prejudgment Interest

Plaintiff seeks an award of prejudgment interest, and defendant does not respond to this request in its response brief, apparently conceding that plaintiff is entitled to a reasonable prejudgment interest award.  Plaintiff argues that the amount should be calculated as an average of the prime rate for the years in question, compounded monthly.  The Court accepts this method of calculation, but plaintiff does not calculate an amount, as the amount will depend on the amount

of back pay the Court awards and for which years. The Court makes no award of prejudgment interest at present, but plaintiff may present an amount to the Court at a later date.

## V.  CONCLUSION AND NEXT STEPS

This Court orders defendant to reinstate plaintiff to a park supervisor position by December 31, 2018. This will give defendant ample time to find a position for plaintiff. If defendant is unable to reinstate plaintiff by December 31, 2018, then it will owe plaintiff back pay, at a rate equal to a park supervisor with the same number of years of service plaintiff would have enjoyed if she had not been terminated, until the date plaintiff is actually reinstated.

The Court will enjoin defendant from any further discrimination or retaliation in violation of Title VII or § 1981. The Court will order defendant to expunge its records of the discriminatory investigation into plaintiff's timesheets and the resulting discharge.

The Court will award plaintiff the following in back pay: $154,707.50 in lost salary; $1,200 in lost longevity bonuses; and $9,255.42 in substitute health insurance premiums; a total of $165,162.92. The Court will award plaintiff prejudgment interest, compounded monthly on the average prime rate for the period of September 11, 2012, to the date of this Court's judgment.

The Court will defer entering judgment at this time. By January 15, 2019, or fifteen days from the date plaintiff is reinstated if plaintiff is reinstated before December 31, 2018, plaintiff will (1) file a supplemental memorandum of law explaining and calculating any amounts she seeks as back pay in addition to the amounts set forth in the preceding paragraph, such as additional back pay accrued in 2018, a tax-component award, or pre-judgment interest, to the extent they are supported by appropriate data and computed according to a transparent, reliable methodology; (2) prepare a draft final judgment order, which plaintiff will both attach as an exhibit to her memorandum and submit, in Microsoft Word format, to the Court's proposed order email inbox,

and (3) submit a motion for attorney's fees, properly noticed for presentment, so that the Court may set an appropriate briefing schedule at the presentment hearing, if necessary.

**SO ORDERED.**                                    **ENTERED:**   November 16, 2018

_____
**JORGE L. ALONSO**
**United States District Judge**