**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LYDIA VEGA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 451 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| | ) | |
| CHICAGO PARK DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In the latest installment in the long-running saga of this case, plaintiff, Lydia Vega, has filed a motion to enforce this Court's April 15, 2019 judgment against defendant, the Chicago Park District. Plaintiff claims that defendant has not yet expunged all records of her discriminatory discipline, nor has it made certain missed pension contributions necessary to restore her pension credit. Defendant contests the motion, arguing that the records and pension contributions plaintiff has identified are beyond the reach of the judgment. After a hearing, and based on the following findings of fact and conclusions of law, the Court agrees with defendant as to the expungement of records, but with plaintiff as to the pension contributions. Therefore, plaintiff's motion is denied in part and granted in part.

**FINDINGS OF FACT**

To the extent (if any) that any of the following findings of fact as stated may be deemed conclusions of law, they shall also be considered conclusions of law. In the same way, to the extent that the Court's conclusions of law may be deemed findings of fact, they shall also be so considered. In particular, "[t]o the extent that any factual findings are made in the Conclusions of

Law section, that was done to better organize the Opinion for comprehensibility." *Vargas v. United States*, 430 F. Supp. 3d 500, 502-03 (N.D. Ill. 2019).

Plaintiff Lydia Vega brought this lawsuit asserting claims of national-origin discrimination against her former employer, the Chicago Park District ("CPD"), arising out of her termination in September 2012. In March 2017, a jury found in her favor on her discriminatory discharge claims. Following the conclusion of the jury trial and the resolution of post-trial motions, the Court proceeded to consider plaintiff's requests for back pay and other equitable relief. The present dispute arises out of what followed.

## I.     Equitable Relief Phase of Proceedings

The parties submitted briefs and the Court held a bench trial on equitable relief in January 2018. Among the remedies plaintiff asked for were expungement of disciplinary records and missed pension contributions.

Plaintiff's presentation on the pension contributions issue was confusing, and she adduced little evidence, relying primarily on the Illinois Pension Code, without fleshing out how the code applied to this case. In its November 16, 2018 Memorandum Opinion and Order (ECF No. 280) (hereafter, "the equitable relief opinion"), the Court explained that prevailing Title VII plaintiffs should generally be made whole by compensating them for lost pension benefits, in order to put them in the same position they would have been in absent their employer's discrimination. However, the Court concluded that it could not order defendant to make any particular sum of pension contributions on plaintiff's behalf because plaintiff had not proven what the sum was—if any—that CPD would have to pay in order to ensure that she received credit for the correct number of years of service. The Court reproduces here its discussion of the pension contributions issue in the equitable relief opinion:

2

The Seventh Circuit has said that, "[i]n order to make plaintiffs whole, a discharged employee should be compensated for pension benefits lost through the wrongful termination." *Graefenhain* [*v. Pabst Brewing Co.*, 870 F.2d 1198, 1212 (7th Cir. 1989)]; *see also Loeb v. Textron, Inc.,* 600 F.2d 1003, 1021 (1st Cir. 1979) ("Pension benefits are part of an individual's compensation and, like an award of back pay, should be awarded."). "If a prevailing plaintiff is returned to the defendant's employment, this award will consist of payments to the pension fund on plaintiff's behalf, bringing plaintiff's pension interest to the level it would have reached absent discrimination." *Loeb*, 600 F.2d at 1021.

*Ortega* [*v. Chi. Bd. of Educ.*, 280 F. Supp. 3d 1072, 1115-16 (N.D. Ill. 2017)]. Plaintiff seeks an award in the amount of the pension contributions defendant would have made on her behalf if she had remained a CPD employee, to be paid directly in to the Park Employees' Annuity and Benefit Fund ("Pension Fund" [or "pension fund"]). Defendant opposes any such award, arguing that plaintiff has not identified any reliable method of calculating such damages or established that such relief is necessary to make her whole.

In particular, defendant argues that plaintiff has not established any basis for her "assumption that a pro rata amount of the annual tax levy paid to the [CPD pension] fund [by CPD] is allocated to a particular employee." (Def.'s Resp. Br. at 25[, ECF No. 278].) The Illinois Pension Code requires CPD's Board of Park Commissioners to levy an annual tax in order to fund a yearly lump-sum contribution to the pension fund based on the aggregate amount of its employees' pension contributions in that year. *See* 40 ILCS 5/12-149.

The Court agrees with defendant that plaintiff has not established that the award of pension contributions that plaintiff seeks is necessary to make her whole. While the Court is aware of decisions in which prevailing plaintiffs have received the sort of relief plaintiff seeks, *see, e.g., Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, No. 09 C 5251, 2014 WL 1514235, at *12 (E.D.N.Y. Apr. 16, 2014); *EEOC v. Yellow Freight Sys., Inc.*, No. 98 C 2270, 2002 WL 31011859, at *31-32 (S.D.N.Y. Sept. 9, 2002), in this case plaintiff does not identify a provision of the Illinois Pension Code or any other authority or evidence on which the Court might base a conclusion that, if it does not order CPD to make contributions to the pension fund "on [plaintiff's] behalf" (Pl.'s Br. at 16[, ECF No. 269]), then plaintiff will not receive a level of pension benefits commensurate with the years of service she would have received if not for defendant's discriminatory termination. Stated differently, plaintiff does not establish that the pension benefits she will receive when she retires are directly tied to amounts CPD contributed to the pension fund on her behalf. The relationship between (1) the number of years in which defendant made a contribution to the pension fund that was calculated in part based on its employment of plaintiff, as opposed to the years of service with which plaintiff is credited, and (2) benefits that will be subsequently paid from the fund to plaintiff

3

upon retirement, is opaque. Because plaintiff has not made a sufficient showing to justify the remedy she seeks, the Court will not order defendant to make the pension contributions plaintiff requests.

(ECF No. 280 at 22-24.) The Court concluded the equitable relief opinion by ordering defendant to reinstate plaintiff to a park supervisor position by the end of the year, or else, if it was unable to do so by that deadline, it would "owe plaintiff back pay, at a rate equal to a park supervisor with the same number of years of service plaintiff would have enjoyed if she had not been terminated, until the date plaintiff is actually reinstated." It did not award the pension contributions plaintiff had asked for or otherwise address them, except in the portion of the opinion reproduced above. The Court also stated that it "will enjoin defendant from any further discrimination or retaliation in violation of Title VII or [42 U.S.C.] § 1981," and it "will order defendant to expunge its records of the discriminatory investigation into plaintiff's timesheets and the resulting discharge." (*Id.* at 25.) However, it "defer[red] entering judgment" at that time, instead calling for supplemental briefs on certain other issues not relevant here, and directing plaintiff to submit a draft final judgment order along with her supplemental brief. (*Id.*)

Some days later, plaintiff moved for clarification on several issues, two of which were related to the Court's reinstatement remedy and plaintiff's terms of employment upon reinstatement. First, plaintiff asked whether plaintiff would be entitled to an annual park bonus. Additionally, plaintiff asked whether defendant was required to restore plaintiff's lost years of service for purposes of her pension calculation. Regarding the latter issue, plaintiff stated that she agreed with the Court that the "connection between Defendant's pension contributions and the benefits Vega receives from the pension fund is 'opaque,'" and the applicable Illinois law "does not clearly state specific contributions are necessary for an employee to receive service credit used to calculate benefits." (Pl.'s Nov. 29, 2018 Mot. for Clarification at 5-6, ECF No. 290 (quoting

4

Equitable Relief Op. at 23).) However, plaintiff pointed out that the Court itself had acknowledged that discriminatorily discharged employees should generally be compensated for lost pension benefits in order to be made whole, and, had plaintiff not been discriminatorily discharged, she would have had an additional six years of pension credit, which would enable her to retire with full pension benefits six years earlier than otherwise. So, plaintiff sought clarification as to whether the Court's decision required CPD to treat plaintiff as if she had never been discharged for purposes of calculating the years of service for which she would be credited.

The Court considered its decision to have been clear (if not explicit) on these issues, but to alleviate any confusion, the Court granted plaintiff's motion as to these issues. Regarding the bonus issue, the Court clarified that, "[t]o the extent any clarification [was] necessary," plaintiff was "to be reinstated on terms of employment 'equal' to those of 'a park supervisor with the same number of years of service plaintiff would have enjoyed if she had not been terminated,'" and defendant was to "treat plaintiff as it would treat any other employee in good standing with those years of service." (Dec. 3, 2018 Order at 1, ECF No. 292 (quoting Equitable Relief Op. at 25).) Regarding the pension credits issue, the Court clarified that "[t]o the extent any clarification [was] necessary," plaintiff was "to be reinstated on terms of employment equal to those of a park supervisor with the same number of years of service plaintiff would have enjoyed if she had not been terminated; in other words, she is to be treated like any other employee in good standing with those years of service." (Dec. 3, 2018 Order at 2, ECF No. 292.)

The parties proceeded to meet and confer regarding fees and costs, per this district's Local Rule 54.3, and to provide the Court with supplemental briefing on the outstanding issues. On January 11, 2019, plaintiff attached to her supplemental brief a draft final order of judgment. (Pl.'s Mem. of Law As Requested By the Court's Nov. 16, 2018 Order, Ex. 5, ECF No. 299-5.)

5

Paragraph 2 of the draft final judgment order described the reinstatement remedy, the expungement remedy, and the injunction against further discrimination and retaliation that the Court had said it would impose:

> On November 16, 2018 (ECF No. 280) and December 3, 2018 (ECF No. 282) the Court issued and clarified the following remedies and relief:
>
> a. defendant Chicago Park District is to reinstate plaintiff Lydia Vega and place her in the next park supervisor position that becomes available, on terms of employment equal to those of a park supervisor with the same number of years of service plaintiff would have enjoyed if she had not been terminated and she is to be treated like any other employee in good standing with those years of service;
>
> b. defendant Chicago Park District is enjoined from discriminating against plaintiff Lydia Vega based on her national origin by disciplining or terminating her in a manner disproportionate to the manner in which employees of other national origins who have engaged in similar conduct are treated, or for conduct tolerated in employees of other national origins, or from retaliating against her for bringing this lawsuit; and,
>
> c. defendant Chicago Park District is to expunge all references to the discriminatory investigation into plaintiff Lydia Vega's alleged timesheet fraud and resulting discipline or unlawful termination, including as follows: (a) all investigative reports and videos; (b) all memoranda concerning the investigation and Vega's meetings with the investigators and human resources; (c) records of the calls complaining about Vega; (d) the transcripts and exhibits from the Administrative Hearing held on January 31, 2013 and February 1, 2013, the undated decision of Hearing Officer Shin, any confirmation of the decision by the Personnel Board, transcripts, exhibits, files, and decision and confirmation of that decision by any CPD authority; (e) and any record of the termination and "Do Not Rehire" notation in Oracle, Plaintiff's personnel records file, and anywhere else it appears; and, (f) any disciplinary file relating to Plaintiff Vega.

(*Id.*) CPD filed a brief five-page response, but it did not object to any of these provisions of the draft final judgment order, instead focusing on other issues, namely, the calculation of the tax-component award and prejudgment interest.

After reviewing and considering the supplemental briefing, the Court entered a slightly modified version of the draft final judgment order, which was identical to the proposal with respect

to the language that the Court has quoted in the above paragraph. (*See* Apr. 15, 2019 Final Order of J. ¶ 2, ECF No. 316.) Upon defendant's motion, the Court stayed the judgment pending appeal. After the Seventh Circuit rendered its decision affirming the judgment in all relevant respects, *see Vega v. Chi. Park Dist.*, 954 F.3d 996, 1012 (7th Cir. 2020), this Court lifted the stay as to the portions of the final judgment order that had been affirmed. (*See* Nov. 19, 2020 Order, ECF No. 384.)

## II.    Plaintiff's Efforts to Obtain Compliance With the Final Order of Judgment

In the summer of 2021, plaintiff began to make inquiries to confirm that her disciplinary records had been expunged and that she was being credited with the thirty-one years of service to which she was entitled for pension purposes. First, throughout June and July 2021, plaintiff corresponded with defendant's Human Resources officers, including Deputy Director of Human Resources Laurie Kirshenbaum and Employment Services Manager Gina Schwail, about expunging her disciplinary record. After much back and forth, on June 29, 2021, Schwail emailed plaintiff a screenshot of CPD's Oracle system, which showed her date of hire and seniority date as July 1, 1990 (although another field showed an "effective date" of December 27, 2018, which apparently means that was the date that the record was created in that system, (Mot. to Enforce Ex. 3, Sep. 9, 2021 Email from Atty McGarry to Atty Wood, ECF No. 410-6 at 19, PageID# 11919.)). Subsequently, Ms. Kirshenbaum emailed plaintiff a letter, dated July 7, 2021, confirming that plaintiff has worked for Chicago Park District as a Park Supervisor since July 1, 1990, and has had continuous employment to the present. On July 21, 2021, Ms. Kirshenbaum sent plaintiff an email to confirm that CPD's records had been purged of any reference to plaintiff's discriminatory discipline.

During the same time frame in June and July 2021, plaintiff corresponded with a Pension Fund employee, Erik Hernandez, about her pension credit. In their email correspondence, Hernandez explained that he needed CPD to submit the missed pension contributions on plaintiff's behalf in order to fulfill plaintiff's request for thirty-one years of service credit. He stated in a July 6, 2021 email, "We are still waiting on the Park to send us the contributions. . . . They usually just send them to us. I am not sure the hold up." (Mot. to Enforce Ex. 1, Vega Decl., Ex. G, Jul. 6, 2021 Email from Erik Hernandez to Pl., ECF No. 410-3 at 3, PageID# 11855.)

CPD did not respond to plaintiff's inquiries about the issue, so she suggested setting up a three-way meeting between CPD, the pension fund, and herself. In a July 29, 2021 email, Mr. Hernandez responded, in part, as follows: "I will be happy to attend any meeting you would like to set up. In these cases, the Fund will get the contributions from Roberto Alas, Payroll Accountant [at CPD] . . . . After that, we will get detailed information on how to manually post it to your ledgers and give you the service credit. That comes from Mike Simpkins, Human Resources [at CPD]." (*Id.*, Ex. I, Jul. 29, 2021 Email from Erik Hernandez to Pl., ECF No. 410-3 at 12, PageID# 11864.)

Plaintiff reached out to Mr. Simpkins, but he did not immediately answer her inquiries. She also reached out to Mr. Alas and spoke with him by phone on August 2, 2021. On August 3, 2021, she sent him an email to memorialize their conversation, writing as follows: "[Y]ou said that you are having difficulty making contributions on my behalf to the Pension Fund for the years from September 10, 2012 to December 27, 2018 because your records indicate that I was 'terminated on September 12, 2012' and was not employed by [CPD] from that date until December 27, 2018, so your records would not support pension contributions for that period of time. I believe you also said that you don't have the money to send to the pension on my behalf for that period of time,

including my employee contributions." (*Id.*, Ex. J, Aug. 3, 2021 Email from Pl. to Roberto Alas, ECF No. 410-3 at 14-15, PageID# 11866.)

Plaintiff's counsel raised these issues with defense counsel in an email conversation taking place throughout August and September 2021. After conferring with their client, defense counsel responded that the relevant records had been expunged, just as Mr. Kirshenbaum had represented, and "[n]o one is sure what Mr. Alas was looking at," to the extent he had suggested otherwise. (Mot. to Enforce Ex. 3, Aug. 20, 2021 Email from Atty McGarry to Atty Simmons Gill, ECF No. 410-6 at 3, PageID# 11903.) Regarding the pension contributions, defense counsel stated that this Court's April 15, 2019 Final Order of Judgment does not require CPD to pay them. According to defense counsel, CPD has satisfied the judgment in full, "the 11/16/18 order clearly states [that] the Court denied [plaintiff's] request to order [CPD] to make the contributions" (*id.*, Ex. 3, Aug. 31, 2021 Email from Atty McGarry to Atty Simmons Gill, ECF No. 410-6 at 5, PageID# 11905), and CPD does not normally "cut checks to the Pension Fund for any employee" (*id.*, Ex. 3, Sep. 2, 2021 Email from Atty McGarry to Atty Wood, ECF No. 410-6 at 10, PageID# 11910). Defense counsel stated that they have been in contact with the pension fund's attorney, and they were waiting for further information from that attorney, but until then there was nothing CPD could do. (*Id.*, ECF No. 410-6 at 10-11, PageID# 11910-11.)

### III.     Plaintiff's Motion to Enforce Judgment and the Show-Cause Hearing

On September 20, 2021, plaintiff filed the present motion to enforce the judgment, seeking a rule to show cause why CPD should not be held in contempt of court for failing to comply with the Court's April 15, 2019 Final Order of Judgment. In her motion, plaintiff asked the Court to order CPD to take all actions necessary to ensure that she received the proper service credit from the pension fund and to expunge all records of her discriminatory discipline and discharge. (Mot.

to Enforce, ECF No. 410.)  The parties filed briefs, and the Court held a show-cause hearing on November 29, 2021.

At the show-cause hearing, three witnesses testified. Steve Lux, chief financial officer for CPD, testified that all full-time park supervisors have to belong to the pension fund, CPD withholds pension contributions from their paychecks and transmits them to the fund, and additionally "[t]he Park District contributes to the pension fund a property tax levy equal to 1.1 times what the employee's contributed two years earlier." (Tr. at 14:19-21, ECF No. 429.) He testified that no contributions had been made on plaintiff's behalf for the period between her discriminatory discharge in September 2012 and reinstatement in December 2018 (hereafter, the "gap period"). Had plaintiff never been terminated, he testified, CPD would have turned over her employee contributions as well as made employer contributions on her behalf. The Court finds this testimony credible.

Next, Mr. Alas testified that his payroll records showed that plaintiff's employment had been terminated in September 2012, but he knew nothing of pension credits. He testified, "I don't deal with the pension, I only wire money to the pension. I don't have record of credits." (Tr. at 30:22-24.) The Court finds this testimony credible.

Finally, Erik Hernandez testified that he had examined the pension fund's records and found that, according to those records, plaintiff had no pension credit for the gap period. He had calculated the amounts that the pension fund would need to receive in order to provide plaintiff with pension credits for the approximately six-year gap period, and provided plaintiff's counsel with printouts of spreadsheets showing the calculation. (*See* Pl.'s Proposed Findings of Fact and Conclusions of Law, Ex. 1 (Show-Cause Hearing Ex. 18), ECF No. 433-1.) According to these calculations, the requisite sums were $44,039.72 in employee contributions and $46,440.98 in

employer contributions, with both figures including interest as of November 30, 2021. He testified

that he was not sure how CPD usually raised the funds that it transferred to the pension fund as

employer contributions. However, when asked if, "in order for Ms. Vega to receive the credit for

the gap period, both the employer and employee contributions need to reach the pension fund," he

answered, "correct." (Tr. at 43:7-10.) The Court finds this testimony credible.

Following the hearing, the parties filed proposed findings of fact and conclusions of law.

## CONCLUSIONS OF LAW

Plaintiff seeks to enforce certain injunctive components of the Court's April 15, 2019 Final

Order of Judgment. In order to enforce these components, found in paragraph 2 of the judgment

order, she has to prove defendant's noncompliance, according to the following procedure:

> In general, an injunction is enforced through the district court's civil contempt
> power as follows. If the plaintiff (the party obtaining injunction) believes that the
> defendant (the enjoined party) is failing to comply with the injunction, the plaintiff
> moves the court to issue an order to show cause why the defendant should not be
> adjudged in civil contempt and sanctioned. The plaintiff's motion cites the relevant
> injunctive provision and alleges that the defendant has refused to obey its mandate.
> If satisfied that the plaintiff's motion states a case of noncompliance, the court
> orders the defendant to show cause why he or she should not be held in contempt,
> and the court schedules a hearing for that purpose. At the hearing, if the plaintiff
> proves what he or she has alleged in the motion, the court hears from the defendant.
> The court then determines whether the defendant has complied with the injunction
> and, if not, what sanctions are necessary to ensure compliance.

13 Moore's Federal Practice § 65.81 (2021) (citing *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th

Cir. 2000)); see *Sommerfield v. City of Chicago*, 252 F.R.D. 407, 413 (N.D. Ill. 2008).

To be enforceable, an injunction must "state its terms specifically" and "describe in

reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). To comply with

Rule 65(d), "[a]ll that is required . . . is for the language of the injunction to be as specific as

possible under the totality of the circumstances, such that a reasonable person could understand

what conduct is proscribed." *Medtronic, Inc. v. Benda*, 689 F.2d 645, 649 (7th Cir. 1982). While

11

courts should resolve "close questions of interpretation . . . in the defendant's favor in order to prevent unfair surprise," they should not take this "rule of strict construction to a dryly logical extreme," because "[i]f narrow literalism is the rule of interpretation, injunctions will spring loopholes." *Schering Corp. v. Illinois Antibiotics Co.,* 62 F.3d 903, 906 (7th Cir. 1995). The injunction has to be specific enough to give the defendant "fair notice of what is required," but it need not be so specific as to "answer all hypothetical questions that might be imagined." *Hinrichs v. Bosma*, No. 105CV0813 DFH TAB, 2005 WL 3544300, at *4 (S.D. Ind. Dec. 28, 2005) (Hamilton, J.) (citing *Minn. Mining & Mfg. Co. (3M) v. Pribyl*, 259 F.3d 587, 598 (7th Cir. 2001), and *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir. 1985)).

### I. Pension Contributions

As defendant rightly points out in opposing plaintiff's motion to enforce, the Court never ordered CPD to make any specific amount of contributions to the pension fund. What the Court did instead was (a) to order CPD to reinstate plaintiff to the next available park supervisor position "on terms of employment equal to those of a park supervisor with the same number of years of service plaintiff would have enjoyed if she had not been terminated and . . . treat[ her] like any other employee in good standing with those years of service" and (b) to enjoin CPD from "retaliating against [plaintiff] for bringing this lawsuit." (*See* Apr. 15, 2019 Final Order of J. ¶ 2, ECF No. 316.) Thus, to determine whether CPD violated paragraph 2 of the April 15, 2019 Final Order of Judgment by failing to make pension contributions on plaintiff's behalf, the Court must interpret the Final Order of Judgment to determine whether the reinstatement remedy and accompanying injunction against discrimination and retaliation required CPD to make the pension contributions plaintiff now seeks, even in the absence of language specifically addressing them.

As an initial matter, while Rule 65(d) requires injunctions to state their terms specifically and provide a reasonable level of detail, the rule "does not require the impossible." *Scandia Down Corp.*, 772 F.2d at 1431. Although specificity and detail are "essential," "[t]here is a limit to what words can convey. The more specific the order, the more opportunities for evasion ('loopholes')." *Id.*; *see 3M*, 259 F.3d at 598 (citing *Scandia Down*, 772 F.2d at 1431, and *Schering*, 62 F.3d at 906). Thus, "Rule 65(d) does not require a torrent of words when more words would not produce more enlightenment about what is forbidden. When the difficulty stems from the inability of words to describe the variousness of experience, the court may prefer brief imprecise standards to prolix imprecise standards." *Scandia Down Corp.*, 772 F.2d at 1432. Then, if there remains any doubt about "what is forbidden," the enjoined party has the "right to seek clarification or modification of the injunction." *Id.*; *see also Medtronic*, 689 F.2d at 649 ("The appellants are placed on adequate notice regarding permissible and impermissible conduct. They are, of course, always free to seek a more detailed statement if they so choose."). Therefore, it is no fatal deficiency in the Final Order of Judgment that it orders CPD to reinstate plaintiff "on terms of employment equal to those of a park supervisor with the same number of years of service plaintiff would have enjoyed if she had not been terminated," to treat her "like any other employee in good standing with those years of service," and to refrain from "retaliating against [plaintiff] for bringing this lawsuit," without spelling out in more precise terms exactly what discriminatory and retaliatory conduct is proscribed. (*See* Apr. 15, 2019 Final Order of J. ¶ 2.) Neither plaintiff nor this Court were required to anticipate explicitly every way in which CPD might contrive to discriminate or retaliate against plaintiff; to attempt to enumerate every possible discriminatory or retaliatory act would only create "loopholes" that would potentially undermine the remedial purpose of the order, namely, to return plaintiff to work as nearly as possible to the same position she would have been in had she never

suffered unlawful discrimination, without subjecting her to further unlawful employment practices.

Further, as the Court has taken pains to recount in some detail above, the procedural history of this case shows that defendant was on notice of the implications of paragraph 2 of the Final Order of Judgment for defendant's pension contribution obligations to plaintiff. In seeking clarification of the Court's original ruling on the pension contribution issue, plaintiff acknowledged that she had not demonstrated, and did not understand, what amount of pension contributions CPD had to make to ensure that plaintiff received pension credit for the gap period—but she also argued, as the Court had implicitly acknowledged (*see* Equitable Relief Op. at 22-24), that if she does not receive pension benefits commensurate with her years of service, including the six-year gap period, then she will not be made whole. Plaintiff sought clarification of whether the Court's decision would require CPD to treat plaintiff as if she had never been discharged for purposes of calculating the years of service for which she would be credited. The Court granted the motion as to the pension issue in response to that argument, specifically clarifying that, "[t]o the extent any clarification [was] necessary," plaintiff was "to be reinstated on terms of employment equal to those of a park supervisor with the same number of years of service plaintiff would have enjoyed if she had not been terminated; in other words, she is to be treated like any other employee in good standing with those years of service." (Dec. 3, 2018 Order at 2, ECF No. 292.) This ruling is reflected in the Final Order of Judgment, which contains, in paragraph 2.a., language closely tracking the language the Court had used in its clarification order. It should have been clear that defendant is obliged to treat plaintiff like any other employee in good standing with the years of service she would have had if she had never been discriminatorily discharged—which means CPD must do for plaintiff anything it would do for any other employee in good standing to

14

ensure that she receives the same pension benefits as any other employee with those years of service.

True, plaintiff had not demonstrated, by the time of the equitable relief opinion or at any time prior to the Final Order of Judgment, what defendant was required to do to ensure that plaintiff received the pension credit to which she was entitled. Defendant argues that plaintiff should have done this at the 2018 equitable relief trial, and she should not be allowed to correct her mistake now through the back door of paragraph 2 of the Final Order of Judgment. Defendant has the Court's sympathy here. Plaintiff could have called Erik Hernandez or someone in a similar position at the pension fund to testify at the 2018 bench trial, or otherwise adduced evidence to make the showing she belatedly makes now, and saved the parties and the Court much trouble. Plaintiff's own sloppiness in 2018 caused this dispute, in significant part.

But only in part. The procedural history of this case being what it is, and paragraph 2 of the Final Order of Judgment being what it is, defendant was on notice of its obligation to treat plaintiff like any other employee with her years of service with respect to the terms and conditions of her employment, including pension benefits. Nevertheless, it offers no justification for its refusal in the summer of 2021, when first apprised of the issue, to make the contributions that Mr. Hernandez told plaintiff needed to be made on her behalf, and the Court is hard pressed to imagine any reason for it other than discrimination or retaliation. Suppose another employee who had never filed an employment discrimination lawsuit discovered that CPD had neglected to make six years' worth of pension contributions on her behalf, requiring her to work six years longer in order to max out her pension benefits. Would CPD do nothing for such an employee? Surely it would correct its mistake by bringing the account current, as Mr. Hernandez had suggested in his emails. And when an employer would not have taken an adverse action against an employee who had

15

never filed a Title VII complaint, but for whom everything else was the same, that is the very definition of retaliation. *See Lockard v. Fid. Info. Servs., Inc.*, 722 F. Supp. 2d 994, 1006 (N.D. Ill. 2010) (citing Federal Civil Jury Instructions of the Seventh Circuit § 3.02).

The Final Order of Judgment was not explicit on this issue, but a party need not act willfully to violate an injunction; it is enough to have "failed to take steps to reasonabl[y] and diligently comply with the [o]rder." *Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008); *see FTC v. Trudeau*, 579 F.3d 754, 763 (7th Cir. 2009) (citing *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1038 (7th Cir. 1995) ("The district court does not, however, ordinarily have to find that the violation was willful and may find a party in civil contempt if that party has not been reasonably diligent and energetic in attempting to accomplish what was ordered.") (internal quotation marks omitted)). CPD was on notice of its obligation to treat plaintiff like any other employee with the years of service she would have had if she had never been discriminatorily discharged; CPD was on notice that this obligation extended to plaintiff's pension benefits; and as of the summer of 2021, when plaintiff began inquiring about her pension benefits, it was on notice that she might not be receiving the service credit to which she was entitled—but CPD did nothing, and it explicitly took the position that it was required to do nothing, rather than seek clarification or modification from this Court. Under the circumstances, this was not reasonably diligent and energetic effort to comply with the Final Order of Judgment.

To the extent it was still unclear in the summer of 2021 what amount of contributions the pension fund required from CPD to credit plaintiff with the proper years of service, it is no longer unclear. Mr. Hernandez calculated the amounts and testified to them at the show-cause hearing. He was specifically asked if, "in order for Ms. Vega to receive the credit for the gap period, both

the employer and employee contributions need to reach the pension fund" in the amounts he had calculated, and he answered, "correct." (Tr. at 43:7-10.)

Defendant purports to object to Mr. Hernandez's competence to testify to these matters, claiming that they are outside his personal knowledge, but the Court fails to see any valid basis for the objection. Mr. Hernandez is a pension fund employee and he testified about matters within the scope of his employment, including calculations that he testified to having personally made. Defendant objects to plaintiff's purporting to call him as a witness under Federal Rule of Civil Procedure 30(b)(6), and the Court agrees with defendant to the extent that its argument is that plaintiff cannot label someone a 30(b)(6) witness to avoid laying a proper foundation for his testimony—but it makes no difference because Mr. Hernandez has the proper foundation; he testified to matters within his personal knowledge and the scope of his employment duties. During cross-examination at the show-cause hearing, defendant questioned Mr. Hernandez about the amounts he had calculated, suggesting that he had recommended awarding far more in employee contributions than the 9% rate he had cited, as applied to the Court's back pay award. But this line of questioning did nothing to undermine his credibility because, as plaintiff correctly pointed out, defendant was comparing "apples and oranges." (Tr. at 54:9.) It is clear from the documentation of the calculations to which Mr. Hernandez testified that the pension contributions were properly calculated based on the rate of pay plaintiff would have earned in the years of the gap period if she had never been discriminatorily discharged, not based on the Court's actual back pay award, a figure that was reduced by plaintiff's mitigation earnings and other similar deductions.

Further, if defendant had any genuine basis for believing that the pension fund functions other than the way Mr. Hernandez testified, defendant could have called its own witness to rebut his testimony. Defendant may be making the same mistake it made in litigating the fees issue in

this case, to the extent it believes that, because plaintiff has the primary burden of proof, defendant can prevail by doing nothing other than throwing dust in the air and pounding on the table. But, as the Seventh Circuit's decision on plaintiff's attorneys' fee award demonstrated, *see Vega v. Chi. Park Dist.*, 12 F.4th 696, 703 (7th Cir. 2021), that can be a dangerous strategy. In this contempt proceeding, once plaintiff stated a case of noncompliance and proved her allegations, defendant had to show cause why it should not be held in contempt. Only one party—plaintiff—has presented any evidence on the issue at hand, and that evidence—Mr. Hernandez's testimony—strikes the Court as credible. Defendant had an opportunity to show cause why it should not be held in contempt, but it did not take it.

Defendant concluded its closing argument at the show-cause hearing by arguing, "this hearing was nothing more than a way to finally call the pension board and get some information instead of what [plaintiff] forgot to do five years ago before discovery closed." (Tr. at 53:17-20.) The Court reiterates that it has some sympathy for defendant in this regard; plaintiff should have ironed this issue out years ago, prior to final judgment. But to the extent defendant is arguing, as it occasionally seems to, that discovery is inappropriate at this stage, defendant is incorrect. The due process rights of "both the alleged contemnor and the complainant" require a district court to "resolve relevant factual disputes—allowing discovery and holding an evidentiary hearing if necessary—in a civil contempt proceeding." *Tranzact Techs., Inc. v. 1Source Worldsite*, 406 F.3d 851, 855 (7th Cir. 2005). The fact that plaintiff should have done some of this legwork five years ago does not relieve this Court of its obligation to do the fact-finding—including hearing new evidence—necessary to determine whether defendant has complied with the judgment the Court issued.

Defendant also argues that the pension fund is a separate entity, and CPD cannot be held responsible for what the pension fund does or does not do. But what the evidence now placed before the Court shows is that it is defendant, not the pension fund, that has thrown up the roadblock here. All defendant has to do to ensure that plaintiff receives the pension benefits she would have today if she had never been discriminatorily discharged is pay the pension fund certain contributions it would have made on plaintiff's behalf. Defendant has not presented, and the Court does not see, any non-discriminatory and non-retaliatory reason for its refusal to do that.

For all these reasons, the Court concludes that plaintiff has shown that defendant violated the Final Order of Judgment by refusing to make contributions to the pension fund on plaintiff's behalf, and defendant has not shown why it should not be held in contempt for refusing to make any such contributions.

## II.    Expungement

Plaintiff requests the Court to order CPD to expunge all records of her discriminatory discipline and discharge, including the payroll records that Mr. Alas accessed showing that she was not employed during the gap period.

Defendant opposes this relief, arguing that federal and state laws prevent it from altering payroll records, and in any case, CPD has substantially complied with the Final Order of Judgment as to the expungement remedy.

The Court agrees with defendant that it is in substantial compliance with the Final Order of Judgment as to expungement. The expungement remedy set forth in paragraph 2.c. requires the expungement of "all references to the discriminatory investigation into plaintiff Lydia Vega's alleged timesheet fraud and resulting discipline or unlawful termination," and it enumerates several specific examples of references to eliminate, which pertain specifically and fairly narrowly to that

19

investigation and resulting disciplinary proceedings. *See Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 343 F. Supp. 3d 789, 802 (N.D. Ill. 2018) (reasoning, in accord with the maxim *noscitur a sociis* ("a word is known by the company it keeps"), that items "'grouped in a list should be given related meaning'" and courts should "'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words'" (quoting *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990), and *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). True, one of the items enumerating the sort of "references" to be expunged is "any record of the termination and 'Do Not Rehire' notation in Oracle, Plaintiff's personnel records file, and anywhere else it appears" (Final Order of Judgment ¶ 2.c.(e)), and phrases such as "any record of the termination" and "anywhere else it appears" are quite broad. But plaintiff herself argues that the Court must interpret the language of the Final Judgment and Order in its full context, taking account of its purpose. *See Watson v. Potter*, No. 03-C-4023, 2007 WL 6872907, at *5, *7 (N.D. Ill. May 15, 2007), *aff'd,* 260 F. App'x 936 (7th Cir. 2008) (cited in Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 33). The Court's concern in paragraph 2.c. was removing references to plaintiff's discriminatory treatment from any records or systems where they might be found and used as a basis for further discrimination or retaliation—i.e., removing anything that might be perceived as a "black mark on Plaintiff's employment record" or references to prior proceedings that might function as "roadblocks on the remedial path laid out by this Court." *Watson*, 2007 WL 6872907, at *11-12; *see id.* at *5-6. Now that plaintiff's pension issue has been resolved, the Court fails to see how a reference in payroll records to the mere historical fact that plaintiff was not on the payroll during the gap period, without any accompanying reference to plaintiff's disciplinary proceedings or to this case, might function as a "black mark" or "roadblock" to plaintiff's reintegration to employment at CPD. Defendant has removed all overt references to plaintiff's discriminatory

20

discipline and discharge in the records of human resources and any related departments, leaving only this isolated, oblique reference in payroll records to plaintiff's gap in employment, without any indication of the reason for it. The Court accepts that defendant has legitimate, non-discriminatory purposes, whether regulatory, financial, or otherwise, for maintaining the integrity of these payroll records, and it finds and concludes that defendant has substantially complied with the Final Order of Judgment's expungement provisions, the reference to plaintiff's employment gap in payroll records notwithstanding.

## III. Sanctions

At the hearing, plaintiff asked the Court for the following relief as sanctions for defendant's contempt of court: (a) an order directing defendant to transfer to the pension fund the employee and employer contributions, plus interest, necessary to provide plaintiff with pension credit for the gap period, as calculated by the pension fund, with the transfer to be completed by a date certain, (b) an order stating that, if defendant does not comply by the deadline, defendant shall pay a fine of "between $1,000 and $2,000 per day," and certain CPD officers should appear to explain why they did not meet the deadline, (c) an order directing CPD to adjust its payroll records to show that plaintiff was continuously employed, and (d) an order requiring defendant to pay the attorneys' fees and costs of both plaintiff and the pension fund.

The Court finds and concludes, under paragraph 2 of the Final Order of Judgment, that CPD must make contributions to the pension fund on plaintiff's behalf in amounts sufficient to ensure that she receives the credit for the total years of service that she would have earned by now if she had never been discriminatorily discharged. Further, the Court finds, based on the evidence adduced in these proceedings, that those amounts are $44,039.72 in employee contributions and $46,440.98 in employer contributions, a total of $90,480.70. The Court directs defendant to

transfer that amount to the pension fund on or before June 28, 2022. The Court declines to set a fine for failure to comply with that deadline at this time.

The Court denies plaintiff's request for an order directing CPD to adjust its payroll records because, as the Court has explained above, it considers defendant to have substantially complied with the expungement provisions of the Final Order of Judgment. The Court also denies plaintiff's request for fees and costs. As the Court has explained above, it considers plaintiff partially at fault for not adducing prior to final judgment the evidence it has adduced in these contempt proceedings, so it does not consider an award of fees and costs for these contempt proceedings to be a fair sanction for defendant's violation, which was based on a non-frivolous (if ultimately mistaken) interpretation of the Final Order of Judgment.[1] However, if defendant does not make the payment of $90,480.70 by the June 28, 2022 deadline, the Court may revisit plaintiff's request for fees and costs.

The Court sets a status hearing for June 30, 2022, and directs the parties to file a joint status report on June 28, 2022, to report on payment. If payment is made and the parties consider the issue resolved, they may so indicate in the status report, and the Court will strike the status hearing.

---

[1] The Court does not decide now whether plaintiff is entitled to fees and costs under the fees provision of Title VII, 42 U.S.C. § 2000e-5(k), but if plaintiff believes she is, she may file a fee petition after the June 28, 2022 deadline. However, plaintiff is cautioned that the Court's ruling today may be some indication of what the Court considers a reasonable fee for these contempt proceedings, and it reminds plaintiff that she has already received what this Court and the Seventh Circuit have both acknowledged to be a massive fee award in this case.

## CONCLUSION

Plaintiff's motion to enforce judgment [410] is granted in part. The Court finds and concludes that defendant is in contempt of court for violating paragraph 2 of this Court's April 15, 2019 Final Order of Judgment by refusing to make up missed contributions to the Park Employees' Annuity and Benefit Fund on plaintiff's behalf in order to put her in the same position as any other employee in good standing with the years of service plaintiff would have had had she never been subject to discriminatory discipline and discharge. The Court sanctions defendant in the amount of $90,480.70, which amount defendant is ordered to pay to the Park Employees' Annuity and Benefit Fund on plaintiff's behalf by June 28, 2022. A status hearing is set for June 30, 2022. The parties shall submit a joint status report by June 28, 2022.

SO ORDERED.                                    ENTERED: June 2, 2022

                                               _____
                                               **HON. JORGE ALONSO**
                                               **United States District Judge**